377-07/MEU/LJK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
CENTRAMET TRADING S.A.,

                                                    **07 CIV 6379 (RMB)**

                          Plaintiff,

        -against-

EGYPTIAN AMERICAN STEEL ROLLING
COMPANY,

                          Defendant.

---------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## TO VACATE MARITIME ATTACHMENT

.

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Defendant
                              Egyptian American Steel Rolling Co.
                              80 Pine Street
                              New York, NY 10005
                              (212) 425-1900 / (212) 425-1901 fax

<u>Of Counsel</u>
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

NYDOCS1/288257.3

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................... ii

PRELIMINARY STATEMENT ................................................................1

BACKGROUND FACTS ............................................................................1

The Sale and Purchase Contract
for the Scrap Steel Was Not
Maritime in Nature...............................................................................1

EASROC Was Not a Party to the
Maritime Contract of Charter Party ...................................................2

EASROC is Not Liable for Demurrage...............................................3

CENTRAMET's Attachment Action at
New York ...........................................................................................5

Post-Litigation Irregularities .............................................................5

ARGUMENT

POINT I

THIS COURT SHOULD CONSIDER DISMISSAL
OF THIS ENTIRE ACTION FOR LACK OF
SUBJECT MATTER JURISDICTION .................................................7

POINT II

ADMIRALTY JURISDICTION IS LACKING AND
THEREFORE THIS COURT MUST VACATE
THE ATTACHMENT ..........................................................................9

POINT III

CENTRAMET'S ENTIRE APPLICATION IS
FRIVOLOUS AND THE ATTACHMENT SHOULD
BE VACATED....................................................................................13

CONCLUSION.........................................................................................18

APPENDIX ..............................................................................................19

# TABLE OF AUTHORITIES

**Cases**

Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434 (2d Cir. 2006)........... 5

Aston Agro-Industrial AG v. Star Grain Ltd., 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y.

    Dec. 20, 2006)................................................................................................ 11

Cabassa v. Gummerson, 2006 U.S. Dist. LEXIS 41098 (N.D.N.Y. Mar. 30, 2006)........ 17

Dundas Shipping Ltd. v. Centramet Trading S.A., 06 CIV 14223 (RCC) ........................ 7

French Republic v. Fahey, 278 F. 947 (D.MD. 1922) ..................................................... 11

FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990) ....................................................... 8

Galland v. Margules, 2005 U.S. Dist. LEXIS 17125 (S.D.N.Y. Aug. 17, 2005) aff'd 2006

    U.S. App. LEXIS 19809 (2d Cir. July 6, 2006)........................................................ 7, 8

Intercontinental Contractors, Inc. v. Canadian Maritime Carriers. Ltd., 1986 U.S. Dist.

    LEXIS 25872, *2 (E.D.PA. May 6, 1986)................................................................. 11

J.S. Volga Shipping Co. v. Centramet Trading S.A., 07 CIV 4602 (PKC) ........................ 7

Kossick v. United Fruit Co., 365 U.S. 731 (1961).......................................................... 10

Maersk, Inc. v. Neewra, Inc., 2006 U.S. Dist. LEXIS 73096 (S.D.N.Y. Oct. 6, 2006) ..... 7

Manway Constr. Co., Inc. v. Hous. Auth. of the City of Hartford, 711 F.2d 501 (2d Cir.

    1983) ............................................................................................................................ 8

Maritima Petroleo e Engenharia Ltda v. Ocean Rig 1 AS, 78 F.Supp.2d 162 (S.D.N.Y.

    1999) ............................................................................................................................ 9

Metal Transport & Logistics, Ltd. v. Centramet Trading S.A., 07 CIV 5726 (PKC)......... 7

Nautilis Denizcilik San ve Tic. Ltd. Sti v. Centramet Trading S.A., 07 CIV 732 (RJH)... 7

Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574 (1999) .................................................... 8

Sea Transport Contractors, Ltd. v. Industries Chemique du Senegal, 411 F.Supp.2d 386

    (S.D.N.Y. 2006) ............................................................................................................ 10

Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co. Pvt. Ltd., 06 CIV

    4711 (GEL) (S.D.N.Y. Oct. 5, 2006) ........................................................................... 11

Shipping Financial Serv. Corp. v. Drakos, 140 F.3d 129 (2d Cir. 1998) ......................... 10

Winter Storm Shipping, Inc. v. TPI, 310 F.3d 263 (2d Cir. 2002) ..................................... 5

Woodcraft Works, Ltd. v. United States, 139 Ct. Cl. 149 (July 12, 1957).................12

## Other Authorities

2 T. Schoenbaum, Admiralty and Maritime Law, §21-2 at 471 (2d ed. 1999)................. 11

1 T. Schoenbaum, Admiralty and Maritime Law, §3010 at 111 (2d ed. 1999)................ 12

1 Benedict on Admiralty §182 (2005) ....................................................................... 12, 13

## PRELIMINARY STATEMENT

Defendant EGYPTIAN AMERICAN STEEL ROLLING CO. ("EASROC"),
through its attorneys Freehill Hogan & Mahar, LLP, submits this memorandum of law in
support of its motion pursuant to Rule E(4)(f) to vacate the maritime attachment obtained
by Plaintiff Centramet Trading S.A., or, in the alternative, to reduce the quantum of that
attachment.

## BACKGROUND FACTS

The background facts to this matter are somewhat complicated.  Based upon the
allegations made in the Verified Complaint, it appears that several of the salient facts are
in dispute.  EASROC submits, though, that based upon the accompanying Declarations of
Eng. Kamal Beshay, Nader Eissa, and Henry C.M. Page and the documentation
submitted as exhibits thereto, the following reflects the true background to the instant
dispute.

1.   **The Sale and Purchase Contract for the Scrap Steel**
     **Was Not Maritime in Nature**

EASROC entered into a contract to purchase 20,000 metric tons of scrap steel
from non-party seller GST Commodities Trading Company ("GST").   The steel
originated at Russia and was to be delivered to EASROC at Egypt.  There are at least
three different versions of the sale and purchase contract between seller GST and buyer
EASROC, and it is unclear at present which version of the contract (if any) was deemed
by GST and EASROC as the final version.  Beshay Declaration ¶3-5.

The main differences in the terms of the various GST-EASROC sale and purchase
contracts involve the arbitration clause, and are thus not germane to the issues presently
before the Court.  The following terms are consistent from version to version:

- The steel was sold on CIF FO (cost, insurance, freight, free out) terms

- No maritime obligations whatsoever were placed on EASROC

- The only maritime obligation placed on GST was to arrange for transportation to carry the steel from Russia to Egypt

- EASROC was required to pay "demurrage"[1] to GST as a price term under the contract, but the quantum was left blank in the contract, to be agreed later once a vessel was nominated

- The contract provides for a "discharge rate" which is used to calculate how much free time exists before demurrage is incurred. The quantity of cargo is divided by the discharge rate resulting in the amount of free time.

Beshay Declaration ¶3-5, 8.

## 2.    EASROC Was Not a Party to the Maritime Contract of Charter Party

GST, for its part, appears to have contracted with Plaintiff CENTRAMET TRADING S.A. ("CENTRAMET"), a company closely related to GST (both companies have the same principal officer:  *see* Issa Declaration ¶7; Beshay Declaration ¶14). EASROC has never been provided with a copy of the GST-CENTRAMET contract (assuming, of course, that there is one), but it appears that GST purchased the majority of the scrap steel from CENTRAMET[2] and required CENTRAMET to provide the transportation of the steel from Russia to Egypt.  According to the Verified Complaint, CENTRAMET voyage chartered the vessel, M/V MERVE A, from non-party Nautilus Denizcilik San ve Tic Ltd. Sti, specifically to carry the scrap steel to Egypt.

---

[1] Demurrage is a form of contractual damages which is meant to compensate a vessel owner for the use of the ship beyond the period contractually permitted for discharge. The permitted discharge period, known as "free time", is calculated by dividing the quantity of cargo by the agreed discharge rate.

[2] Two of the three bills of lading show CENTRAMET as the shipper.  For GST to have been in a position to sell the scrap steel to EASROC, GST must have purchased the steel from CENTRAMET.

Initially, a different vessel had been nominated to carry the steel from Russia to Egypt, and the parties attempted to negotiate a discharge rate and a demurrage rate. GST offered a demurrage rate of $5,000 per day pro rata and a discharge rate of 1000 metric tons per weather working day. Beshay Declaration ¶9. This offer was rejected, and Mr. Beshay, for and on behalf of Defendant EASROC,[3] responded to CENTRAMET, counter-offering a discharge rate of 750 MT per weather working day on FSHEX EIU (Fridays, Saturdays[4] and holidays excluded even if used) terms, and a demurrage rate of $1500. The initially nominated vessel's availability to perform under the charter was lost, though, and another vessel, the M/V MERVE A, was proffered instead. For the MERVE A, EASROC offered a discharge rate of 1000 metric tons per weather working day, FSHEX EIU, and demurrage at a rate of $1500. The demurrage rate was rejected by CENTRAMET, which made no counter-offer. Beshay Declaration ¶9.

Thereafter, the cargo of approximately 9,274 metric tons of scrap steel was loaded aboard the vessel, and the master on behalf of CENTRAMET signed bills of lading indicating the cargo was loaded "CLEAN ON BOARD". Beshay Declaration ¶10.

## 3.  EASROC is Not Liable for Demurrage

Before the vessel arrived at Egypt, GST wrote to CENTRAMET, advising that the cargo could be delivered even in the absence of original bills of lading (which act in this regard as a receipt for the cargo), if a bank guarantee was provided to serve as security

---

[3] Mr. Beshay signed the communication on behalf of "Beshay Steel", which is a trade name for EASROC and is not a separate entity. References to Beshay Steel are in fact references to Defendant EASROC.

[4] In Egypt, the official secular weekend is Thursday-Friday, but in keeping with the Muslim Sabbath, a large number of businesses nonetheless treat the weekend as Friday-Saturday.

pending delivery of the original bills. An appropriate bank guarantee was provided to, and was accepted by, GST and CENTRAMET. Beshay Declaration ¶12.

The vessel arrived at Egypt on August 7, 2006 and gave Notice of Readiness (to discharge the cargo) on August 8, 2006. Discharge commenced on August 8, 2006 and continued to August 9, 2006, during which time some of the cargo was offloaded. Thereafter, the master of the vessel, on behalf of CENTRAMET, wrongfully halted discharge on the purported basis that the original bills of lading had not been delivered. Issa Declaration ¶6. During this period of blatantly wrongful delay by CENTRAMET, the cargo was surveyed and was found to be substantially off-specification in violation of the terms of the sale and purchase agreement for the scrap steel. Beshay Declaration ¶13. In particular, the cargo was found to contain non-compliant dimensions and to be mixed with substantial quantities of slag and impurities (rocks, concrete, rubber, bales, etc.) among other defects. Issa Declaration ¶4. EASROC promptly wrote to GST, rejecting the cargo as off-specification. Beshay Declaration ¶13.

GST's principal, Petr Terebov (who is also a principal of CENTRAMET) inspected the cargo at Egypt. GST agreed that the steel was off-specification and EASROC agreed to accept that particular delivery of off-specification scrap steel, and GST agreed to a substantial discount on the price and to cancel the rest of the contract. GST also confirmed that all demurrage and related costs were for its own account. GST confirmed in writing that this was "a final settlement and solution." Issa Declaration ¶5, 7; Beshay Declaration ¶14, 15. Based on this agreement, discharge continued thereafter and was completed on September 30, 2006. The additional time it took to complete discharge was due in whole or in large part to the off-specification nature of the cargo

and not due to any failure by EASROC to make appropriate discharge arrangements. Beshay Declaration ¶17.

### 4.    CENTRAMET's Attachment Action at New York

On or about July 12, 2007, CENTRAMET brought an action against EASROC in this Court, seeking a maritime attachment pursuant to Rule B in order to restrain the sum of $466,229.01[5] as purported security in favor of a potential arbitration award which CENTRAMET represented had been commenced (or would soon be commenced) in London, England.[6]   CENTRAMET's application was granted and CENTRAMET has restrained the full amount of security it sought in the form of electronic funds transfers in which EASROC has an attachable interest within the meaning of the holdings of Winter Storm Shipping, Inc. v. TPI, 310 F.3d 263 (2d Cir. 2002) and Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434 (2d Cir. 2006).

As will be seen below, however, CENTRAMET's application is fatally flawed and the attachment should be vacated in its entirety.   In the alternative, the attachment should be reduced in quantum as CENTRAMET's claim is grossly over-inflated.

### 5.    Post-Litigation Irregularities

The allegation made in the Verified Complaint that demand had been made of EASROC for sums purportedly due under the voyage charter and sales contract is

---

[5] Of this sum, $276,229.75 purportedly represents outstanding demurrage for a period of 53 days, which is the entire length of time the vessel was in Egypt. CENTRAMET has thus, among other defects, failed in its Verified Complaint to provide a credit at least for the 9.274 days of free time and the 16 Fridays and Saturdays during the entire port call when demurrage would not accrue on the FSHEX EIU terms.   CENTRAMET has recently demanded arbitration of EASROC and has added to its arbitration demand loadport demurrage which it incurred, for which EASROC is in no way responsible, since the cargo was to be delivered "Free On Board".

[6] In this action, CENTRAMET seeks security only and not a resolution of the dispute on the merits.

entirely false.  EASROC received no such demand prior to the institution of this suit. Indeed, despite the fact that CENTRAMET's claim is about a year old, CENTRAMET did not even demand arbitration until August 30, 2007.  Beshay Declaration ¶19.

After suit had been filed, EASROC demanded documentation that supported CENTRAMET's claim.  To EASROC's surprise, CENTRAMET forwarded documents that had obviously been forged and which did not contain the agreements of the parties. One such forged document was a purported "amendment" to the sale and purchase contract which purported to add a requirement that EASROC accept a later shipment of scrap steel, in October 2006.  EASROC never received such a document and the "signature" of EASROC to this document is a forgery, cut and pasted from another document.  The document is purportedly dated September 1, 2006, just two weeks after the settlement agreement reached with GST that the remainder of the contract to deliver scrap steel was terminated.  Beshay Declaration ¶21.

Another forged document received from CENTRAMET is a purported agreement to pay $7000 per day in demurrage.  This supposed agreement, which appears handwritten on a fax communication, is also a forgery and was not signed by EASROC (or by Beshay Steel).  Indeed, EASROC has neither the fax nor the handwritten response anywhere in its files.  Neither document is true.  Issa Declaration ¶3; Beshay Declaration ¶21.

CENTRAMET has also forwarded a document from ASLI Shipping (which was not the entity that chartered the vessel to CENTRAMET – the exact relationship between ASLI and Nautilus is not known to EASROC), which invoices CENTRAMET for 48.42 days of demurrage at $7000 per day.  Whatever agreement CENTRAMET may have had

with ASLI is not known to EASROC, and is certainly not EASROC's responsibility. EASROC never agreed to any such terms. It is worth noting, though, that the vessel was at Egypt for a total of less than 55 days, so even subtracting out the free time of approximately 9.3 days and all of the Fridays and Saturdays in that period, the number of days of demurrage on the ASLI invoice to CENTRAMET is exaggerated.[7] CENTRAMET, for its part, appears to have a history of not paying demurrage that it owes: since December 2006, there have been four suits in this Court against CENTRAMET seeking to secure funds CENTRAMET owed for unpaid demurrage.[8]

## ARGUMENT

### Point I

### THIS COURT SHOULD CONSIDER DISMISSAL OF THIS ENTIRE ACTION FOR LACK OF SUBJECT MATTER JURISDICTION

It is well-established that an application to vacate an attachment pursuant to Rule E(4)(f) is not the proper procedural device by which a defendant may seek dismissal of an action. *See, e.g.*, Maersk, Inc. v. Neewra, Inc., 2006 U.S. Dist. LEXIS 73096 (S.D.N.Y. Oct. 6, 2006). Nonetheless, when it is evident that there is a complete lack of federal subject matter jurisdiction, the Court should dismiss the action *sua sponte*, even in the absence of an application by a defendant pursuant to Rule 12. In Galland v. Margules, 2005 U.S. Dist. LEXIS 17125 (S.D.N.Y. Aug. 17, 2005), *aff'd* 2006 U.S. App.

---

[7] It is plain that if CENTRAMET did not negotiate free time with the vessel owner on back-to-back terms with those obtained by EASROC vis-à-vis GST, then only CENTRAMET can be held liable for any difference. EASROC is not privy to – and has no copy of – the voyage charter party contract.

[8] *See* Dundas Shipping Ltd. v. Centramet Trading S.A., 06 CIV 14223 (RCC); Nautilis Denizcilik San ve Tic. Ltd. Sti v. Centramet Trading S.A., 07 CIV 732 (RJH); J.S. Volga Shipping Co. v. Centramet Trading S.A., 07 CIV 4602 (PKC); Metal Transport & Logistics, Ltd. v. Centramet Trading S.A., 07 CIV 5726 (PKC).

LEXIS 19809 (2d Cir. July 6, 2006), the Court dismissed the plaintiff's action *sua sponte*, even in the absence of an application by the Defendant pursuant to Rule 12 because there was no cognizable federal cause of action under 28 U.S.C. §§1331 or 1332 (the action was plainly not maritime and would not have been within the meaning of Rule 9(h) or 28 U.S.C. §1333). The Second Circuit affirmed the ruling by Judge Chin in <u>Galland</u>, noting that the plaintiff's injuries (if true) were unfortunate, but that the federal courts were an improper place to seek relief.

A party seeking relief in a District Court of the United States must plead facts that bring the suit within the court's subject matter jurisdiction. Rule 8(a)(1). The failure to plead such facts warrants dismissal. Rule 12(h)(3). <u>Ruhrgas AG v. Marathon Oil Co.</u>, 526 U.S. 574, 583 (1999) ("Subject-matter delineations must be policed by the courts on their own initiative...."); <u>FW/PBS, Inc. v. City of Dallas</u>, 493 U.S. 215, 231 (1990) (courts have an "independent obligation to examine" the basis of their jurisdiction); <u>Manway Constr. Co., Inc. v. Hous. Auth. of the City of Hartford</u>, 711 F.2d 501, 503 (2d Cir. 1983) (citing Rule 12(h) when holding that courts may dismiss cases *sua sponte* for lack of subject matter jurisdiction).

Here, Plaintiff CENTRAMET has pled only the existence of admiralty jurisdiction (*see* Verified Complaint, ¶1), which is lacking, as the only contract that binds EASROC is the sale and purchase contract, which is non-maritime.

CENTRAMET, in an attempt to support its claim as maritime in nature, alleges in its Verified Complaint, at ¶10, that it has an assignment of GST's claim against EASROC (to the extent it has one) for demurrage. Such assignment, however, does not – and

8

cannot – result in giving CENTRAMET maritime jurisdiction over this dispute. *See* Page Declaration ¶6.

CENTRAMET, in another effort to give a "salty flavor" to its Verified Complaint, also alleges at ¶6, that the bills of lading for the cargo incorporated the terms of the voyage charter. The question of whether the bills of lading incorporate the terms of the charter is not relevant, though, because no action under English law (which governs the contract) can exist under the bills of lading. Page Declaration, ¶7-9.[9]

If the Court finds that federal subject matter jurisdiction is lacking, the Court need go no further: the action should be dismissed with prejudice and the restrained funds should accordingly be released.

**Point II**

**ADMIRALTY JURISDICTION IS LACKING
AND THEREFORE THIS COURT MUST
VACATE THE ATTACHMENT**

It is black-letter law that a maritime attachment pursuant to Rule B may not be maintained in the absence of maritime jurisdiction over the plaintiff's claim. Rule A provides that the Supplemental Rules (which include Rule B) apply only to "the procedure in admiralty and maritime claims within the meaning of Rule 9(h)". Rule A(1). *See also* Maritima Petroleo e Engenharia Ltda v. Ocean Rig 1 AS, 78 F.Supp.2d 162, 166 (S.D.N.Y. 1999), *citing* 2 Thomas J. Schoenbaum, Admiralty and Maritime Law, §21-2 at 471 (2d ed. 1999) (a Rule B maritime attachment can be invoked only

---

[9] Indeed, CENTRAMET's English solicitors have essentially disclaimed this argument put forward by its New York counsel by way of a letter written to EASROC's English solicitors. *See* Page Declaration, ¶4, Moreover, the arbitration demand sets forth specifically that the claim is made solely by reason of the assignment of GST's claim and is not at all based on any supposed incorporation of the charter party into the bills of lading.

when a plaintiff files a verified complaint sufficient to make a *prima facie* showing that the plaintiff has a valid maritime claim against the defendant in the amount sued for). *"The absence of maritime jurisdiction would prove fatal to [a] plaintiff's attachment."* Id. (emphasis supplied).

The plaintiff bears the burden of establishing that the federal court has subject matter jurisdiction over its claim. The subject matter jurisdiction of the court must be affirmatively proven and the Court may not infer subject matter jurisdiction. Shipping Financial Serv. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998) (holding that "when the question to be considered is one involving the jurisdiction of a federal court, jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it").

Admiralty jurisdiction does not extend to contracts in which the maritime aspects are incidental to the purpose of the contract. While the courts have generally found the outer limits of the boundaries of admiralty jurisdiction difficult to draw, "[t]he United States Supreme Court has held that the 'true criterion' and 'crucial consideration' for determining admiralty jurisdiction is the 'nature and subject matter of the contract at issue.'" Sea Transport Contractors, Ltd. v. Industries Chemique du Senegal, 411 F.Supp.2d 386, 393 (S.D.N.Y. 2006); *see also* Kossick v. United Fruit Co., 365 U.S. 731 (1961). In determining the "nature and subject matter of the contract at issue", the contract should only be identified as a maritime contract if it "directly and intimately related to the operation of a vessel and navigation; it is not enough that the contract relate in some preliminary (shore side) manner to maritime affairs." 1 Thomas J. Schoenbaum, Admiralty and Maritime Law, §3010 at 111.

Importantly, admiralty jurisdiction does not attach to a contract merely because the services to be performed under the contract have reference to a ship, or to its business, or that the ship is the object of such services.   Intercontinental Contractors, Inc. v. Canadian Maritime Carriers. Ltd., 1986 U.S. Dist. LEXIS 25872, *2 (E.D.PA. May 6, 1986), *referencing* 1 Benedict on Admiralty §182 (2005). "In order to be considered maritime, there must be a ***direct and substantial link*** between the contract and the operation of the ship, its navigation, or its management afloat, taking into account the needs of the shipping industry, for the very basis of the constitutional grant of admiralty jurisdiction was to ensure a national uniformity of approach to world shipping."   1 Benedict on Admiralty §182 (2005) (emphasis supplied).

Here, the subject matter of the only contract to which Defendant EASROC is a party is the sale and purchase contract of a quantity of scrap steel.  Neither scrap steel nor the purchase thereof is directly or intimately related to the operation of a vessel or its navigation.  It has been widely held that a commodity sale and purchase contract, such as the one entered into by EASROC, even if the contract requires maritime transport and contains a demurrage clause relating to the shipment of the commodity, is not maritime. French Republic v. Fahey, 278 F. 947, 949 (D.MD. 1922) (indicating that a non-maritime contract of sale and purchase does not become maritime merely because one of the parties may be entitled to recover demurrage damages); Aston Agro-Industrial AG v. Star Grain Ltd., 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. Dec. 20, 2006) (holding that a sale and purchase contract is not maritime merely because it contains maritime terms, such as a requirement to pay demurrage, and does not give rise to maritime jurisdiction, even if the sole claim relates to the non-payment of demurrage). *See also* Shanghai Sinom

Import and Export v. Exfin (India) Mineral Ore Co. Pvt. Ltd., 06 CIV 4711 (GEL) (S.D.N.Y. Oct. 5, 2006) (unpublished; copy of transcript attached) (holding that the breach of a provision of a sale and purchase contract does not give rise to maritime jurisdiction, vacating attachment).

The relevant underlying contract in this action is the sale and purchase contract, because that is the only contract to which Defendant EASROC is a party. That contract is not maritime in nature, and any alleged breach of that contract – even with respect to the payment of demurrage – does not give rise to maritime jurisdiction.[10] EASROC's liability to pay demurrage to GST (assuming, *arguendo*, one still exists – see below) is only incidental to the sale and purchase contract as a whole. *See* Woodcraft Works, Ltd. v. United States, 139 Ct. Cl. 149 (July 12, 1957) (holding that a sale and purchase contract for lumber which required the payment of demurrage was not a maritime contract and did not give rise to maritime jurisdiction, even though the only claim was for the payment of demurrage).

That there was a delivery term in the subject sale and purchase contract that involved anticipated ocean transport is irrelevant, as this term (which provided only for the purchase price to include "cost insurance and freight" (CIF), and required the payment of demurrage as part of the price term) was not a "direct and substantial link"

---

[10] It does not even appear that CENTRAMET's contract with GST (assuming there was one) was maritime, as that contract likely would only have involved the sale of the scrap steel by CENTRAMET to GST on terms that required CENTRAMET to arrange for the ocean carriage of the cargo. Even to the extent, though, that CENTRAMET might have a maritime claim against GST, GST did not have a maritime contract or even a maritime claim against EASROC. Accordingly, the purported assignment of GST's claim for demurrage up to CENTRAMET, to the extent it was effective (which is denied) was the assignment of a non-maritime claim that cannot give rise to maritime jurisdiction with respect to EASROC.

between the contract and the operation of a vessel. To hold otherwise would be to significantly enlarge the Court's maritime jurisdiction by allowing all sale and purchase contracts which contain delivery terms to be subsumed within the Court's admiralty jurisdiction.

Given the absence of maritime jurisdiction, the attachment must be vacated.

### Point III

### CENTRAMET'S ENTIRE APPLICATION IS FRIVOLOUS AND THE ATTACHMENT SHOULD BE VACATED

CENTRAMET's entire application before this Court is frivolous and should be rejected. It has been demonstrated above that CENTRAMET lacks admiralty subject matter jurisdiction because it has no maritime claim, and CENTRAMET obtained no maritime claim through the purported assignment of GST's "claim" against EASROC, because GST (to the extent it has a claim at all, which is denied) had no maritime claim of its own to assign to CENTRAMET. The Verified Complaint, though, is riddled with other fatal flaws.

The purported "assignment" described at ¶10 of the Verified Complaint is a nullity, and CENTRAMET is aware that there was no claim to assign.[11] GST and EASROC entered into what was termed by GST to be a "final settlement and solution" with respect to all disputes concerning the cargo on August 16, 2006, several months before the April 28, 2007 "assignment". That final settlement between GST and EASROC included the agreement that all demurrage charges were for GST's account and were not the responsibility of EASROC. CENTRAMET was effectively on notice of this

---

[11] Indeed, the Verified Complaint at ¶10 foreshadows as much by providing, "GST has also assigned its claim for demurrage, *to the extent it has one*, to Plaintiff..." (emphasis supplied).

agreement between GST and EASROC because the principal officer of both GST and CENTRAMET (Petr Terebov) was the one who entered into the settlement agreement between GST and EASROC.

Paragraph 13 of the Verified Complaint is also blatantly untrue. This paragraph alleges that significant demurrage accrued because EASROC failed to produce an original bill of lading when the vessel arrived at Egypt and that as a result the cargo could not immediately be discharged. As set forth in the Facts, above, CENTRAMET was in possession of both a communication from GST that authorized discharge of the cargo without presentation of any original bills of lading and a bank guarantee to secure these instructions from GST well in advance of the vessel's arrival at Egypt. Moreover, as soon as the vessel arrived, discharge operations did commence. It was only after a portion of the cargo had already been discharged that the master wrongfully halted discharge on this purported basis. CENTRAMET has no good faith basis for making such an allegation in its Verified Complaint.

Paragraph 14 of the Verified Complaint is also false. As CENTRAMET and GST are well aware, the physical operation of discharging the cargo was delayed not by any failure on the part of EASROC to properly arrange discharge, but was instead due entirely to the non-compliant nature of the cargo: the dimensions of the scrap steel were not in compliance with the sale and purchase agreement, and the cargo was loaded down with all manner of impurities – rocks, rubber, bales, and other items. The principal officer of both GST and CENTRAMET (Petr Terebov) personally came to Egypt to inspect the cargo and agreed that it was not in compliance with the sale and purchase contract and agreed that all time in the port was to be for GST's account.

While it would not be surprising that the vessel owner might be charging the vessel charterer, CENTRAMET, for demurrage, that demurrage is not the responsibility of EASROC based on the agreement of GST to accept all such charges for its own account as part of the settlement for EASROC accepting the substantially out-of-compliance cargo.

The amount of damages claimed by CENTRAMET is also grossly and irresponsibly exaggerated. First, CENTRAMET alleges that 53 days of demurrage were incurred. This is obviously wrong. The vessel spent a total of approximately 55 days in Egypt,[12] arriving on August 7 but giving notice of readiness to discharge the cargo only on August 8, 2006 (leaving 54 days). Free time of 9.3 days must be subtracted from the vessel's stay, yielding 44.7 days remaining under discussion. The Court may take judicial notice of the fact that in 2006, there were 8 Fridays, 8 Saturdays, and no holidays celebrated in Egypt between August 7 when the vessel arrived and September 30 when discharge was completed. These 16 days must be subtracted based on the stipulated FSHEX EIU term, leaving no more than 28.7 days under discussion. This number should be reduced by 8.2 days during which the Master wrongfully halted discharge operations and negotiations commenced to convince EASROC to accept the off-specification goods, leaving 21.5 days. From this must be subtracted the time spent in correcting the banking documentation to allow for payment of the goods under the letter of credit, because the goods were no longer being sold pursuant to the negotiation of a clean on board bill of

---

[12] We note from CENTRAMET's demand for arbitration that it appears that CENTRAMET is attempting to charge EASROC with loadport demurrage as well. Such a claim is plainly in bad faith, as the cargo was to be delivered on "FO" (free onboard) terms. Moreover, the contractual terms discuss discharge rates to establish free time at the discharge port in Egypt, but are silent as to loading rates, which would establish free time at the load port in Russia. Thus, CENTRAMET's contention cannot be correct.

lading, as required by the letter of credit terms. This additional time is attributable solely to the failure by the sellers of the cargo to deliver on-specification goods, and GST assumed full responsibility for this time in writing. This time amounted to 13.3 days, resulting in only 8.2 days remaining for any possible claim for demurrage (which claim is denied).

Next, the amount of demurrage on a per-day basis is also incorrect. GST agreed that all demurrage was to be for its own account as a result of the non-compliant nature of the cargo delivered. Even if this agreement were to be discounted, though, at no time did EASROC ever agree to pay demurrage at a rate any greater than $1,000 per day.[13] Accordingly, to the extent any demurrage is owed (which is denied), the maximum is no more than $8,200.[14]

In no way is EASROC responsible for "a further $18,323.00 in charges related to the excessive period spent at Alexandria, Egypt, during discharge operations" as alleged in ¶16 of the Verified Complaint. The sale and purchase contract between EASROC and GST was plainly on CIF FO terms. Such additional charges (to the extent there were any such charges, which is denied), therefore were not for EASROC's account under the terms of its contract. From the "Deed of Assignment" from GST to CENTRAMET, this claim was not assigned to CENTRAMET in any event. CENTRAMET simply has no basis whatsoever for asserting a claim for any such charges against EASROC.

Paragraph 17 alleges that CENTRAMET demanded that the damages claimed be paid by EASROC. This allegation is categorically denied – before the institution of this

---

[13] The document supplied by CENTRAMET that purports to be an acceptance of a $7,000 per day rate is a forgery. *See above.*
[14] Even if CENTRAMET's fictitious figure of $7,000 per day was accepted, the amount of demurrage over this period would be no more than $57,400.

suit, CENTRAMET made no demands of EASROC for the payment of anything, much less the false and grossly exaggerated damages set forth in the Verified Complaint.

The filing of a Verified Complaint signed by counsel under the sanction of Rule 11, particularly in a situation where, as here, the Verified Complaint is utilized to obtain *ex parte* relief restraining the property of the defendant, acts as an affidavit made by the attorney. Cabassa, Cabassa v. Gummerson, 2006 U.S. Dist. LEXIS 41098, *6 (N.D.N.Y. Mar. 30, 2006). When a party has submitted a false affidavit containing claims that are knowingly false or where the attorney executing the verification could have discovered the falsity of such claims by an investigation of the background facts, the Court, in its discretion, is free to deny the requested relief on this ground alone. Id. It is submitted that given this veritable laundry list of knowingly false allegations made in the Verified Complaint, the Court would be well within the bounds of its discretion to vacate the attachment in this matter on this basis alone, even if the Court does find, *arguendo*, that it has subject matter jurisdiction in the first place.

## CONCLUSION

For all the foregoing reasons, the attachment should be vacated and this Court

should grant defendant EASROC such other, further and different relief, including but

not limited to dismissal of the action and/or sanctions of attorneys fees and costs, as this

Court may deem just and proper in the premises.

Dated: New York, New York
         September 5 , 2007

                              Respectfully submitted,

                              FREEHILL HOGAN & MAHAR, LLP
                              Attorneys for Defendant
                              Egyptian American Steel Rolling Company

         By:     _____
                              Michael E. Unger (MU 0045)
                              Lawrence J. Kahn (LK 5215)
                              80 Pine Street
                              New York, NY  10005
                              (212) 425-1900 / (212) 425-1901 fax

# APPENDIX

Transcript of Oral Argument.txt

1

```
    6A57SHAM
 1  UNITED STATES DISTRICT COURT
 1  SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x
 2
 3  SHANGHAI SINOM IMPORT AND EXPORT,
 3
 4                  Plaintiff,
 4
 5          v.                              06 Civ. 4711
 5
 6  EXFIN (INDIA) MINERAL ORE CO.,
 6  PVT. LTD.,
 7
 7                  Defendant.
 8
 8  ------------------------------x
 9
 9                                  October 5, 2006
10                                  4:30 p.m.
10
11  Before:
11
12                      HON. GERARD E. LYNCH
12
13                                      District Judge
13
14                      APPEARANCES
14
15  TISDALE & LENNON, LLC
15       Attorneys for Plaintiff
16  BY:  LAUREN COZZOLINO DAVIES
16       CHARLES E. MURPHY
17
17  DeORCHIS WIENER & PARTNERS, LLP
18       Attorneys for Defendant
18  BY:  JOHN ORZEL
19       SUBIR MAJUMDAR
20
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

2

⌷

```
    6A57SHAM
 1          (Case called)
 2          (In open court)
 3          MS. DAVIES:  Good afternoon.  Lauren Davies for the
 4  plaintiff.  And this is Charles Murphy of our office.
 5          THE COURT:  Good afternoon.
 6          MR. ORZEL:  Good afternoon, your Honor.  John Orzel
 7  from DeOrchis Wiener & Partners, for the defendant.  With me is
 8  Mr. Subir Majumdar, who is Indian counsel for us.
 9          THE COURT:  OK.  Welcome Mr. Majumdar, and good
10  afternoon, Mr. Orzel.
11          All right.  We are here on the defendant's application
12  to vacate an order of maritime attachment.  The essential
13  argument of the defendant is that this is not a maritime
```

Page 1

Transcript of Oral Argument.txt

14    contract and, therefore, there is no admiralty jurisdiction,
15    and, therefore, the rules permitting the attachment have no
16    application and indeed the case should be dismissed for lack of
17    jurisdiction.
18         Do I have that right, Mr. Orzel?
19         MR. ORZEL:  That is correct, your Honor.
20         THE COURT:  OK.  I have read the parties' submissions,
21    and I have also read a number of the critical precedents that
22    are cited.  Let me see if I understand the facts correctly,
23    Ms. Davies.  This is a contract for the sale of iron ore from a
24    company in India to your client which is a company in China.
25         MS. DAVIES:  That's correct, your Honor.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                3

6A57SHAM
1          THE COURT:  OK.  And the contract, which is in the
2     record, has certain provisions that specifically relate to a
3     requirement that the goods will be shipped by sea.
4          MS. DAVIES:  That is correct.
5          THE COURT:  OK.  Is there actually something that
6     explicitly says "And, by the way, you have to send this by
7     water."  I take it there is no question it would be sent by
8     water.  We are talking about tons of iron ore; it's not going
9     to fly or go by truck or something.
10         MS. DAVIES:  The provisions, specifically ten through
11    13, and several others, relate specifically to the nomination
12    of a vessel.
13         THE COURT:  They all assume.  These provisions assume
14    it's going to be by sea, but I just didn't see something that
15    said that you have to ship by sea.
16         MS. DAVIES:  I would presume that by nominating or
17    requiring the nomination of a vessel it would need to be by
18    water.
19         THE COURT:  Yes.  Whether there is such an explicit
20    provision or not, it's clear that the contract contemplates
21    transportation by sea.
22         And then there are all of these provisions that
23    specifically relate to nominating a particular vessel, things
24    like demurrage and lay time, and different conditions that
25    would apply to such a shipment by sea.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

                                                                4

6A57SHAM
1          Now, I take it the plaintiff does not contend that the
2     defendant breached any of those specific maritime conditions.
3          MS. DAVIES:  Actually, your Honor, we do.  I mean not
4     in terms of specifically breaching, say, clause 10 or clause
5     11, but these clauses taken together are maritime provisions
6     for the delivery of the iron ore from India to China.
7          THE COURT:  But it got to China.  It didn't wash
8     overboard somewhere along the way.
9          MS. DAVIES:  No, it did not.  But we did not receive
10    the entirety of the cargo at the discharge port in China.
11         THE COURT:  Right.  But that's because -- I mean tell
12    me if there is a dispute about this, but I thought it was
13    undisputed that the iron ore got to China, actually got off the
14    ship and then got seized by some other party due to some other
15    litigation.
16         MS. DAVIES:  Yes, that is correct.  There is not a
17    dispute to the seizure.  Just to clarify that a bit, when the
18    vessel arrived at the port in China, the day prior to the
                              Page 2

Transcript of Oral Argument.txt

19  vessel's arrival a nonparty named the Red Horse had effected a
20  maritime attachment against the cargo.
21          THE COURT:  Ah, live by the sword and die by the
22  sword.
23          MS. DAVIES:  Yes.
24          THE COURT:  But the basic breach of contract action is
25  pretty simple:  You bought something, you paid for it, and you
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                      5

6A57SHAM
1  didn't get it, or you didn't get all of it in a timely way as
2  required by the contract.  Right?
3          MS. DAVIES:  I would agree with that, yes.
4          THE COURT:  And whatever the defendant failed to do --
5  which I think essentially is simply that they failed in the
6  basic provision of delivering the goods to you -- they didn't
7  fail to comply with any of those specifically maritime
8  requirements in the contract.
9          MS. DAVIES:  I would respectfully disagree on the same
10  basis, because they did fail to deliver the cargo, and in a --
11          THE COURT:  Well, I hear that, but that would have
12  been true -- I mean suppose, I don't know, somebody else came
13  along and offered them a higher price, and the defendant sold
14  the iron ore that was destined for you to another company in
15  India, and it never got on a boat at all, they just send you a
16  cable saying, sorry, we found a better price, better luck next
17  time, we're not sending anything.  Right?  That would have been
18  a breach of this contract too, right?
19          MS. DAVIES:  Yes, I agree.
20          THE COURT:  And that wouldn't have had anything to do
21  with boats.
22          MS. DAVIES:  I agree, because that would have been
23  before the maritime portion of this contract, meaning the ocean
24  transportation for delivery had been effected.
25          THE COURT:  But the ocean transportation has been
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                      6

6A57SHAM
1  effected, right, successfully.  It gets to Shanghi or wherever
2  it's going.
3          MS. DAVIES:  Yes, it does get there.
4          THE COURT:  OK.  And lastly, this is clearly not a
5  contract between any kind of party and a vessel owner or
6  transporter of goods of any sort.  Right?
7          MS. DAVIES:  Well, what do you mean by a transporter
8  of goods?
9          THE COURT:  Well, am I correct that there -- maybe you
10  don't know from where your client sits -- but the defendant
11  doesn't own any ships, I take it.
12          MS. DAVIES:  That's correct.
13          THE COURT:  And the contract contemplates that they're
14  going to enter a contract with somebody who does own ships in
15  order for that -- in order to charter a boat, to take the cargo
16  to China.
17          MS. DAVIES:  That is true, but what the defendant does
18  do is they act as somebody who would have been a ship owner in
19  a traditional charter party by setting forth the requirements
20  that you see in the contract:  The type of vessel that needs to
21  be demurraged, lay time, all those provisions.
22          THE COURT:  What is the commercial purpose of that?
23  Is this something that matters?  And, if so, to whom?
                            Page 3

Transcript of Oral Argument.txt
24    In other words, is there a reason why the purchaser in
25  a contract of this kind cares about these various maritime
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7

6A57SHAM
1   terms?
2           MS. DAVIES:  My opinion would be that both parties in
3   this instance want to see -- especially the buyer -- want to
4   see the cargo arrive safely and in the condition in which it's
5   supposed to be.  This is iron ore, so the common issues with
6   that would be salt water, rust, corrosion of the vessel.  It
7   could be improperly loaded, improperly stowed.  The vessel
8   could be of an improper type.  So those types of things seem to
9   be what they were contemplating.
10          THE COURT:  Mr. Orzel, maybe you can give me a
11  perspective on this.  Isn't at least some part of this contract
12  one in which your client undertakes a role similar to that of
13  at least some party -- I'm not sure what kind of party -- in a
14  typical maritime transaction?  I'm not sure whether it's a
15  broker or an MVOCC.  Somebody out there is in the business of
16  chartering boats and entering these specifications, and the
17  seller in this contract undertakes that role, don't they?
18          MR. ORZEL:  I don't believe so, your Honor.  At best I
19  think we undertake, or these provisions are prefatory to our
20  entering into a maritime contract.
21          The provision such as the lay time, the dispatch, even
22  the vessel itself, they all have commercial import.  Lay time
23  provisions, because the buyer is the one who would be
24  responsible for paying for lay time.  They want to know what
25  that is beforehand, so that's why that type of provision would
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

6A57SHAM
1   be in the contract.
2           The provision about giving them the right to review
3   the vessel before we enter into the charter party, it's because
4   if the vessel is more than 20 years old, they probably couldn't
5   get cargo insurance for it, and under the contract it's their
6   obligation to provide the cargo insurance.
7           The risk of loss passed when we loaded the vessel.
8           THE COURT:  The risk of loss passed when you loaded
9   the vessel, meaning if -- well, I take it there is some dispute
10  about that, isn't there?
11          MR. ORZEL:  No, it's clause 17, which is very clear.
12  Risk of loss passes when the cargo leaves our discharge chute
13  at the load port.  So if the vessel sank, it's their loss, not
14  ours.
15          THE COURT:  And they would have to go after the --
16          MR. ORZEL:  Ship owner.
17          THE COURT:  -- after the ship for that --
18          MR. ORZEL:  Correct.
19          THE COURT:  -- for that recovery.
20          MR. ORZEL:  So at best this lays the groundwork for us
21  entering into the charter party, which we did.  But in and of
22  itself it's not a contract of carriage.
23          THE COURT:  Yes, and you then did enter into a
24  contract of carriage with somebody.
25          MR. ORZEL:  Correct.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

9

Page 4

Transcript of Oral Argument.txt

6A57SHAM

1  THE COURT:  And you also agree that that contract was
2  successfully completed.
3  MR. ORZEL:  Correct.
4  THE COURT:  And the goods get offloaded, in fact.
5  MR. ORZEL:  That is correct.
6  THE COURT:  All right.  And at that point there is
7  other attachment.
8  MR. ORZEL:  Right.  And just as a point of clarity,
9  it's the plaintiff's responsibility in China to discharge the
10 vessel.
11 THE COURT:  Right, that's provided specifically under
12 the contract.
13 MR. ORZEL:  Correct.
14 THE COURT:  All right.  I think I'm prepared to rule.
15 The defendant moves to vacate an order of maritime attachment,
16 arguing that admiralty jurisdiction does not exist in this case
17 since the underlying contract that's the basis of plaintiff's
18 claims is not a maritime contract.
19        It is undisputed that the contract is primarily a
20 contract for the sale of goods, specifically iron ore, from an
21 Indian company to another in China.
22        The contract, in addition to various provisions
23 typical of such a sales contract, also includes maritime
24 provisions requiring the ore implicitly to be shipped by sea
25 and specifying certain requirements regarding the conditions

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

10

6A57SHAM

1  for such shipment.
2        It is clear, however, that the contract is not a
3  contract for maritime transportation; rather, the contract
4  contemplates that the defendant will enter such a contract with
5  a suitable ship owner.
6        There is no allegation here that defendant breached
7  the specifically maritime aspects of the contract.  It provided
8  for appropriate ship transportation in accordance with the
9  terms of the contract, and, in fact, the shipment of ore was
10 delivered intact to China as the contract required.  However,
11 it was not delivered to the plaintiff purchaser, because the
12 ore was attached as part of an unrelated lawsuit between the
13 defendant and another Chinese company.  For present purposes
14 there is no need to address the nature or merits of that
15 dispute or the merits of plaintiff's claims of breach of
16 contract.
17        Suffice to say, that plaintiff has sued because it did
18 not receive the goods, or all of them, in a timely manner, and
19 it seeks various items of damages for such nondelivery.
20        On this record, both common sense and long-established
21 case law suggests that this is a nonmaritime dispute between a
22 purchaser and seller over the alleged failure to deliver
23 purchased goods.  I note that that dispute has no connection to
24 the United States whatsoever, and there is apparently no basis
25 for in personam jurisdiction over the defendant in this court

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

11

6A57SHAM

1  or for subject matter jurisdiction in the federal courts on any
2  nonadmiralty basis.  This case is only here because of the
3  liberal provisions for attachment and in rem jurisdiction in
4  admiralty cases.

Page 5

Transcript of Oral Argument.txt

```
 5          The Fifth Circuit's decision in Lucky Gold Star v.
 6   Phibro Energy, 958 F.2d 58 (1992), states the long-established
 7   law on this subject, noting that a contract for a land-based
 8   sale of goods is not maritime merely because the seller agrees
 9   to ship the goods by sea to the buyer.  Citing its earlier
10   decision in Loredo Offshore Contractors v. Hunt Oil Company,
11   754 F.2d 1223, 1231-32 (Fifth Circuit 1985), the court noted
12   that "It is fundamental that the mere inclusion of maritime
13   obligations in a mixed contract does not without more bring
14   nonmaritime obligations within the pale of admiralty law."
15          Our Court of Appeals in Phypin Steel Company v. Asoma
16   Corporation, 215 F.3d 273, 277 (2d Cir. 2000), drew a similar
17   distinction, noting that "Admiralty jurisdiction extends only
18   to wholly maritime contracts or severable maritime portions of
19   mixed contracts."
20          Contrary to plaintiff's argument, Phypin does not
21   support its position.  Although the mixed contract there did
22   indeed permit admiralty jurisdiction, that was because the
23   action there arose specifically under the bill of lading, which
24   the court found to be a maritime contract in itself.
25          As the court noted, Phypin's in rem claim "arises
```

6A57SHAM
```
 1   under and is based on their purported entitlement to the bill
 2   of lading" as opposed to the cargo itself.  That is not so in
 3   this case.
 4          The plaintiff argues, however, that these cases have
 5   been superseded by the Supreme Court's more recent decision in
 6   Norfolk Southern Railroad v. Kirby, 543 U.S. 12 (2004).  It's
 7   true that the Supreme Court there rather expanded the notion of
 8   a maritime contract and declined to treat a contract specifying
 9   both land and sea shipment as composed of severable land-based
10   and maritime components, but the contract in Norfolk Southern
11   was dramatically different in nature from the one here.
12          In Norfolk Southern the court found the contract to be
13   maritime in nature because its primary objective was to
14   accomplish the transportation of goods by sea from Australia to
15   the United States.  The contract -- unlike the contract here --
16   was specifically a contract of carriage, and the fact that the
17   last leg of the journey was to have been by rail did not
18   undermine the fact that the principal objective of the contract
19   was maritime commerce.
20          The reasons why the court took the approach that it
21   did to the contract in Norfolk Southern are instructive and are
22   highly distinguishable from any considerations applicable here.
23          As the Supreme Court noted, maritime commerce has
24   evolved along with the nature of transportation.  Given the
25   container revolution, maritime transportation is often
```

6A57SHAM
```
 1   inseparable from land-based aspects of transportation in a new
 2   era in which cargo owners can contract for transportation
 3   across oceans to inland destinations in a single transaction.
 4   I am here paraphrasing very closely the words of the Supreme
 5   Court which can be found at 543 U.S. 24-25.
 6          These conditions and this change in the nature of
 7   maritime commerce critical to the decision in Norfolk Southern
 8   have no bearing here.  What we have here is a contract of the
 9   sort perfectly familiar long before the advent of container
```
                                   Page 6

Transcript of Oral Argument.txt

10    ships and integrated transportation systems.  The purchase of
11    goods by a buyer in one country from a seller in another, with
12    a proviso that the goods are to be sent by sea, and with some
13    incidental provisions bearing on the nature of that shipment,
14    the alleged breach here was a breach wholly of the sale of
15    goods provisions of the contract, not of its incidental
16    maritime aspects, or indeed, of any transportation aspect at
17    all.  There is thus no basis in this case for maritime
18    jurisdiction.
19          Now, those are the reasons for my ruling, but I think
20    it would be a blinking reality to ignore another factor about
21    the case.
22          In recent years, maritime attachments in this District
23    in particular, and distinct from just about everywhere else in
24    the United States, have become a rather prominent heading of
25    our jurisdiction.  This stems from the Second Circuit's
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                14
6A57SHAM
1     decision in Winter Storm Shipping, 310 F.3d 263 (2d Cir. 2002),
2     in which the Court of Appeals permitted the attachment of
3     transient assets, essentially wire transfers, passing through
4     New York City and through the banks and the New York
5     clearinghouse, which essentially has resulted in a system in
6     which disputes between parties all over the world tend to find
7     their way here not so that the case can actually be litigated
8     here but solely for the purpose of obtaining security via the
9     maritime attachment provisions of Rule B of the admiralty
10    rules.
11          And the Second Circuit recently applied Rule B in a
12    rather literal manner that disapproved of the actions of some
13    district court judges -- this one not included -- in trying to
14    set additional limits or additional restrictions on the ability
15    to obtain maritime attachments.  And that decision, Aqua Stoli,
16    it seems to me to press a continuation of the liberal use of
17    maritime attachments in this District, though I do note that
18    the opinion in Aqua Stoli contained a footnote, which loosely
19    paraphrased says, my God, what have we done, and casts some
20    doubt on whether Winter Storm was correctly decided.  But it is
21    decided, and we have to live with it.
22          This is relevant only for the following reasons:  I
23    note that in light of the decisions in Winter Storm and Aqua
24    Stoli, we can expect efforts by plaintiffs, entirely
25    legitimately, to try to obtain maritime attachments by
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                                15
6A57SHAM
1     interpreting the admiralty jurisdiction of this court
2     liberally.  Were such efforts to be countenanced, we would have
3     in effect the kind of perfect storm -- forgive me, the courts
4     addressing admiralty cases always seem inclined to nautical
5     puns -- but we have a kind of perfect storm in which the
6     combination of expansive maritime attachments and expansive
7     interpretations of admiralty jurisdiction would mean that just
8     about any international dispute in any sort of commercial
9     context all over the world, wherever anything came close to a
10    boat, would result in the potential for filing attachments in
11    this District.
12          Now, that would be great news for the New York bar,
13    which is not something that in my family has ever been regarded
14    as a negative, but it would be less good news for this court
                        Page 7

Transcript of Oral Argument.txt

15  and less good news for the banks that would have to administer
16  these attachments, and ultimately less good news for the
17  orderly resolution of disputes around the world.
18          Now, none of that constitutes a reason for declining
19  to find admiralty jurisdiction in a case where admiralty
20  jurisdiction exists, and that's why I first made clear that in
21  this case I believe that under the case law this is not
22  properly viewed as a maritime case.
23          But in the event this decision is reviewed by the
24  Second Circuit, I wanted them to be aware that I am aware of
25  the realistic consequences here and of the reasons why there is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

16

6A57SHAM
1  an incentive for plaintiffs to seek expansive interpretations
2  of the admiralty jurisdiction.
3          I am convinced that none of this was in the mind of
4  the Supreme Court justices who unanimously decided the Norfolk
5  Southern case.  In fact, it is clear that that court was quite
6  admirably looking to the realities of modern commerce in a way
7  that suggested that admiralty jurisdiction needs to be
8  interpreted in keeping with the commercial realities of the
9  Modern Age, and they had in mind the fact that we no longer
10  have a system that can so readily be separated between maritime
11  transportation and land-based transportation when goods are
12  loaded into a container, put on a truck, taken to the port, the
13  container is then put on a ship, the ship goes somewhere else,
14  and the container is put on a railroad flat car for ultimate
15  delivery, and all of this is arranged by a single contract of
16  carriage.
17          I think that to say, as the Supreme Court did in that
18  case, that where the contract of carriage includes going all
19  the way from Australia to Atlanta or someplace by ship, and
20  then a little rail journey at the end, to call that anything
21  other than a maritime contract would be a mistake.
22          But here we don't have a defendant that undertook to
23  be an integrated carrier, or a ship owner, or any kind of
24  maritime party; we have essentially a basic land-based contract
25  for the sale of goods.  And unless all such contracts which
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

17

6A57SHAM
1  involve anything heavy enough that it's inevitably going to be
2  shipped by sea are to be treated as admiralty contracts, with
3  all of the consequences that that entails, I don't think that
4  some of the expansive language in Norfolk Southern casting
5  doubt on the traditional rule about severing maritime and
6  nonmaritime aspects of contracts, I don't think that language
7  should be interpreted broadly, lest the admiralty jurisdiction
8  swallow up all other forms of commercial cases.  So that's the
9  ruling.
10          Now, Mr. Orzel, I want to get -- specifically the
11  motion is a motion to vacate the attachment.
12          MR. ORZEL:  Correct.
13          THE COURT:  And that's been granted.
14          I take it that given the rationale, you are also
15  implicitly or explicitly, you are now going to move to dismiss
16  the action for lack of jurisdiction.
17          MR. ORZEL:  Correct, your Honor.
18          THE COURT:  OK.  And I also assume then, Ms. Davies,
19  that you have no problem with my dismissing the underlying
                            Page 8

Transcript of Oral Argument.txt
20    action for lack of jurisdiction, which will put you in a
21    position, if you choose, to pursue this further, to take this
22    ruling directly to the Second Circuit and not worry about
23    the -- I don't know if the vacation order in itself would be
24    appealable.
25          MS. DAVIES:  We have no problem with that, your Honor,
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

18

6A57SHAM
1    although we would respectfully request that you stay the
2    release of the funds while plaintiff considers their options to
3    appeal.
4          THE COURT:  No, I'm not going to do that.  I think
5    this is a case where there is no jurisdiction, and, you know,
6    if we're wrong you will get it back, because it seems like this
7    company engages in enough transactions that if at some point it
8    turns out that I'm wrong, you file a new attachment, or the
9    attachment is reinstated, and unless they go bankrupt between
10   now and then -- which nobody is suggesting is going to
11   happen -- you will have new security once more.
12         All right.  So the stay is denied.  The order of
13   attachment is vacated.  The underlying action is dismissed for
14   lack of jurisdiction.  The plaintiff's motion to stay those
15   rulings is denied, and I think we have done our day's work.
16         OK.  Thank you very much.
17         Mr. Orzel, we will issue a written order, just sort of
18   invoking the on-the-record opinion, and I guess you will get
19   that tomorrow.  OK?
20         MR. ORZEL:  OK.  Very good.
21         THE COURT:  All right.  Very good.
22                          -  -  -
23
24
25

                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

Page 9