FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
Egyptian American Steel Rolling Co.
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax

Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
CENTRAMET TRADING S.A.,

                              Plaintiff,                    **07 CIV 6379 (RMB)**

          -against-                                         **DECLARATION OF
                                                            HENRY C.M. PAGE**

EGYPTIAN AMERICAN STEEL ROLLING
COMPANY,

                              Defendant.
-----------------------------------------------------------x

     **HENRY CHARLES MICKLEM PAGE**, pursuant to 28 U.S.C. §1746 hereby declares and says the following under penalty of perjury:

1.    I am a partner of the international law firm, Penlaw, 23 rue d'Anjou, 75008 Paris, France. I have been with the firm since 1995 when it was a division of the English law firm Penningtons. I am qualified as an avocat a la cour – a solicitor of the Supreme Court of France and I am also qualified as a solicitor of the Supreme Court of England and Wales. I am qualified under French and English law to give advice concerning French and English law and have done so on numerous occasions. In particular, I have specialized in Maritime Law and international trade since 1989, practicing in England and in France. I have been involved in many disputes relating to Bills of Lading, Charterparties and contracts for sale of goods. I have been involved in numerous cases which have subsequently been reported including, for example Fercometal v Mediterranean Shipping Company SA, HL 1988 (the "Simona") [1989] AC 788.

1

I was also one of the leading lawyers in the series of Romanian ship arrest cases (Navrom) that constituted a significant development in piercing the corporate veil on a State scale in France. I have recently been involved in the case of The Republic of Kazakhstan v Istil Group Ltd [2007] ECWA Civ 512 which is a leading case on the law of assignments.

2.      I am fluent in English (my native language) and French. I assisted in the drafting of this Declaration and fully understand and agree with the contents of this Declaration. Insofar as the matters asserted herein are within my own knowledge they are true. Insofar as the matters asserted herein are not within my own direct knowledge, I believe them to be true.

3.      Penlaw are the attorneys for Defendant EGYPTIAN AMERICAN STEEL ROLLING COMPANY ("EASROC") and I submit this Declaration with respect to the captioned action in the United States District Court for the Southern District of New York in order to provide my expert opinion on English law, which is the governing law of the sale and purchase contract to which EASROC is a party.

4.      I refer to the Verified Complaint signed by Alfred E. Yudes and Neil A. Quartaro of Watson Farley & Williams (New York) sworn on 12 July 2007 in support of the application by Centramet Trading S.A. The background to this application was as follows. On or about 14 June 2006 a company called GST Commodities Trading Co entered into a Sales Contract with EASROC for the supply of a quantity of steel scrap CIF FO terms to Alexandria, Egypt. This Sales Contract contained certain provisions relating to demurrage.

2

Pursuant to this Sales Contract and their obligation to arrange the carriage of the goods GST seem to have entered into some sort of arrangement with Centramet who chartered a vessel called the MV Merve A. When the goods were loaded on board the vessel three bills of lading were issued at Novorossisk on 29 July 2007. All three bills of lading were signed by the Master of the MV Merve A. The consignee named in the bills of lading was to the order of Arab African International Bank.

It appears that when the goods arrived in Alexandria there was a problem with the quality of the goods and this was admitted by GST and all matters arising out of this problem, including any demurrage that would accrue, were settled in August 2006. EASROC then took delivery of the cargo from the Owners of the vessel.

It then appears that on 28 April 2007 GST assigned inter alia any demurrage claim they had under the above Sales Contract to Centramet. EASROC were not given any notice of this assignment and only became aware of its existence when they received notification of the Rule B attachment towards the end of July 2007.

On 26 July 2007 this office wrote to Watson, Farley & Williams (New York) informing them that we were instructed on behalf of EASROC. On 27 July 2007 we received a reply from Watson, Farley & Williams (London) which informed us that "the substantive dispute between our respective clients is being dealt with by Ms Olga Baglay and Ms Samantha Tite of this firm's London office." The Sales Contract of 14 June 2006 between our client and GST provided for ICC arbitration in London. Under English law any assignee of any claims under this Sales Contract would be bound by the arbitration

clause and if they considered they had a claim then they would be bound to bring the same in arbitration. Watson, Farley & Williams (London) then state in the same 27 July letter that "In short, your clients refused, in breach of a Sales Contract dated 14 June 2006 to pay the sums of (i) US$276,229.75 (representing unpaid demurrage) and (ii) US$18,323 (in respect of discharge operation costs) which, following the assignment described below, were owing to our clients. This breach of the Sales Contract formed the grounds of the Rule B attachment application. Such grounds were accepted by the SDNY Court and the attachment was sanctioned." Watson, Farley & Williams (London) then provided us with copies of the Sales Contract dated 14 June 2006, the demurrage invoice dated 6 October 2006, the discharge costs invoice dated 2 October 2006 and the assignment between GST and Centramet dated 28 April 2007. A copy of this letter, with attachments, is annexed as HCMP 1. While of course our clients had a copy of the Sales Contract they had neither seen prior to this date the demurrage and discharge costs invoices nor the assignment.

At this stage I would pause and say that the analysis provided by Watson, Farley & Williams (London) is in my view the correct analysis of how Centramet can bring a claim for any demurrage alleged to be owed by EASROC. Subject to EASROC's defence that any claim for demurrage was included in the settlement of August 2006, the only obligation upon EASROC to pay demurrage was to GST under the Sales Contract. There was no other contract between EASROC and Centramet and therefore the only way Centramet could bring a claim for demurrage was under the assignment of 28 April 2007. Watson, Farley & Williams (London) have set out in their fax of 27 July 2007 the correct contractual analysis under English law of how in theory

4

Centramet can bring a claim for demurrage in England against my clients in arbitration.

However, having received this fax I then reread the Verified Complaint of 12 July 2007 referred to above. The Verified Complaint alleges at paragraph 5 that "Plaintiff Centramet transported approximately 9,274.897 metric tons of scrap metal (the "Cargo") belonging to Defendant EASR aboard M/V MERVE A pursuant to three (3) CONGENBILL negotiable bills of lading (the "Bills of Lading")." At paragraph 6 the Verified Complaint then goes on to allege that "The Bills of Lading incorporated the terms of the Voyage Charter." This thread is then concluded by paragraph 10 of the Verified Complaint in which it is alleged "To avoid any doubt, GST has also assigned its claim for demurrage, to the extent it has one, to Plaintiff Centramet pursuant to an assignment dated April 28, 2007." These allegations made in the Verified Complaint filed by Watson Farley & Williams (New York) are at complete variance with the fax from Watson, Farley & Williams (London) dated 27 July 2006. While it is not stated expressly I can only presume then that the Verified Complaint is trying to state that in fact there was a direct contract between Centramet and EASROC under the three bills of lading, presumably because the shipper in two of the bills of lading is named as "JSC "TK" MAIRCENTER ON BEHALF OF "CENTRAMET TRADING SA"."

To try and base the theoretical ability to bring a claim for demurrage under English Law on any other basis than that set out in the fax of Watson, Farley & Williams (London) is quite simply wrong. The bills of lading are quite clearly signed by the Master on behalf of the Owners of the vessel. There is simply no way that the fact that Centramet are mentioned as Shipper can found the basis for a contract between Centramet and EASROC. This is quite clear

under English law, as set forth in one of the standard textbooks, Cooke on
Voyage Charters. Copies of the relevant portion of the text is attached as
HCMP 2. In fact I presume that the prompt response from Watson, Farley &
Williams (London) of 27 July 2007 where they clearly set out the basis upon
which their clients would bring the claim in London was as a result of their own
reading the Verified Complaint of 12 July 2007 which was filed in this Court by
Watson Farley & Williams (New York) and realising that the Verified Complaint
was wrong as a matter of English Law.

On 30 August 2007 see HCMP 3 we were copied into a fax from Watson,
Farley & Williams (London) in which they have written to the Secretariat of the
ICC International Court of Arbitration commencing an arbitration as per the
arbitration clause in the Sales Contract of 14 June 2006. This is entirely
consistent with their above fax of 27 July 2007. As assignees under English
law they are bound by the arbitration clause and may invoke the arbitration
clause to pursue any claim which they may have. We note that in clause 20 of
request for arbitration Centramet state that it "as GST's assignee, seeks an
award of all relief available under the Contract and/or applicable law in
connection with EASR's failure to meet its obligations with regard to the
payment of demurrage and port costs as described above." Had Centramet
considered they had a claim under the bills of lading then they would not of
course have referred the dispute to the International Court of Arbitration since
under the bill of lading there is quite clearly no incorporation of the arbitration
clause in the Sales Contract. This is simply more proof that the contents of
the Verified Complaint are completely wrong as an analysis of how in theory
Centramet can bring a claim for demurrage. It is also interesting to note the
quantum claimed for demurrage by Centramet in the arbitration reference.
Demurrage due under a Sales Contract such as this is referred to as Contract

6

Demurrage and the most recent case discussing Contract Demurrage in the English Courts was Fal Oil Co. Ltd v. Petronas Trading Corporation [2004] EWCA Civ 822 see HCMP 4. Under a Sales Contract such as this the demurrage provisions can be classified as either providing an indemnity or providing for an independent liability. Centramet in the reference to arbitration do not make any attempt to state how the demurrage provision in the Sales Contract is to be considered. Moreover at no stage have they ever provided laytime and demurrage calculations showing what their case is on the demurrage due at discharge port or indeed ever provided the laytime and demurrage calculations the Owners sent them as Charterers. It is not clear therefore whether the demurrage that is sought to be recovered relates solely to discharge port or also relates to loadport. It is surprising to say the least that no supporting documentation in the form of laytime and demurrage calculation has been received by now from Centramet. It is clear from the Sales Contract that EASROC are in theory only liable for discharge port demurrage. Whether they claim demurrage on the basis of an indemnity or an independent liability Centramet can only claim for the discharge port demurrage. Centramet cannot simply claim all demurrage they have paid to Owners since this was paid under a totally different contract. Moreover Centramet have only been assigned the rights and obligations of GST and can only claim what GST are entitled to claim namely discharge port demurrage subject of course to any defences EASROC.

5. I would also like to deal with some other matters. There is no doubt that the Sales Contract is not a maritime claim within the meaning of the Brussels Convention on the arrest of seagoing ships (to which England is a party) and under the Supreme Court Act 1981:

(i)     As regards the Brussels Convention, this is not a contract for the use or hire of a vessel. The Sales Contract, which the Plaintiff relies upon, is for the sale and purchase of goods. It is not a charterparty. Thus it is not a maritime claim under the convention and could not found the arrest of a vessel under English law.

(ii)     As regards the Supreme Court Act 1981, I refer to the case of Petrofina SA v AOT Ltd (the Maersk Nimrod) [1992] Q.B. 571, in a contract very similar to this one, the English High Court found that the contract for sale of goods, even though the contract dealt with demurrage was "not an agreement relating to the carriage of goods in a ship" and thus "did not fall within admiralty jurisdiction". A copy of the Maersk Nimrod is attached as HCMP 5.

Thus the claim is not, and cannot be, a maritime claim under English law. It would not invoke the admiralty/maritime jurisdiction of the English Courts even if it concerns a claim for demurrage.

6.     Under English law, the assignment cannot confer admiralty/maritime jurisdiction over this dispute. It is a well established rule that an assignee cannot have better rights than an assignor. The assignment by GST to Centramet does not and cannot change the nature of the dispute. It remains a dispute arising out of alleged breach of a Sales Contract (as accepted by the Plaintiff) (see faxes from Watson Farley & Williams (London) dated 27 July 2007 (HCMP 1) and 30 August 2007 (HCMP 2) ).

7.     The party to the Bill of Lading contract is the shipowner, Nautilus Denizcilik San. ve Tic Ltd. and the holder of the Bill of Lading, EASROC. There is no possible contractual relationship between Centramet on the one hand (who

8

was only the shipper under two of the bills of lading, i.e. the person who put the cargo on board the vessel) and EASROC on the other hand. The carrier (the owner of the vessel) contracted to carry the goods to Egypt and deliver them to EASROC. Centramet was charterer of the vessel from shipowners. Centramet has and had no contractual relationship with EASROC. EASROC only had a contractual relationship with GST under the sale contract.

8.     The question of whether the Bill of Lading incorporates the terms of the charterparty is therefore not relevant since no action between Centramet and EASROC could exist under the bills of lading. There is no possible right under English Law for Centramet to claim demurrage from EASROC under the bills of lading. The only way that Centramet could possibly claim against EASROC would be as assignee of GST's rights, as to which see above.

9.     As a matter of English law there is no doubt that all claims of GST against EASROC under the contract were fully and finally settled by the Settlement Agreement evidenced by the correspondence at HCMP 6. The agreement reached between EASROC and GST was that all claims were settled upon EASROC paying a reduced amount for the off specification cargo.   In addition, GST agreed that all lost time (meaning demurrage) was for their account.  This agreement was made without exception or reserve.  Thus GST had and has no claim against EASROC which could be assigned to Centramet, and accordingly Centramet has no valid claim under English Law.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Dated: Paris, France
       31 August 2007

By    _____

                    HENRY C.M. PAGE

31-08-2007  18:41    FROM-PENLAW                    +33 1 44 51 59 71    T-454  P.011/100  F-561

# Fax

| | |
|---|---|
| **To:** | Henry Page |
| **Organisation:** | Penlaw |
| **Fax Number:** | 00 33 144 515971 ~~至 ᒿᒿʆᒿ~~ |
| **Date:** | 27 July 2007 |
| **Your Ref:** | MISR |
| **Email:** | stite@wfw.com |
| **From:** | Olga Baglay/Samantha Tite |

## Watson, Farley & Williams

"HCMP1"

| | |
|---|---|
| **Total Pages:** | 11 |
| **Our Ref:** | TITE1/20972.50001 |
| **Doc Number:** | 26128040 v1 |

Dear Sirs

**Centramet -v- Egyptian American Steel Rolling Company**

We refer to your fax of 26 July 2007 which was directed to our New York office.  The substantive dispute between our respective clients is being dealt with by Ms Olga Baglay and Ms Samantha Tite of this firm's London office.  Please ensure, therefore, that all future correspondence on this matter is directed to their attention.

We reject your suggestion that the recent attachments of your client's funds were in any way unlawful or wrongful.  The grounds for our client's Rule B attachment application were clearly set out in the papers which were filed with the SDNY Court earlier this month.

In short, your clients refused, in breach of a Sales Contract dated 14 June 2006 to pay the sums of (i) US$276,229.75 (representing unpaid demurrage) and (ii) US$18,323 (in respect of discharge operation costs) which, following the assignment described below, were owing to our clients.  This breach of the Sales Contract formed the grounds of the Rule B attachment application.  Such grounds were accepted by the SDNY Court and the attachment was sanctioned.

Preparations are currently underway as regards the commencement of arbitration proceedings.  We will notify you in the prescribed manner once the formal proceedings have been initiated.

We are surprised by your documentation request.  We would imagine that, apart from the assignment, such documents to already be within your client's control given that your clients are either a party to or the named addressee on all such documents.  In any event, in order to be of assistance, we attach copies of the following documents:

1    Assignment between GST and Centramet dated 28 April 2006.

2    Sales Contract between GST and EASR dated 14 June 2006.

3    Demurrage invoice dated 6 October 2006.

**Watson, Farley & Williams LLP,** 15 Appold Street, London EC2A 2HB, Tel: +44 (0)20 7814 8000, Fax: +44 (0)20 7814 8141/2 , CDE Box 530
CONFIDENTIALITY:

This fax and/or the documents accompanying it may be privileged and confidential.  If any of your organisation are not named addressees of this fax, you must not read the contents, copy them or disclose them to any other person.  Please telephone us immediately to arrange to have the fax returned to us.  Any unauthorised use, disclosure, copying or distribution is strictly prohibited.

London • Athens • Paris - New York • Singapore • Bangkok • Rome • Hamburg

Watson, Farley & Williams LLP is a limited liability partnership registered in England and Wales with registered number OC312252.  It is regulated by the Law Society of England and Wales and its members are solicitors or registered foreign lawyers.  A list of members of Watson, Farley & Williams LLP and their professional qualifications is open to inspection at the above address.  Any reference to a "partner" means a member of Watson, Farley & Williams LLP, or an employee or consultant with equivalent standing and qualification.

Watson, Farley & Williams LLP or an affiliated undertaking has an office in each of the cities listed above.

4    Discharge costs invoice dated 2 October 2006.

5    Fax demanding payment from EASR dated 6 November 2006.

We trust that these documents will assist you in understanding the basis of our client's claim and the reason for the recent attachment. No doubt you will be in contact once you have had an opportunity to review and take instructions on the attached documentation.

Yours faithfully

*Watson, Farley & Williams LLP*

**Watson, Farley & Williams LLP**

31-08-2007    18:42    FROM-PENLAW                    +33 1 44 51 59 71    T-454    P.013/100    F-561

DATED 28 April 2007

(1) GST COMMODITIES TRADING CO.

- and -

(2) CENTRAMET TRADING SA

DEED OF ASSIGNMENT

Watson Farley & Williams
15 Appold Street
LONDON EC2A 2HB

Ref : BAGO1/SMAC1/20972.50001

THIS ASSIGNMENT is made the 28 day of April 2007

BETWEEN:-

(1)    GST COMMODITIES TRADING CO, whose registered office is at Langham House

       Suite 401, 302 Regent Street, London W1B 3HH (the "Assignor"); and

(2)    CENTRAMET TRADING SA, whose registered office is at 220, route de Ferney,

       Grand-Saconnex, P.O.Box # 201, 1218 Geneva, Switzerland (the "Assignee")

WHEREAS:-

(1)    The Assignee entered into a charterparty with Nautilis Denizcilik San.ve TIC.LTD.STI (the
       "Owner") dated 14 July 2006 for the hire of the vessel m.v. "Merve A" (the
       "Charterparty").

(2)    The Assignor entered into a contract for the sale of steel scrap on CIF terms (the "Sale
       Contract") dated 14 June 2006 to Egyptian American Steel Rolling Company (the
       "Buyer"). The cargo sold under the Sale Contract was carried on the "Merve A" pursuant
       to the Charterparty. An express clause of the Sale Contract stated that the Buyer was liable
       for demurrage as per the Charterparty.

(3)    The Assignor now wishes to assign to the Assignee the benefit of the Assignor's claim for
       demurrage under the Sale Contract (the "Demurrage Claim")

NOW THIS DEED WITNESSETH as follows:-

1      For one dollar and other good consideration, receipt of which is hereby acknowledged, the
       Assignor hereby assigns absolutely to the Assignee all its rights of action against the Buyer
       as well as any choses in action relating to or in any way connected with the Demurrage
       Claim.

2      This assignment shall be governed by and construed in accordance with the Laws of
       England.

3      Nothing in this assignment shall detract from any accrued rights of the Assignee to claim
       demurrage directly from the Buyer arising from the Sale Contract.

2

IN WITNESS whereof the parties hereto have entered into this Assignment as a deed the day and year first above written.

SIGNED AND DELIVERED as a Deed                )
for and on behalf of GST Commodities Trading Co )
in the presence of:                                          )

SIGNED AND DELIVERED as a Deed                )
for and on behalf of Centramet Trading SA       )
Limited in the presence of;                          )

Sergey Semin

3

15 06 06 19:55                                                              CTP.1

**CONTRACT NO : GB001**                                    14/06/2006

GST Commodities Trading Co. hereinafter referred to as sellers, agree having sold and
EGYPTIAN AMERICAN STEEL ROLLING CO. hereinafter referred to as Buyer, agree having
bought material mentioned here below subject to following terms and conditions:

| | |
|---|---|
| **QUANTITY** | : 20'000 MT +/- 10% in seller's option. Partial shipment by gearless ships allowed. |
| **QUALITY** | : Steel scrap |
| **SIZE** | : 1500 mm x 600 mm x 600 mm. Maximum 2% of oversize is allowed. If the quantity of over size is over 2% - this tonnage (over 2% only) to be penalized by $10 pmt. |
| **THICKNESS** | : Minimum 4 mm. Maximum 5% of thickness less then 4 mm allowed. If this quantity of is over 5% - this tonnage (over 5% only) to be penalized by $10 pmt . |
| **PRICE** | : US $ 303,- per mt, CIFR Alexandria/ Egypt |
| **SHIPMENT** | : Latest by 15th of August 2006 |
| **ORIGIN** | : Russia |
| **DISCHARGE RATE** | : Discharge rate will be as follows: |

~~1000 mtos pwwd fidex ain~~

NOR to be tendered during office hours.
Demurrage to be as per Charter Party covering the respective voyage and
free dispatch respectively. Demurrage rate to be indicated at time of vessel's
nomination.

**PAYMENT** : 100% of the invoice value for each shipment is payable by Irrevocable, sight
Letter of Credit issued by first class bank, against the following documents:
- 2 Original plus 2 copies of Commercial Invoice
- 3/3 Original bill of lading issued to the order of issuing bank
- Draft survey report issued in loading port by Inspectorate.
All claims, if any, to be solved outside of LC.

**FINAL WEIGHT** : Final weight is to be considered as average between draft survey in loading
port and draft survey in discharging port issued by Inspectorate.

**FINAL QUALITY** : As per load port quality certificate issued by Inspectorate.

Egyptian American
Steel Rolling Co.

15 06 06 19:55                                                                      CTP.2

ARBITRATION      : All disputes arising in connection with the present contract shall be
                 finally settled under the rules of Conciliation and Arbitration of the
                 International Chamber of Commerce, by one or more, appointed in
                 accordance with said rules. The adjustment of the arbitration court shall
                 be final with no possibility of appeal.
                 This contract shall be governed by and in accordance with the laws of
                 England. The seat of Arbitration will be London, England.

Buyer                                           Seller

Egyptian American                               GST Commodities Trading Co
Steel Rolling Co.                               London. United Kingdom

31-08-2007   18:43    FROM-PENLAW                    +33 1 44 51 59 71    T-454   P.018/100   F-561

16/09 06   MON 20:40 FAX                                                        ☑001

Date: 01/09/2006

## AMENDMENT

**CONTRACT NR** : GB001
**DATE**        : 14/06/2006
**QUANTITY**    : 20.000 MTONS  (+/- 10% AT SELLER'S OPTION)
**UNIT PRICE**  : USD/MT 303,00 CIF FO Alexandria / Egypt

**PLEASE AMEND THE  FOLLOWING CLAUSES OF THE A/M  CONTRACT AS FOLLOWS:**

**CLAUSE 'SHIPMENT'**

THE LATEST SHIPMENT IS TO BE 15TH OF OCTOBER 2006

THE REST OF THE CONTRACT WILL REMAIN UNCHANGED. THIS AMENDMENT IS AN INTEGRAL PART OF THE CONTRACT NR GB001 DTD 14/06/2006.

**SELLER**                              **BUYER**
GST COMMODITIES TRADING CO              EGYPTIAN AMERICAN STEEL
                                        ROLLING CO.

                                        Egyptian American
                                        Steel Rolling Co.

# ASLI
ASLI DENIZ TAŞIMACILIĞI VE NAKLİYE TİCARET LTD. ŞTI.

Tarih: ..... / ..... /280.....

06.10.2006
FM : ASLI SHIPPING
TO : CENTRAMET TRADING S.A SWITZERLAND
REF : MV MERVE A
       NOVOROSSISK / ALEXANDRIA  STEEL SCRAP

## DEMMURAGE  INVOICE
## MV MERVE A

DEMMURAGE (48.42 DAYS X USD 7000)..........................USD  338,940.00-

LESS  ADVANCE PAYMENT ...........................................USD   50,000.00,-

LESS COMMISSION %3.75..............................................USD   12,710.25-

SUM............................................................................USD  276,229.75-

PLEASE REMIT THE AMOUNT OF USD  276,229.75 - FOLL ACCT:-

KOÇBANK
BRANCH      : FENERYOLU
BRANCH CODE : 649.
ACCT NO.     : 404-57843-(USD)
IBAN NO.      : TR 4800199 601000000 40457843
SWIFT CODE  : KABATRIS
BENIFICIARY : NAUTILOS DENIZCILIK SAN.ve TİC. LTD.ŞTI.

ASLI DENIZ TAŞIMACILIĞI
VE NAKLİYE TİC. LTD. ŞTI.

31-08-2007   18:43   FROM-PENLAW                    +33 1 44 51 59 71        T-454   P.020/100   F-561



**ACTIVE MARINE ISTANBUL**
AKTİF DENİZCİLİK TİC. LTD. ŞTİ.

02.10.2006
FM  :  ACTIVE MARINE
TO  :  CENTRAMET TRADING S.A SWITZERLAND
REF :  MV MERVE A
       NOVOROSSISK / ALEXANDRIA  STEEL SCRAP

# D/A  INVOICE
# MV MERVE A

DISBURSMENT ACCOUNT FOR EXTRA STAY AT EL DEKHLIA PORT

BELONG TO MATINA SHIPPING...................................USD  18,323.00.-

SUM.............................................................................USD  18,323.00.-

PLEASE REMIT THE AMOUNT OF USD  18,323.00 - FOLL ACCT:-

MISR INTERNATIONAL BANK (MIBANK)
MOHANDESSINE BRANCH
ADDRESS: 54, EL BATAL AHMED ABDEL AZIZ, EL MOHANDESSINE
TELEX  : 20640 – 21841 MIBCA
FAX    : 02/3489796
TEL    : 02/3494424 – 02/3497091
ACCOUNT NO.: 6046949
SWIFT CODE :  MIIBEGCXXXX
FAVOUR OF  :  MATINA LINE
              CAPT.SAMIR HOUSNY FARID EL WARDANY

Erenköy Samettin Günaltay Caddesi Yıldız Apt. No: 206/11 Kadıköy / İstanbul
Yel: +90(216) 360 37 90 / 360 34 45  Fax: +90 (216) 360 17 79
Tlx: 0667-23755 acro ir  e-mail: activemarine@superonline.com

31-08-2007  18:44    FROM-PENLAW                +33 1 44 51 59 71    T-454  P.021/100  F-561

# GST COMMODITIES TRADING CO.

Langham House, #401, 302 Regent Street, London W1B 3HH, United Kingdom

**To:**     Egyptian American Steel Rolling Co.
**Att:**    Mr. Kamal Beshay
**Fax:**    00202 620 1592                              <u>via fax</u>     
**Date:**   06.11.2006
**Re:**     m/v Merve A / balance payment


Dear Mr. Beshay,

Despite our several fax messages we have no news from you about balance for above mentioned shipment.

We regret to admit that it is not strengthening our relation.

We count on your professional attitude and kindly ask you to finalize payment of remaining amount as soon as possible.


GST Commodities Trading Co.

GST Commodities Trading Co.
London, United Kingdom

"HCMP 2"

# Fax

**Watson, Farley & Williams**

| | |
|---|---|
| **To:** | Secretariat of the ICC |
| **Organisation:** | International Court of Arbitration |
| **Fax Number:** | 00 33 1 49532933 |

| | |
|---|---|
| **CC:** | Henry Page |
| **Organisation:** | Penlaw |
| **Fax Number:** | 00 33 1 44 515971 |
| **Your Ref:** | MISR |

| | | | |
|---|---|---|---|
| **Date:** | 30 August 2007 | **Total Pages:** | 25 |
| | | **Our Ref:** | SMAC1/BAGO1/TITE1/209 72.50001 |
| **Email:** | stite@wfw.com | **Doc Number:** | 26135313 v1 |
| **From:** | Charles Smallwood/Olga Baglay/Samantha Tite | | |

Dear Sirs

**Centramet Trading SA -v- Egyptian American Steel Rolling Company**
**Request for Arbitration**

We act for Centramet Trading SA and we attach, for your attention, our client's Request for Arbitration (the "Request"). In accordance with the ICC Rules of Arbitration we will send you four hard copies of the Request by courier today together with the US$2,500 commencement fee. We would be grateful if you would acknowledge receipt in due course.

We confirm that our client has appointed Mr Colin Sheppard as arbitrator. His contact details are noted in the Request We will ensure that a copy of the Request is sent to Mr Sheppard later today.

Yours faithfully

*Watson, Farley & Williams LLP.*

**Watson, Farley & Williams LLP**

**Watson, Farley & Williams LLP**, 15 Appold Street, London EC2A 2HB, Tel: +44 (0)20 7814 8000, Fax: +44 (0)20 7814 8141/2 , CDE Box 530

CONFIDENTIALITY:

This fax and/or the documents accompanying it may be privileged and confidential. If you or your organization are not named addressees of this fax, you must not read the contents, copy them or disclose them to any other person. Please telephone us immediately to enable us to re-send the fax. Any unauthorised use, disclosure, copying or distribution is strictly prohibited.

London ▪ Athens ▪ Paris ▪ New York ▪ Singapore ▪ Bangkok ▪ Rome ▪ Hamburg

Watson, Farley & Williams LLP is a limited liability partnership registered in England and Wales with registered number OC312252. It is regulated by the Law Society of England and Wales and its members are solicitors or registered foreign lawyers. A list of members of Watson, Farley & Williams LLP and their professional qualifications is open to inspection at the above address. Any reference to a 'partner' means a member of Watson, Farley & Williams LLP or a

IN AN ARBITRATION PURSUANT TO THE RULES OF THE INTERNATIONAL

CHAMBER OF COMMERCE

BETWEEN :

**CENTRAMET TRADING SA**
(Switzerland)

**Claimant**

- and -

**EGYPTIAN AMERICAN STEEL ROLLING COMPANY**
(Egypt)

**Respondent**

**REQUEST FOR ARBITRATION**

30 August 2007

Olga Baglay
Charles Smallwood
Samantha Tite

Watson, Farley & Williams LLP
15 Appold Street
London
EC2A 2HB

Tel: +44 20 7814 8000
Fax: + 44 20 7814 8210

**Counsel for Claimant**

26128045 v2

1    This Request for Arbitration is submitted pursuant to Article 4 of the Rules of Arbitration of the International Chamber of Commerce (the "**ICC Rules**" and the "**ICC**" respectively).

2    In accordance with Articles 3(1) and 4 of the ICC Rules, this Request for Arbitration is submitted in 4 copies, one for each of the Claimant and Respondent, one for the arbitrator appointed by the Claimant (who may or may not sit as sole arbitrator) and one for the ICC Secretariat. Further copies of the Request will be provided if the parties are unable to agree on a sole arbitrator. In addition, a cheque for the Claimant's advance payment of US$2,500 is enclosed.

3    As required by the Contract (as defined below), this Request for Arbitration is submitted in the English language.

## A:    THE PARTIES

4    The Claimant in this Arbitration is Centramet Trading SA ("**Centramet**").

5    Centramet is a company incorporated under the laws of Switzerland and having its registered office at 220 Route de Ferney, Grand-Saconnex, PO Box 201, 1218, Geneva, Switzerland.

6    Centramet is represented in this matter by Olga Baglay, Charles Smallwood and Samantha Tite of Watson, Farley & Williams LLP of:

15 Appold Street
London
EC2A 2HB
United Kingdom
Tel: +44 20 7814 8000
Fax: +44 20 7814 8210.

7    The Respondent in this Arbitration is Egyptian American Steel Rolling Company ("**EASR**").

8    EASR is a company organised and existing under the laws of Egypt and having its registered office at 6 Farid Simeka Street, Heliopolis, Cairo, Egypt.

9    EASR is represented in this matter by Henry Page of Penlaw of:

23 rue d'Anjou

75008 Paris
France
Tel: +33 1 44 51 59 70
Fax: +33 1 44 51 59 71,

## B:     BACKGROUND TO THE CLAIM

10      On 14 June 2006, EASR agreed to purchase approximately 20,000 metric tonnes of steel
        scrap on a CIF basis for US$303 per metric tonne from GST Commodities Trading Co.
        ("GST") pursuant to a sales contract numbered GB001 (the "Contract"). The Contract
        expressly provided that EASR was required to pay demurrage pursuant to the
        Charterparty (defined below).

11      Centramet chartered the m.v. "MERVE A" (the "Vessel") from its owners, Nautilus
        Denizcilik San Ve Tic Ltd STI, for a voyage from Novorossiysk, Russia to Alexandria,
        Egypt. The terms of the charter are recorded in a recap dated 14 July 2006 (the
        "Charterparty"). Notice of the charterparty and the applicable demurrage rate was
        given to EASR by e-mail on 12 July 2006 (the "E-mail") Beshay Steel, acting on behalf
        of EASR, endorsed on the E-mail their acceptance of a demurrage rate of US$7,000/day
        and faxed the endorsed e-mail to GST.

12      On or about 20 July 2006, the Vessel arrived at Novorossiysk, Russia to load the steel
        scrap cargo.  9,274.897 metric tonnes of scrap metal were loaded onto the Vessel
        pursuant to three CONGENBILL negotiable bills of lading (the "Bills of Lading"). The
        Vessel sailed from Novorossiysk at 16.20 hours local time on 29 July 2006 and arrived in
        Alexandria, Egypt, safely and without incident, at 03.45 hours local time on 6 August
        2006.

13      On arrival in Alexandria, EASR failed to produce the original Bills of Lading.
        Accordingly, discharge operations were delayed and significant demurrage accrued. The
        Vessel was sent to anchor, almost fully laden, between 9 and 30 August 2006 whilst the
        issues of original documentation and the availability of discharge personnel and
        equipment were resolved.  Discharging of the cargo restarted on 31 August but was then
        subsequently interrupted between 5 and 8 September 2006 and again between 11 and 23
        September 2006. The full discharge operation was not completed until 30 September
        2006 by which time the Vessel had spent approximately 53 days on demurrage incurring
        a total demurrage cost of US$338,940 (less 3.75% commission as per the Charterparty).

26128045 v2

14    In September 2006, Centramet agreed to pay the Vessel owners an advance payment of US$50,000 on account of demurrage. Centramet paid the advance and on 6 October 2006 received an invoice for the outstanding amount of US$276,299.75 (the "**Invoice**").

15    Centramet sent a copy of the Invoice to GST who then forwarded it to EASR requesting payment. A payment chaser was sent on 6 November 2006 by fax and subsequently by e-mail. In breach of the Contract, EASR have failed to pay the outstanding demurrage.

16    To date, EASR has also refused to pay the sum of US$18,323 in respect of port costs which were incurred due to the excessive period spent at Alexandria and for which EASR is also responsible. The invoice for the port costs was originally presented to Centramet on 2 October 2006 and subsequently forwarded to EASR (the "**Port Costs Invoice**").

17    On 16 March 2007, Centramet paid a further US$295,000 to the Vessel owners in settlement of the Vessel owners claim under the Charterparty against Centramet for unpaid demurrage (US$276,229.75) and interest (US$54,089.45) and costs (US$70,000). Payment was made by Centramet to the Vessel owners' US lawyers (Tisdale & Lennon LLC) and confirmed by the payment receipt (the "**Payment Receipt**").

18    On 28 April 2007, GST assigned its claim for demurrage under the Contract to Centramet pursuant to a written assignment (the "**Assignment**").

19    Copies of the Contract, Charterparty, E-mail, Bills of Lading, Invoice, Port Costs Invoice, Payment Receipt and the Assignment are attached to this Request.

## C:    RELIEF SOUGHT

20    Centramet, as GST's assignee, seeks an award of all relief available under the Contract and/or applicable law in connection with EASR's failure to meet its obligations with regard to the payment of demurrage and port costs as described above. Centramet has, itself, paid the total sum of US$345,000 (i.e. US$50,000 plus US$295,000) to the Vessel owners on account of the demurrage claim.

21    Centramet now seeks in this Arbitration, in particular, and without prejudice to any further claims or arguments, an award against EASR in the sum of US$344,552.75 excluding interest and costs. This sum is made up of the full amount of accrued demurrage (US$338,940) less commission at 3.75% (i.e. US$12,710.25) together with the unpaid port costs of US$18,323.

26128045 v2

22      Centramet sought to secure this claim by attaching funds owned by EASR in the United
        States. Accordingly, Centramet commenced proceedings against EASR before the United
        States District Court for the Southern District of New York in an action bearing docket
        number 07CIV6379 (the "New York Action"). Centramet obtained an Order of
        Attachment against EASR's assets in New York and attached assets of EASR on 19 and
        24 July 2007 to the value of US$466,228.82.

23      Centramet is not, however, fully secured for its claim in the Arbitration by the security
        which has been obtained in the New York Action. The amount secured in the New York
        Action can be broken down as follows:

        | | |
        |---|---|
        | Unpaid demurrage: | US$276,229.75 |
        | Port charges: | US$18,323.00 |
        | 3 years interest at 8.5%: | US$81,676.26 |
        | Arbitration costs: | US$40,000 |
        | Attorney's fees: | US$50,000 |
        | Total | US$466,228.82 |

        Centramet has no security, therefore, in the New York Action (or otherwise) for the
        US$50,000 advance payment which was made by it in 2006 to the Vessel owners prior to
        the Settlement Agreement on account of demurrage.

24      In addition to the above sums, Centramet claims interest calculated at such rate, and from
        such date and in relation to such amounts as the Tribunal may deem appropriate.

25      Centramet also claims the cost of the Arbitration including attorneys fees, expert fees,
        arbitrator fees, ICC administrative costs, direct costs and all other costs, expenses and
        fees of any kind whatsoever.

26      Centramet reserves the right to modify its claim and to claim additional, or alternative,
        heads of claim to those set out above.

**D:    ARBITRATION AGREEMENT**

27      The parties agreement to ICC Arbitration is included in the final clause of the Contract
        which provides that:

                *"All disputes arising in connection with the present contract shall be finally
                settled under the Rules of Conciliation and Arbitration of the International*

*Chamber of Commerce by one or more, appointed in accordance with the said Rules. The adjustment of the arbitration court shall be final with no possibility of appeal. This contract shall be governed by and in accordance with the laws of England. The seat of arbitration will be London, England.*"

## E:    CLAIMANT'S CHOICE OF ARBITRATOR

28    The Contract provides that the dispute is to be resolved by one or more arbitrators appointed in accordance with the ICC Rules. The Contract does not, however, specify how the decision as to whether a sole or three arbitrators are to be appointed is to be made and/or within what time frame. Given the relatively small sum of money in dispute, the appointment of a sole arbitrator would seem sensible provided the parties are able to agree to the same.

29    Pursuant to the Contract and Article 4(3)(e) of the ICC Rules, Centramet chooses and nominates Mr Colin Sheppard to act as an arbitrator, possibly the sole arbitrator subject to EASR's approval, in this matter.

30    Mr Sheppard's contact details are as follows:

43 Park Road
Chiswick
London W4 3EY
United Kingdom

Tel: +44 208 994 0800
Fax: +44 208 742 0649
E-mail: jcsheppard@btconnect.com

31    Mr Sheppard is a competent individual to act in this matter. He has confirmed his independence to Centramet. If appropriate, Mr Sheppard would be happy to confirm his independence to the ICC Court and, if necessary, EASR.

32    Centramet is aware of no facts or circumstances which might be of such a nature as to call into question Mr Sheppard's independence in the eyes of the parties.

## F:    APPLICABLE RULES OF LAW

33    The final clause in the Contract provides that:

> *"This contract shall be governed by and in accordance with the laws of England. The seat of Arbitration will be London, England."*

34    The parties agreed in the Contract that the substantive law under which Centramet's claims are to be determined is English law and that the seat of arbitration is London, England.

Respectfully submitted,

*O. Baglay*

Olga Baglay

Watson, Farley & Williams LLP

15 Appold Street

London

EC2A 2HB

**<u>Counsel for Claimant</u>**

31-08-2007  18:46    FROM-PENLAW              +33 1 44 51 59 71    T-454  P.030/100  F-561

# IN AN ARBITRATION PURSUANT TO THE RULES OF THE INTERNATIONAL

# CHAMBER OF COMMERCE

**BETWEEN :**

### CENTRAMET TRADING SA
#### (Switzerland)

**Claimant**

- and -

### EGYPTIAN AMERICAN STEEL ROLLING COMPANY
#### (Egypt)

**Respondent**

---

## ANNEX 1

---

30 August 2007

Olga Baglay
Charles Smallwood
Samantha Tite

Watson, Farley & Williams LLP
15 Appold Street
London
EC2A 2HB

Tel: +44 20 7814 8000
Fax: + 44 20 7814 8210

**Counsel for Claimant**

26128045 v2

31-08-2007  18:46   FROM-PENLAW                    +33 1 44 51 59 71       T-454  P.031/100  F-561

15 06 06 19:55                                                           CTP. 1

**CONTRACT NO : GB001**

14/06/2006

GST Commodities Trading Co. hereinafter referred to as sellers, agree having sold and EGYPTIAN AMERICAN STEEL ROLLING CO, hereinafter referred to as Buyers, agree having bought material mentioned here below subject to following terms and conditions:

**QUANTITY** : 20'000 MT +/- 10% in seller's option. Partial shipment by geareless ships allowed.

**QUALITY** : Steel scrap

**SIZE** : 1500 mm x 600 mm x 600 mm. Maximum 2% of oversize is allowed. If this quantity of over size is over 2% - this tonnage (over 2% only) to be penalized by $10 pmt.

**THICKNESS** : Minimum 4 mm. Maximum 5% of thickness less then 4 mm allowed. If this quantity of is over 5% - this tonnage (over 5% only) to be penalized by $10 pmt.

**PRICE** : US $ 303,- per mt, CIFR Alexandria/ Egypt

**SHIPMENT** : Latest by 15th of August 2006

**ORIGIN** : Russia

**DISCHARGE RATE** : Discharge rate will be as follows:

~~The discharge rate is at 1000 mtns pwwd Shex ein.~~
~~.....~~

NOR to be tendered during office hours.
Demurrage to be as per Charter Party covering the respective voyage and free dispatch respectively. Demurrage rate to be indicated at time of vessel's nomination.

**PAYMENT** : 100% of the invoice value for each shipment is payable by irrevocable, sight Letter of Credit issued by first class bank, against the following documents;
- 2 Original plus 2 copies of Commercial Invoice
- 3/3 Original bill of lading issued to the order of issuing bank
- Draft survey report issued in loading port by Inspectorate.
All claims, if any, to be solved outside of LC.

**FINAL WEIGHT** : Final weight is to be considered as average between draft survey in loading port and draft survey in discharging port issued by Inspectorate.

**FINAL QUALITY** : As per load port quality certificate issued by Inspectorate.

Egyptian American
Steel Rolling Co.

Jun. 15 2006 04:42PM P1/2   FAX NO. :+28 2 6221553                    FROM :BESHAY STEEL

15 06 06 19:55                                                        CTP.2

**ARBITRATION** : All disputes arising in connection with the present contract shall be
finally settled under the rules of Conciliation and Arbitration of the
International Chamber of Commerce, by one or more, appointed in
accordance with said rules. The adjustment of the arbitration court shall
be final with no possibility of appeal.
This contract shall be governed by and in accordance with the laws of
England. The seat of Arbitration will be London, England.

Buyer                                    Seller

Egyptian American                        CST Commodities Trading Co
Steel Rolling Co.                        London, United Kingdom

31-08-2007  18:47    FROM-PENLAW                        +33 1 44 51 59 71    T-454  P.033/100  F-561

16/09 06  MON 20:40 FAX            ⁻·ₑ                                        ☒0001

Date: 01/09/2006

## AMENDMENT

**CONTRACT NR** : GB001
**DATE**            : 14/06/2006
**QUANTITY**    : 20.000 MTONS  (+/- 10% AT SELLER'S  OPTION)
**UNIT PRICE**  : USD/MT 303,00 CIF FO Alexandria / Egypt

**PLEASE AMEND THE  FOLLOWING CLAUSES OF THE A/M  CONTRACT AS FOLLOWS:**

**CLAUSE 'SHIPMENT'**

THE LATEST SHIPMENT IS TO BE 15TH OF OCTOBER 2006

THE REST OF THE CONTRACT WILL REMAIN UNCHANGED. THIS AMENDMENT IS AN INTEGRAL PART OF THE CONTRACT NR GB001 DTD 14/06/2006.

**SELLER**

GST COMMODITIES TRADING CO

**BUYER**

**EGYPTIAN AMERICAN STEEL ROLLING CO.**

none["

31-08-2007  18:47    FROM-PENLAW                +33 1 44 51 59 71    T-454  P.036/100  F-561

~0851378.TXT

activemarine@activemarine.net

=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=-=

~0851378.TXT

ALWAYS UNDER MASTER'S SUPERVISION. NO ANY
OPERATION WHICH WILL DAMAGE THE VESSEL IS EVER ALLOWED. ANY  DAMAGES
OCCURRED IN VESSEL IS TO BE REPAIRED BY  STEVEDORES
UNDER CHARTERERS GUARANTEE, COST AND TIME.
- DEM  7000 USD PDPR /FREE DESPATCH BE
- DEMURRAGE IF ANY PABLE W/I 15 BDAYS  FM PRESENTATION MUTUAL AGREED
LAYTIME CALCULATION SUPPORTED BY ALL  RELEVANT DOCS:
T/S, NOR, SOF. FAX COPIES ARE ACCEPTABLE.
- IN  CASE OF DEAD FRT LAYTIME TO COUNT ON BASIS OF TNG FOR WHICH THE  FRT
PAID
- FREIGHT  PAYBLE 100 PCT ON BS/L QTTY LESS TTL  COM TO THE OWNRS
NOMINATED
BACCT AGAINST OWNERS FRT INVOICE  DULY SIGNED
AND STAMPED W/I 3 BDAYS AFTER S/R OF BS/L
BUT IAC  BBB
- ACTIVE MARINE'S COMM TO BE PAYBLE 100 PCT TO THE NOMINATED  BANK ACCT IN
THE SAME TIME WITH FREIGHT PAYMENT.
- BS/L TO BE  MARKED 'FRT PAYABLE AS PER C/P' AND 'CLEAN ON BOARD'
- FRT FULLY DEEMED  AND EARNED VAOCLONL
- CHRTRS AGENT BENDS SUB PFMA D/A.
- NOR  LL BE GIVEN W/W/W/W VIA CABLE/RADIO/VHF/TLX IN OFFICIAL  WORKING
HRS
ON WORKING DAY BENDS. NOTICES ETA LPORT TO BE  TENDERED TO AGENTS 3/2/1
DAYS PRIOR VSL'S ARRVL.
NOTICES ETA  DISCHPORT TO BE TENDERED TO AGENTS ON SAILING FM LOADPORT
FOLLOWED BY  3/2/1 DAYS NOTICES PRIOR
VSL'S ARRVL
- OWNRS TO PROVIDE CHRTS  INFO BY FAX/TLX ABT VSLS POSTNS EVERY WORK DAY
- ANY TAXES/DUES ON  CGO/FRT TO BE FOR CHRRS ACCT
- ANY TAXES/DUES ON VSL/CREW/FLAG TO BE  FOR OWNERS ACCT
- VSL IS FREE FM EXINS
- DRAFT SURVEY FOR CGO  TO BE FOR CHRRS ACCT AT LOAD + DISCH PORT. TIME
FR
DRAFT  SURVEY IF LESS THAN 2 HRS NTC, IF MORE
THAN 2HRS TO COUNT AS  LAYTIME
- QUANTITY OF LOAD/DISCH CGO MUST BE DETERMINED BY DRAFT  SURVEY, O/WISE
OWNRS NOT RESPONSIBLE FOR CLAIMS ARISING  THEREOF
AND ALL POSSIBLE SHORTAGES MUST BE SETTLED DIRECTLY BETWEEN  CHRTRS /
SHIPPERS / RECEIVERS WITHOUT INVOLVING OF VESSEL  /
MASTER / OWENRS / MANAGERS
- VESSEL SHOULD HAVE ON BOARD  HYDROSTATIC TABLES OR CURVES INCLUDING
DATA
ABOUT  DISPLACEMENT, TPC, LCF, MTC, BALLAST
TABLES WITH TRIM AND LIST(HILL)  CORRECTION, DETAILED GENERAL ARRANGEMENT
SHIP-S SCHEME WITH SPECIFYING  FRAME NUMBERS,
SHIP-S PARTICULAR DATA.
- ANY SECOND BERTH/ SHIFTING EXPENSES/TIME TO BE FOR  CHARTERERS ACCT.
- ONCE ON DEMMURAGE ALWAYS ON DEMMURAGE
- TIME FOR  PROCEEDING FM ANCHORAGE TO BERTH/SHIFTING/PILOTAGE NOT  TO
COUNT
AS LTIME
- DEBALLASTING TIME NOT TO COUNT AS  LTIME
- ARB/GA IF ANY TO BE HELD IN LONDON ACCORDING TO ENGLISH  LAW
- OWISE AS PER GCN 76 CP LOGICALLY AMMENDED AS PER MTERMS  AGREED
- COMM 1,25 PCT TROGMETTRANS(CHARTERERS BROKER) + 2,5 ACTIVE  MARINE (OWNERS
EXCLUSIVE BROKER)
END
Best Regards

Ercan Kibar

------------------ACTIVE   MARINE------------------

PH:+90-216-6589702/03/04/05                  skype:   ercankibar
FX:+90-216-6589706                            e-mail:
activemarine@superonline.com
MB:+90-535-844 46  00
                            Page 2

Sent By: M;

>>> From: "Petr Terehov" <terehov@bluewin.ch>
>>> To: "alphaegypt" <alphaegypt@link.net>
>>> Date: Wed, 12 Jul 2006 15:10:02 +0200
>>> Subject: FW: MERVE A 16-20 JULY 2006
>>>
>>> Dear Nader,
>>>
>>> This is first nomination.
>>>
>>> Please ask Beshay to confirm
>>>
>>>
>>> M/V MERVE A (EX M/S CORNER BROOK)
>>>
>>> TURKISH FLAG, BLT 76, (RBLT 2006),
>>> LOA/LBP/B/D/S.SPD 135,6/127,7/18,5/9,82/15 KNT
>>> GRT/NRT 7587/2456, DWT 13.500, DWCC 13.200, HO/HA 3/1,
>>> GRAIN FITTED, CO2 FITTED, STEEL FLRD,
>>> GLESS, IMO 7420194, CLASS TURKISH LOYD,
>>> CALL SING: TOOL9, HATCHOVERS PONTOON TYPE,
>>> GR/BL 19098/18086 CBM, UNIT WEIGHT 10 TN
>>>
>>> HOLD DIMENSIONS
>>> -----------------------------------------------
>>> HOLD: 3 = 32,2 X 10,5 X 17,5/ 7423 CBM
>>> HOLA: 2 = 26,6 X 10,5 X 17,5/ 6313 CBM
>>> HOLD: 1 = 25,2 X 10,5 X 17,5/ 5362 CBM
>>> -----------------------------------------------
>>> HATCH: 3 = 27,2 X 13,5 X 3
>>> HATCH: 2 = 25,1 X 13,5 X 3
>>> HATCH: 1 = 20,2 X 13,5 X 3
>>> -----------------------------------------------
>>> - LP 1 GSPB NOVOROSSIYSK
>>> - DP 1 GSPB ALEXANDRIA
>>> - LAYCAN 16-20 JULY 2006 (BEST ETA 16.07)
>>> - DISCH RATE 1000 MTS PWWD$
>>> - MIN QTTY - 10000 MTS
>>> - DEM 7500 USD PDPR /FREE DESPATCH

Dear Sirs,
We can accept the above
vessel on the provision that
demurrage rate is
every 7,000 $.
Agents at disch. port:
"Matina Shipping Agency"

Best Regards.
Beshay Steel
12.07.06.

31-08-2007  18:48    FROM-PENLAW              +33 1 44 51 59 71      T-454  P.038/100  F-561

Page 2

CODE NAME: "CONGENBILL". EDITION 1994

Shipper
LLC "EXPOMET"
204 KOMAROVA STR., BATAYSK 346881, RUSSIA
Contract №756/73317265/15051 dd 04.04.2006г

Consignee
TO THE ORDER OF ARAB AFRICAN
INTERNATIONAL BANK

Notify address
EGYPTIAN AMERICAN STEEL ROLLING CO.
6, FARID SEMEIKA STR., HELIOPOLIS
CAIRO, EGYPT

Vessel                    Port of loading

MERVE A          NOVOROSSISK / RUSSIA

Port of discharge

EL DEKHILA SEAPORT - EGYPT

Shipper's description of goods                     Gross weight

STEEL SCRAP                          IN BULK  318.230 MT

L/C NO. LC/HEL 610/06


BILL OF LADING          B/L No. 1
TO BE USED WITH CHARTER-PARTIES
                              Reference No.

**FIRST ORIGINAL**

(of which          on deck at Shipper's risk; the Carrier not            **CLEAN ON BOARD**
being responsible for loss or damage howsoever arising)

Freight payable as per
CHARTER-PARTY
....

FREIGHT ADVANCE
Received on account of freight:

....

Time used for loading ................ days ................ hours.

SHIPPED at the Port of Loading in apparent good order and
condition on board the Vessel for carriage to the Port of Discharge or so near thereto
as she may safely get the goods specified above.
Weight, measure, quality, quantity, condition, contents and value unknown.
IN WITNESS where of the Master or Agent of the said Vessel has signed the
number of Bills of Lading indicated below all of this tenor and date, any one of
which being accomplished the others shall be void.

FOR CONDITION OF CARRIAGE SEE OVERLEAF

| FREIGHT PAYABLE AS PER CHARTER PARTY | Place and date of issue |
| --- | --- |
| | NOVOROSSISK        29.07.2006 |
| Number of original Bs/L | Signature |
| 3 (THREE) | MASTER OF THE M/V " MERVE A " |
| | MR. SEMIH UYGUNKAN |

Page 2

CODE NAME: "CONGENBILL". EDITION 1994

| Shipper<br>JSC   "TK"   «MAIRCENTER»   ON BEHALF   OF<br>"CENTRAMET TRADING S.A."<br>Contract № 756/52420817/15013 dd  26.12.2005 | BILL OF LADING       B/L No. 2<br>TO BE USED WITH CHARTER-PARTIES<br>                                   Reference No. |
|---|---|

| Consignee<br>TO   THE   ORDER   OF   ARAB   AFRICAN<br>INTERNATIONAL BANK |
|---|

FIRST
ORIGINAL

Notify address
EGYPTIAN AMERICAN STEEL ROLLING CO.
6, FARID SEMEIKA STR., HELIOPOLIS
CAIRO, EGYPT

| Vessel                              Port of loading |
|---|

MERVE A                  NOVOROSSISK / RUSSIA

Port of discharge

EL DEKHILA SEAPORT - EGYPT

Shipper's description of goods                          Gross weight

STEEL SCRAP                                IN BULK  680.520 MT

L/C NO. LC/HEL 610/06

(of which            on deck at Shipper's risk; the Carrier not         CLEAN ON BOARD
being responsible for loss or damage howsoever arising)

| Freight payable as per<br>CHARTER-PARTY<br>....<br><br>FREIGHT ADVANCE.<br>Received on account of freight:<br>................................................<br>......................................................<br>..time used for loading ................ days .............. hours. | SHIPPED  at  the  Port  of  Loading  in  apparent  good  order  and<br>condition on board the Vessel for carriage to the Port of Discharge or so near thereto<br>as she may safely get the goods specified above.<br>Weight, measure, quality, quantity, condition, contents and value unknown.<br>IN WITNESS where of the Master or Agent of the said Vessel has signed the<br>number of Bills of Lading indicated below all of this tenor and date, any one of<br>which being accomplished the others shall be void.<br><br>FOR CONDITION OF CARRIAGE SEE OVERLEAF |
|---|---|

|  | Place and date of issue |
|---|---|
| FREIGHT PAYABLE AS PER<br>CHARTER PARTY | NOVOROSSISK        29.07.2006 |
| Number of original Bs/L<br><br><br>3 (THREE) | Signature<br><br>MASTER OF THE<br>M/V "MERVE A " |

MR. SEMIH UYGUNKAN

Page 2

CODE NAME: "CONGENBILL". EDITION 1994

| Shipper | BILL OF LADING | B/L No. 3 |
| JSC  "TK"  «MAIRCENTER»   ON BEHALF   OF "CENTRAMET TRADING S.A." Contract № 756/52420817/15012 dd 26.12.2005 | TO BE USED WITH CHARTER-PARTIES | Reference No. |

Consignee
TO   THE   ORDER   OF   ARAB   AFRICAN
INTERNATIONAL BANK

Notify address
EGYPTIAN AMERICAN STEEL ROLLING CO.
6, FARID SEMEIKA STR., HELIOPOLIS
CAIRO, EGYPT

## FIRST ORIGINAL

| Vessel | Port of loading |
| MERVE A | NOVOROSSISK / RUSSIA |

Port of discharge

EL DEKHILA SEAPORT - EGYPT

| Shipper's description of goods | Gross weight |
| STEEL SCRAP | IN BULK  8 276.147 MT |

L/C NO. LC/HEL 610/06

(of which                    on deck at Shipper's risk; the Carrier not
being responsible for loss or damage howsoever arising)

**CLEAN ON BOARD**

| Freight payable as per CHARTER-PARTY .... FREIGHT ADVANCE. Received on account of freight: ........................ Time used for loading ............... days ............... hours. | SHIPPED   at   the   Port   of   Loading   in   apparent   good   order   and condition on board the Vessel for carriage to the Port of Discharge or so near thereto as she may safely get the goods specified above. Weight, measure, quality, quantity, condition, contents and value unknown. IN WITNESS where of the Master or Agent of the said Vessel has signed the number of Bills of Lading indicated below all of this tenor and date, any one of which being accomplished the others shall be void. FOR CONDITION OF CARRIAGE SEE OVERLEAF |

| FREIGHT PAYABLE AS PER CHARTER PARTY | Place and date of issue NOVOROSSISK         29.07.2006 |
| Number of original Bs/L 3 (THREE) | Signature MASTER OF THE M/V " MERVE A " MR. SEMIH UYGUNKAN |

31-08-2007   18:49    FROM-PENLAW                    +33 1 44 51 59 71        T-454   P.041/100   F-561



**ASLI**

ASLI DENİZ TAŞIMACILIĞI VE NAKLİYE TİCARET LTD. ŞTİ.

Tarih:...../....../200...

06.10.2006
FM  :  ASLI SHIPPING
TO  :  CENTRAMET TRADING S.A SWITZERLAND
REF :  MV MERVE A
        NOVOROSSISK / ALEXANDRIA  STEEL SCRAP

# DEMMURAGE  I N V O I C E
# MV MERVE A

DEMMURAGE (48.42 DAYS X USD 7000)......................USD  338,940.00.-

LESS  ADVANCE PAYMENT ..............................................USD   50,000.00.-

LESS COMMISSION %3,75................................................USD   12,710.25.-

SUM.................................................................................USD   276,229.75.-

PLEASE REMIT THE AMOUNT OF USD  276,229.75 - FULL ACCT:-

KOCBANK
BRANCH           : FENERYOLU
BRANCH CODE   : 649
ACCT NO          : 404-57843-(USD)
IBAN NO          : TR 4000098-000000000-40467843
SWIFT CODE     : KABATRIS
BENIFICIARY     : NAUTILUS DENIZCILIK SAN. ve TIC. LTD. ŞTİ

31-08-2007  18:49    FROM-PENLAW                    +33 1 44 51 59 71      T-454  P.042/100  F-561



**ACTIVE MARINE ISTANBUL**
AKTİF DENİZCİLİK TİC. LTD. ŞTİ.

02.10.2006
FM  : ACTIVE MARINE
TO  : CENTRAMET TRADING S.A SWITZERLAND
REF : MV MERVE A
      NOVOROSSISK / ALEXANDRIA  STEEL SCRAP

# D/A  I N V O I C E
## MV MERVE A

DISBURSMENT ACCOUNT FOR EXTRA STAY AT EL DEKHLIA PORT

BELONG TO MATINA SHIPPING...................................USD  18,323.00.-

SUM...........................................................................USD  18,323.00-

PLEASE REMIT THE AMOUNT OF USD 18,323.00 - FOLL ACCT:-

MISR INTERNATIONAL BANK (MIBANK)
MOHANDESSINE BRANCH
ADDRESS: 54, EL BATAL AHMED ABDEL AZIZ, EL MOHANDESSINE
TELEX : 20940 - 21841 MIBCA
FAX   : 02/3488796
TEL   : 02/3494424 - 02/3497091
ACCOUNT NO.: 6046949
SWIFT CODE : MIIBEGCXXXX
FAVOUR OF  : MATINA LINE
             CAPT. SAMIR HOUSNY FARID EL WARDANY

Eranköy Sanatkin Günalkay Caddesi Yilda Apt. No: 200/11 Kaдıköy / Istanbul
Tel: +90(216) 360 27 90 / 360 34 45  Fax: +90 (216) 355 17 73
Tlx: 0007-28755 actm it   e-mail: activemarine@supermarine.com

Swift Message Detail                                              Стр. 1 из 1

# Credit ● EuropeBank

**Message Header**

Swift Input:                    FIN 103 Customer Transfer

Sender:                         FBHLNL2AAXXX
                                CREDIT EUROPE BANK N.V.

Receiver:                       PNBPUS3NNYC

                                WACHOVIA BANK NA, NY

**Message Text**

20                              TRANSACTION REFERENCE NUMBER
                                1100FT0708000411

23B                             BANK OPERATION CODE
                                CRED

32A                             VALUE DATE, CURRENCY CODE, AMOUNT
                                Date (yy/mm/dd): 07/03/21
                                Currency: USD
                                Amount: 295000,0

50K                             ORDERING CUST
                                CENTRAMET TRADING S.A.

                                220,ROUTE DE FERNEY

                                GRAND SACONNEX,SWITZERLAND

52A                             ORDERING BANK
                                FBHLNL2A

57D                             PEOPLE'SBANK

                                850 MAIN STREET, BRIDGEPORT

                                CONNECITCUT 08604

221172166                       ABA:221172166

59                              BENEFICIARY CUSTOMER
                                /0757006297

                                TISDALE AND LENNON LLC

70                              DETAILS OF PAYMENT
                                DEM MERVE A

.71A                            DETAILS OF CHARGES
                                OUR



DATED 28 April 2007

(1) GST COMMODITIES TRADING CO.

- and -

(2) CENTRAMET TRADING SA

---

DEED OF ASSIGNMENT

---

Watson Farley & Williams
15 Appold Street
LONDON EC2A 2HB

Ref.: BAGO1/SMAC1/20972.58001

1

THIS ASSIGNMENT is made the 28 day of April 2007

BETWEEN:-

(1)     GST COMMODITIES TRADING CO, whose registered office is at Langham House Suite 401, 302 Regent Street, London W1B 3HH (the "Assignor"); and

(2)     CENTRAMET TRADING SA, whose registered office is at 220, route de Fernay, Grand-Saconnex, P.O.Box # 201, 1218 Geneva, Switzerland (the "Assignee")

WHEREAS:-

(1)     The Assignee entered into a charterparty with Nautilis Denizcilik San.ve TIC,LTD.STI (the "Owner") dated 14 July 2006 for the hire of the vessel m.v. "Merve A" (the "Charterparty").

(2)     The Assignor entered into a contract for the sale of steel scrap on CIF terms (the "Sale Contract") dated 14 June 2006 to Egyptian American Steel Rolling Company (the "Buyer"). The cargo sold under the Sale Contract was carried on the "Merve A" pursuant to the Charterparty. An express clause of the Sale Contract stated that the Buyer was liable for demurrage as per the Charterparty.

(3)     The Assignor now wishes to assign to the Assignee the benefit of the Assignor's claim for demurrage under the Sale Contract (the "Demurrage Claim")

NOW THIS DEED WITNESSETH as follows:-

1       For one dollar and other good consideration, receipt of which is hereby acknowledged, the Assignor hereby assigns absolutely to the Assignee all its rights of action against the Buyer as well as any choses in action relating to or in any way connected with the Demurrage Claim.

2       This assignment shall be governed by and construed in accordance with the Laws of England.

3       Nothing in this assignment shall detract from any accrued rights of the Assignee to claim demurrage directly from the Buyer arising from the Sale Contract.

2

IN WITNESS whereof the parties hereto have entered into this Assignment as a deed the day and year first above written.

SIGNED AND DELIVERED as a Deed
for and on behalf of GST Commodities Trading Co
in the presence of:

)
)
)

SIGNED AND DELIVERED as a Deed
for and on behalf of Centranet Trading SA
Limited in the presence of:

)
)
)

Sergey Semin

3



"HCMP 3"  *Voyage Charters Second Edition Cooke et al.*

**18.63**                              BILLS OF LADING

charterparty is unenforceable between owners and charterers,[95] but it will not be effective if the "charterparty" is merely an oral agreement summarised in a recap telex.[96]

**Parties to the "bill of lading contract"**

**18.64** Two principal issues arise concerning the parties to what may be termed "the bill of lading contract", namely:

(a) The identity of the person who accepts contractual responsibility for the carriage of the goods, usually referred to as "the carrier", and in particular whether the shipowner or the charterer is "the carrier" under the contract.

(b) The identity of the other party to the contract, and in particular whether the contractual rights and obligations of the original party (the shipper) have been transferred to a subsequent holder of the bill of lading, and where feeder or subcontracted services are used.

A related issue arises when the carriage of goods, or some aspect of it, has been sub-contracted by the main carrier, to an independent contractor. What are the terms governing the relationship of the cargo owner and that sub-contractor?

*(a) The identity of "the carrier"*

**18.65** When the ship is under charter, the bill of lading is often issued and signed by the charterer or his agent, or is on the charterer's printed form. The question then arises whether it is the owner or the charterer who is the party to the bill of lading contract in the capacity of "the carrier". Assuming that no issue of lack of authority is raised[97] this question depends upon the correct construction of the bill of lading construed as a whole, including but not limited to the form in which it is signed.[98]

**18.66** Where the bill of lading is signed by the master the presumption is that it takes effect as a contract with the employer of the master, that is to say, the shipowner,[99] or, if the ship is chartered by demise, with the demise charterer.[100] As used in the following paragraphs, the word "shipowner" includes a demise charterer, and "charterer" means a charterer not by demise. The same presumption applies when the bill of lading, although not signed by the master personally, is signed "for the master" by an agent, at any rate where the agent is authorised so to do in the charterparty or otherwise.

> The *Rewia* was sub-chartered, to the operators of a container line, by an NYPE form of charter which contained a clause requiring the master to authorise agents to sign bills of lading on his behalf. A consignment of nutmeg was shipped at Grenada for carriage to a European port under bills of lading which bore the words " . . . in witness whereof the master has signed the number of bills of lading stated below . . . " and which were signed by agents at the loading port "for the master". The bills of lading were in liner form and were headed with the name of the sub-charterers and their managers. The consignment was lost on the voyage and the question arose whether the contracting parties under the bill of lading contracts were the shipowners or the sub-charterers.

95. See *A/S Ocean v. Harding* [1928] 2 K.B. 371, 393.
96. *The Heidberg* [1994] 2 Lloyd's Rep. 287.
97. As to which see below, para. 18.171.
98. See *Sunrise Maritime v. Uvisco (The Hector)* [1998] 2 Lloyd's Rep. 287 at pp. 294–296.
99. *Turner v. Haji Goolam* [1904] A.C. 826; *Wehner v. Dene* [1905] 2 K.B. 92; *Limerick v. Coker* (1916) 33 T.L.R. 103.
100. *Baumwoll v. Gilchrest* [1892] 1 Q.B. 253, [1893] A.C. 8.

The Court of Appe...
had authority to sign...
be owners' bills. In th...
lading and it was im...
charterers, and immat...
of the bills of lading.
Leggatt L.J., with...
reviewing the authorit...
conclusion that a bill...
was made with the ch...
behalf of the charterel...
(*The Rewia* [1991]...
v. *Andrew Weir* (1925...

**18.67** Some bills of l...
another form of clause,...
the contract evidenced b...
demise charterer of the...
was regarded as first to...
cargo, and who would t...
of carriage with the go...
result in any event; and...
benefit of statutory limit...
the laws of some countr...
are generally effective a...
amounts to sufficiently...
carrier are important an...

> CPS were the operatol...
> loaded on the vessel al...
> different styles, each...
> signed . . . ", namely ...
> two critical clauses, or...
> the other providing th...
> the bill of lading it sho...
> and that the line execu...
> The registered owners...
> clause in the bills of la...
> not parties to the bill ...
> Moore-Bick J. held...
> contracts because the c...
> of signature were not s...
> possibility that the for...
> (*Fetim B.V. v. Oce...
> approach to the issue c...
> *Navigation Co. v. Jam...
> held that signing of a c...
> a while justified the c...
> *Balfour Williamson* [1...

**18.68** Conversely and...
ently signed "for the ma...
and legitimate surroundi...
shipowner being the "ca...

. not be effective if the
,yo

be termed "the bill of

for the carriage of the
:ther the shipowner or

/hether the contractual
been transferred to a
:ontracted services are

is been sub-contracted
:rning the relationship

ied and signed by the
then arises whether it
in the capacity of "the
uestion depends upon
ling but not limited to

a is that it takes effect
ier,99 or, if the ship is
; paragraphs, the word
:er not by demise. The
the master personally,
10rised so to do in the

E form of charter which
lading on his behalf. A
1ort under bills of lading
umber of bills of lading
the master". The bills of
rers and their managers.
:ontr.___ g parties under

-296.
: v. Coker (1916) 33 T.L.R.

BILL OF LADING AS A CONTRACT OF CARRIAGE        **18.68**

The Court of Appeal held that the owners were the contracting parties. It was clear that the agents had authority to sign for the master and the charterparty contemplated that the bills of lading would be owners' bills. In these circumstances the question was entirely one of construction of the bill of lading and it was irrelevant that the vessel was engaged on a liner service operated by the sub-charterers, and immaterial to enquire into the events surrounding the booking of the cargo or the issue of the bills of lading.

Leggatt L.J., with whose reasoning the other members of the Court of Appeal agreed, after reviewing the authorities said (page 333): "They are all of a pattern. In my judgment they support the conclusion that a bill of lading signed for the master cannot be a charterers' bill unless the contract was made with the charterers alone, and the person signing has authority to sign, and does sign, on behalf of the charterers and not the owners."

(*The Rewia* [1991] 2 Lloyd's Rep. 325. See also *Tillmans v. Knutsford* [1908] 1 K.B. 185; *Wilston v. Andrew Weir* (1925) 22 Ll.L.Rep. 521.)

**18.67** Some bills of lading contain an express clause identifying "the carrier". Some contain another form of clause, known as a "demise clause". The effect of each was thought to be that the contract evidenced by the bill of lading takes effect between the merchant and the owner or demise charterer of the ship, who alone is treated as the carrier. The purpose of such a clause was regarded as first to ensure that it is the person who is in actual possession of the ship and cargo, and who would thus be most at risk from claims in tort, who is the party to the contract of carriage with the goods owner, although a Himalaya clause would frequently ensure this result in any event; and secondly to ensure that the person who is thus liable is entitled to the benefit of statutory limitation of liability, which at one time did not extend to charterers. Unlike the laws of some countries, under which such clauses are invalid, in English law such clauses are generally effective at least in the absence of clear contrary words. The question is what amounts to sufficiently clear contrary words. Clarity and certainty in the identification of the carrier are important and yet the law is in an unsatisfactory state.

CPS were the operators of a liner service for which they had timechartered the *Flecha*. Parcels were loaded on the vessel and bills of lading on the standard CPS form were signed by CPS's agents in two different styles, each under the attestation "In witness whereof the Master of the said vessel has signed . . . ", namely "as agents for CPS as carriers" and "as agents for the carrier CPS". There were two critical clauses, one identifying the owner as "the carrier" (the identity of the carrier clause) and the other providing that if the vessel was not owned or chartered by demise to the company issuing the bill of lading it should take effect only as a contract of carriage with the owner or demise charterer, and that the line executing the bill of lading was not a principal to the transaction (the demise clause). The registered owners were sued for cargo damage in England, pursuant to an exclusive jurisdiction clause in the bills of lading, and they sought to challenge the proceedings on the basis that they were not parties to the bill of lading contracts.

Moore-Bick J. held in an extempore judgment that the owners were parties to the bill of lading contracts because the demise and identity of carrier clause clearly indicated that result and the modes of signature were not sufficiently clearly to the opposite effect, although he seemed to contemplate the possibility that the form of signature might be so clear and compelling as to achieve that effect.

(*Fetim B.V. v. Oceanspeed Shipping (The Flecha)* [1999] 1 Lloyd's Rep. 612. Compare the approach to the issue of the personal liability of an agent who signs a contract as in *Universal Steam Navigation Co. v. James McKelvie* [1923] A.C. 492, 499–501; [1922] 1 K.B. 518, 535, where it was held that signing of a charterparty "as agents" excluded personal liability only if the contract read as a whole justified the conclusion that the party signing did so only as an agent; see also *Lester v. Balfour Williamson* [1953] 2 Q.B. 168.)

**18.68** Conversely and yet in accordance with the principles stated above, even when apparently signed "for the master", a bill of lading must be considered in the light of all of its terms and legitimate surrounding circumstances, which may point towards someone other than the shipowner being the "carrier".

**18.68**                                   BILLS OF LADING

The *Hector* was timechartered to USEL on terms that the master was to authorise the charterers to "sign bills of lading on their behalf in accordance with mates' receipts". USEL then sub-voyage chartered the vessel on terms that an antedated clean bill of lading would be issued, to be signed by the charterers' agents on his behalf. Some days before loading was complete a bill of lading was issued bearing typed words indicating USEL as "carrier" and signed "for and on behalf of the master" by the charterers' agents; the bill was not in accordance with mate's receipts. It was on the Conline form and contained the standard form identity of carrier clause, cl. 17. A question arose as to whether it was a bill which bound the owners to complete the voyage.

Rix J. held that it was not a bill of lading to which the owners were party. He approached the question first on the basis of the construction of the bill of lading and then considered whether the surrounding circumstances were such as to support or detract from his conclusion. He concluded that the clause designating USEL as "carrier" was a contractual definition of the term as used in the bill of lading, which contained numerous clauses as to the rights and obligations of the "carrier", including those in the Hague Rules.

At page 294 he said: ". . . the matter can be looked at in two ways. Either the three elements of the bill—the USEL stipulation, the signature and cl. 17—can be regarded as being consistent with one another, on the basis that because it is stipulated that USEL are the carrier, it must therefore follow that they are owners too; or the typed stipulation of USEL as carrier on the face of the bill must be regarded as superseding the printed provisions of cl. 17. The rule is only that in the ordinary way a bill signed for the master will be an owners' bill, not that it must be." He concluded by verifying his decision by reference to the surrounding circumstances and held that the charters both contemplated charterers' bills and that USEL had specifically authorised the particular bills of which the owners were ignorant.

(*Sunrise Maritime v. Uvisco (The Hector)* [1998] 2 Lloyd's Rep. 287; *cf. The Ines* [1995] 2 Lloyd's Rep. 144, Clarke J. and see [1999] L.M.C.L.Q. 1 (Waldron).)

**18.69** Rix J.'s judgment was delivered after, and apparently in ignorance of, Moore-Bick J.'s judgment in *The Flecha*; and whereas each case may finally be regarded as having been decided on its own facts, there does appear to be a tension between the two. This was recognised by Colman J. in *The Starsin*,[101] who, on a bill of lading term identical to that in *The Flecha*, preferred the reasoning of Rix J. and treated the signature of or for a charterer as "carrier" as superseding the effect of printed demise and identity of carrier clauses. He approached the matter by posing the question "in what sense could the shipper to whom the bill was originally issued be expected to have understood the words used?" and answering it by giving preponderant weight to the written or typed provisions over the printed provisions and by applying by analogy the principle in *Universal Steam Navigation v. James McKelvie*.[102] He considered that if a party may sign a commercial contract in a way which indicates that he does not accept personal liability, so conversely he may do so in a way which represents that he *does* accept such personal liability. Although the reasoning of Rix J. and Colman J. might have been thought preferable, the Court of Appeal by a majority (Sir Andrew Morritt and Chadwick L.JJ., Rix L.J. dissenting) have reversed Colman J.'s decision on this part of the case.[103] The majority regarded the presence of both an "identity of carrier" clause and a "demise" clause in the standard terms, in a bill of lading on the standard form of and signed by the liner operators (the vessel's charterers) meant that, as a matter of construction of the bill of lading as a whole, it constituted a contract between cargo owners and the shipowners, not the charterers. Leave to appeal to the House of Lords was refused by the Court of Appeal; this may be regretted as the very refined construction of the bill of lading adopted by the majority of the court may be somewhat remote from commercial reality. Any decision of the House of Lords on that issue is awaited at the time of writing.

**18.70** By contrast, some charterer as "carrier".

A and B operated a joint l which was under time cha "Carrier is [A or B] depe covered by this bill of la contract was A or the shi

Sheen J. held that A, inconsistent with anyone was wide enough to inclu

(*The Venezuela* [1980] crucial in *The Venezuela* \ the bill of lading that there which A was the designat some other express desig

**18.71** Notwithstanding t confidence that a bill of la clause, takes effect as a cor on behalf of the charterer,[ own behalf.[105] A similar d *ster*[106] and in *Samuel* v. charterer's name and sign signature, took effect as cc cases the goods were ship mainly their own vessels, ( bill of lading on one of the participants in the line. In *7* used exclusively chartered

**18.72** Even if the charter be "the carrier" under any a bill of lading should as a bill *alone*. The judgment i whether the shipowner or t a question of construction c an antecedent booking arra Moore-Bick J. and Rix J. underlying charterparty as that, whilst it may be legiti whether there was authorit to see whether the owners An indorsee of the bill of l

101. *Homburg Houtimport v. Agrosin (The Starsin)* [2000] 1 Lloyd's Rep. 85 (Colman J.).
102. [1923] A.C. 492. See above, para. 18.67.
103. [2001] 1 Lloyd's Rep. 437.

104. As in *Harrison v. Hudde* charterers".
105. *The Okehampton* [1913] :
106. [1924] A.C. 522.
107. (1906) 11 Com. Cas. 111
108. [1991] 2 Lloyd's Rep. 33
109. See also *The Starsin* [20(
110. [1999] 1 Lloyd's Rep. 61
111. [1998] 2 Lloyd's Rep. 2£

[left margin partial column text:]

> authorise the charterers to
s". USEL then sub-voyage
d be issued, to be signed by
mplete a bill of lading was
"for and on behalf of the
ate's receipts. It was on the
cl. 17. A question arose as
e,

e party. He approached the
hen considered whether the
nclusion. He concluded that
the term as used in the bill
oligations of the "carrier",

Either the three elements of
us being consistent with one
ler, it must therefore follow
the face of the bill must be
/ that in the ordinary way a
. concluded by verifying his
charters both contemplated
r of which the owners

f. The Ines [1995] 2 Lloyd's

ance of, Moore-Bick J.'s
d as having been decided
This was recognised by
] to that in The Flecha,
charterer as "carrier" as
ases. He approached the
m the bill was originally
g it by giving preponder-
.ons and by applying by
ie.[102] He considered that
that he does not accept
. that he does accept such
night have been thought
Chadwick L.JJ., Rix L.J.
[03] The majority regarded
ise in the standard terms,
operators (the vessel's
is a w' le, it constituted
s. Lea_ _ to appeal to the
etted as the very refined
nay be somewhat remote
ue is awaited at the time

m J.).

**18.70** By contrast, some bills of lading may contain a clause specifically identifying the charterer as "carrier".

> A and B operated a joint liner service, in the course of which goods were shipped on the *Venezuela*, which was under time charter to A. The bill of lading, which was signed for the master, provided that "Carrier is [A or B] depending on whichever of the two is operating the vessel carrying the goods covered by this bill of lading". A dispute arose over whether the carrier under the bill of lading contract was A or the shipowner.
>
> Sheen J. held that A, who was time charterer of the ship, was the carrier. The clause was inconsistent with anyone other than A or B being the carrier, and the phrase "operating the vessel" was wide enough to include one who operated her as charterer.
>
> (*The Venezuela* [1980] 1 Lloyd's Rep. 393; in *The Hector* (above) Rix J. considered that what was crucial in *The Venezuela* was that the bill of lading had no provision to inform a third party holder of the bill of lading that there might be a conflict between the bill signed by the master and the bill under which A was the designated carrier, but that the situation might have been different if there had been some other express designation of the "carrier".)

**18.71** Notwithstanding the conflict of view described above, it may be said with some confidence that a bill of lading, which does not contain a demise clause or identity of carrier clause, takes effect as a contract with the charterer where it is, with authority, expressly signed on behalf of the charterer,[104] or where the charterer himself signs without qualification on his own behalf.[105] A similar decision was reached in *Paterson, Zochonis & Co.* v. *Elder Dempster*[106] and in *Samuel* v. *West Hartlepool*[107] where bills of lading headed with the time charterer's name and signed by the master, apparently without any words qualifying the signature, took effect as contracts with the time charterers. It may be important that in those cases the goods were shipped on well-known shipping lines, in which the participants used mainly their own vessels, only chartering in exceptional circumstances. Thus, any holder of a bill of lading on one of the line's forms would expect it to constitute a contract with one of the participants in the line. In *The Rewia*,[108] by contrast, the line operators who chartered the vessel used exclusively chartered tonnage.

**18.72** Even if the charterparty contemplates or even expressly provides that the charterer will be "the carrier" under any bill of lading issued under it, the identity of "the carrier" under such a bill of lading should as a matter of principle be determined by reference to the terms of the bill *alone*. The judgment in *The Rewia* emphasises that, subject to the question of authority, whether the shipowner or the charterer is the carrier under the bill of lading contract is entirely a question of construction of the bill of lading and it is irrelevant that the shipper may have made an antecedent booking arrangement with the charterer.[109] In *The Flecha*[110] and in *The Hector*,[111] Moore-Bick J. and Rix J. both appeared to think that it might be possible to consider an underlying charterparty as part of the factual matrix of the bill of lading contract. It is submitted that, whilst it may be legitimate and even necessary to have regard to the charterparty to discern whether there was authority to bind the owners, it is not legitimate where the purpose is simply to see whether the owners have been made parties to the bill of lading thus brought into being. An indorsee of the bill of lading is normally ignorant of the details of those arrangements, and

104. As in *Harrison* v. *Huddersfield SS. Co.* (1903) 19 T.L.R. 386, where the captain signed "as agent for time charterers".
105. *The Okehampton* [1913] P. 173.
106. [1924] A.C. 522.
107. (1906) 11 Com. Cas. 111.
108. [1991] 2 Lloyd's Rep. 325. See para. 18.66 above.
109. See also *The Starsin* [2000] 1 Lloyd's Rep. 85, 92.
110. [1999] 1 Lloyd's Rep. 612 at p. 618.
111. [1998] 2 Lloyd's Rep. 287 at p. 296.

**18.72** BILLS OF LADING

in his hands the bill of lading itself represents the terms of the contract. It would be wrong to impute constructive knowledge of the terms of a charterparty which are not incorporated into the bill of lading.

**18.73** One may, nonetheless, have regard to provisions of the governing charterparty where they are effectively incorporated into the bill of lading contract; this is not an exception to the general principle but simply an example of it when the bill of lading terms are to be found in more than one document. Similarly, the general principle of having regard only to the bill of lading will not apply where the bill of lading holder has actual notice of the master's lack of authority to sign on behalf of his owners.[112]

*(b) The identity of the cargo interest who is party to the contract*

**18.74** The original contract is usually with the shipper named in the bill of lading, or his principal, and usually precedes the issue of the bill of lading.[113] However, it is not every case in which the named shipper, even if a principal, is privy to the relevant contract of carriage: the bill of lading is only evidence of the contract between the shipper and the carrier which has been made before the goods were shipped. Thus in *Cho Yang Shipping v. Coral (UK) Ltd.*[114] the shipper named in the bill of lading, who had contracted with a forwarding agent for the carriage, the latter acting as principal, was held not to be party to any contract with the carrier, and thus to be under no liability to the carrier for freight. In *Boliden Ore v. Dawn Maritime*[114a] an attempt to establish that the parent company of the named shipper was, as his principal, a party to the bill of lading contract failed on the facts.

**18.75** However, most of the problems in identifying the cargo interest who is party to the bill of lading contract have arisen in determining whether the contractual rights and liabilities have been transferred to a new holder under the legislation providing for a transfer or otherwise. For bills of lading issued before 16 September 1992, this transfer was achieved, if at all, principally by the machinery of the Bills of Lading Act 1855, occasionally by an implied contract or, rarely, by a legal or equitable assignment. Although the latter two methods remain available, they are either uncertain or unwieldy and the principal mechanism for the transfer of rights and liabilities under bills of lading or similar documents issued on or after 16 September 1992 is now provided by the Carriage of Goods by Sea Act 1992, section 6(2) of which repealed the 1855 Act. The effect of the 1855 Act is set out in the first edition of this work at pages 383–384 and will not be discussed here. There has been only one decision of importance on the 1855 Act itself since the first edition, namely that of the House of Lords in *The Giannis N.K.*[115] where it was held that the Act did not divest the original shipper of his liabilities when he transferred the bill of lading, and that he remained under a liability for the shipment of a dangerous cargo. This decision continues to have some importance for the purposes of the 1992 Act because it defined the nature of the undertaking given by a shipper with regard to the dangers of shipped cargoes, and that has not been changed by the 1992 Act.

112. *Manchester Trust v. Furness* [1895] 2 Q.B. 282, 539; *The Hector* [1998] 2 Lloyd's Rep. 287.
113. See *Pyrene v. Scindia Navigation* [1945] 2 Q.B. 402 (see para. 18.45).
114. [1997] 2 Lloyd's Rep. 641. Thus where there is a named consignee in the bill of lading it may be inferred that he, not the shipper, is the contracting party; see *per* Lord Hobhouse in *Borealis AB v. Stargas Ltd. (The Berge Sisar)* [2001] 1 Lloyd's Rep. 663 at para. 19 of his speech, relying on *Dawes v. Peck* (1799) 8 Term Rep. 330 and *The Albazero* [1977] A.C. 774 at p. 786.
114a. [2000] 1 Lloyd's Rep. 247.
115. *Effort Shipping v. Linden Management (The Giannis N.K.)* [1998] 1 Lloyd's Rep. 337. However, the discussion of the Act in the speech of Lord Hobhouse in *The Berge Sisar* [2001] 1 Lloyd's Rep. 663 at para. 18 *et seq.* represents an authoritative and seminal valediction.

**18.76** The la[...]
under the Bills [...]
trade, limited a[...]
endorsement of [...]
represented by [...]
requirement has [...]
concept that the [...]
the contract con[...]
relevant loss or [...]
either takes or [...]
carriage in resp[...]

**The Carriage [...]**

**18.77** The 19[...]
*The Berge Sisa[...]*
legitimate aid t[...]
led to the Act.[...]
for having rega[...]
directed or as r[...]

**The types of do[...]**

**18.78** Apart [...]
contained in or [...]
which the unde[...]
legislation relat[...]
systems or othe[...]

**18.79** By sec[...]
However, the t[...]
endorsement or, [...]
the definition s[...]
"non-negotiable [...]
reserved by the [...]
still be a sea w[...]
of lading often i[...]
bill of lading or [...]
of the Act, but [...]
carrier for it is [...]
creating rights a[...]

115a. As describ[...]
116. *Borealis AB* [...]
[2001] 1 Lloyd's R[...]
117. See *ibid.* pp[...]
of Suit in respect o[...]
117a. *Per* Lord H[...]
118. Section 1(5) [...]
119. See, e.g., *Th*[...]
120. *Cf. Hubbers*[...]

.ct. It would be wrong to
not incorporated into the

:rning charterparty where
s not an exception to the
terms are to be found in
regard only to the bill of
e of the master's lack of

the bill of lading, or his
:ever, it is not every case
:t contract of carriage; the
:he carrier which has been
:. Coral (UK) Ltd.[114] the
ing agent for the carriage,
with the carrier, and thus
:n Maritime[114a] an attempt
s pri'  'al, a party to the
'···.

est who is party to the
rights and liabilities have
ch a transfer or otherwise.
: was achieved, if at all,
:asionally by an implied
atter two methods remain
:hanism for the transfer of
t on or after 16 September
ion 6(2) of which repealed
tion of this work at pages
ision of importance on the
rds in The Giannis N.K.[115]
of his liabilities when he
ity for the shipment of a
:r the purposes of the 1992
hipper with regard to the
992 Act.

loyd's rep. 287.

of lading it may be inferred that
:. Stargas Ltd. (The Berge Sisar)
Term Rep. 330 and The Albazero

:ep. 337. However, the discussion
663 at para. 18 et seq. represents

**18.76** The law which had developed in relation to the passing of title to sue and liabilities under the Bills of Lading Act 1855 was complicated and increasingly ill-equipped for modern trade, limited as it was to bills of lading and based as it was upon a requirement that the endorsement of a bill of lading did not necessarily transfer rights unless property in the goods represented by the bill of lading passed upon or by reason of the endorsement.[115a] That requirement has now gone and the Carriage of Goods by Sea Act 1992 has introduced the concept that the "lawful holder" of the bill of lading shall, in principle, be entitled to sue on the contract contained in or evidenced by it, even if he is not the person who has suffered the relevant loss or damage (section 2(1)), and he is also bound by the obligations under it if he either takes or demands delivery of the goods or if he makes a claim under the contract of carriage in respect of the goods (section 3(1)).

## The Carriage of Goods by Sea Act 1992

**18.77** The 1992 Act cannot be interpreted wholly without regard to the pre-existing law: see The Berge Sisar,[116] in which it appeared to be accepted by the Court of Appeal that it was a legitimate aid to construction to have regard to the terms of the Law Commission report which led to the Act.[117] This was also the view of the House of Lords, where, however, the occasions for having regard to the report were defined as identifying the mischief at which the Act was directed or as resolving any ambiguity, if one arises.[117a]

## The types of document containing or evidencing the contract of carriage

**18.78** Apart from dealing with bills of lading the Act also makes provision for contracts contained in or evidenced by "sea waybills" and for contracts under or for the purposes of which the undertaking given in "ships delivery orders" is given. It also contains enabling legislation relating to the issue and transfer of shipping documents by telecommunication systems or other information technology.[118]

**18.79** By section 1(2), "bill of lading" includes "received for shipment" bills of lading. However the term does not include documents which are incapable of transfer either by endorsement or, as a bearer bill, by delivery without endorsement. This appears to exclude from the definition so-called "straight" or "straight consigned" bills of lading, which are marked "non-negotiable" or which are not made out "to order or assigns" where no right has been reserved by the shipper to amend the bill to make it "to order or assigns", but such a bill may still be a sea waybill. There is no reason in principle why "switch bills" (a second set of bills of lading often issued for commercial reasons either to divide up a quantity covered by a single bill of lading or to conceal the true identity of one party[119]) should be excluded from the effect of the Act, but great care must be taken to ensure that they are issued with the authority of the carrier for it is submitted that only when they are can they properly be viewed as material for creating rights against the carrier.[120] It may be better, when it is desired to divide up a quantity

115a. As described by Lord Hobhouse in The Berge Sisar (above).
116. Borealis AB v. Stargas Ltd. (The Berge Sisar) [1998] 2 Lloyd's Rep. 475 (C.A.), upheld in the House of Lords [2001] 1 Lloyd's Rep. 663.
117. See ibid. pp. 485–486 and also the joint report of the English and Scottish Law Commissions 1991 on Rights of Suit in respect of Carriage of Goods by Sea—Law Com. No. 196; Scot. Law Com. No. 130.
117a. Per Lord Hobhouse in The Berge Sisar (above) at para. 28 of his speech.
118. Section 1(5), as to which see generally Faber in [1996] L.M.C.L.Q. 323.
119. See, e.g., The Atlas [1996] 1 Lloyd's Rep. 642.
120. Cf. Hubbersty v. Ward (1853) 8 Ex. 331.

31-08-2007  18:53    FROM-PENLAW                    +33 1 44 51 59 71    T-454  P.053/100  F-561

" HCMP 4 "



# England and Wales Court of Appeal
# (Civil Division) Decisions

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2004] EWCA Civ 822**

Case Nos: A3/2003/2289 & 2299

IN THE SUPREME COURT OF JUDICATURE
COURT OF APPEAL (CIVIL DIVISION)
ON APPEAL FROM THE QUEEN'S BENCH
DIVISION (COMMERCIAL COURT)
MORISON J.
[2003] EWHC 2225 (Comm)

Royal Courts of Justice
Strand,
London, WC2A 2LL

07th July 2004

B e f o r e :

THE RIGHT HONOURABLE LORD JUSTICE JUDGE
THE RIGHT HONOURABLE LORD JUSTICE BUXTON
and
THE RIGHT HONOURABLE LORD JUSTICE MANCE

Between:

## (1) FAL OIL CO. LTD.
## (2) CREDIT AGRICOLE INDOSUEZ (SUISSE) SA

Claimants/
Respondents
in 1st appeal
Appellants in
2nd appeal

- and -

## PETRONAS TRADING CORPORATION SDN BHD

Defendant/
Appellant in 1st
appeal
Respondent in
2nd appeal

(Transcript of the Handed Down Judgment of
Smith Bernal Wordwave Limited, 190 Fleet Street

**London EC4A 2AG**
**Tel No: 020 7421 4040, Fax No: 020 7831 8838**
**Official Shorthand Writers to the Court)**

---

**Mr. Richard Millett QC & Mr. Edmund King (instructed by Ince & Co.) for the
Claimant /(1)Respondent & (2)Appellant**
**Mr. Stephen Males QC & Mr. Lawrence Akka (instructed by Holman Fenwick Willan) for the Defendant/
(1)Appellant & (2)Respondent**

---

**HTML VERSION OF JUDGMENT**

---

Crown Copyright ©

Lord Justice Mance:

*Introduction*

1.  This is an appeal and cross-appeal by permission of the single judge from a judgment of Morison J given on 10th October 2003. Morison J held after a five-day trial in July 2003 that the defendants, Petronas Trading Corporation Sdn Bhd ("Petronas"), had not established any defence to a claim for the price of fuel oil allegedly sold and delivered to them by the claimants, Fal Oil Co Limited ("Fal Oil"). Petronas appeal against that decision, while Fal Oil appeal against the judge's decision in Petronas's favour on a lesser claim relating to demurrage. Fal Oil's claims were made under a contract of sale dated 29th November 2000. This provided for delivery of four cargoes of 80,000 metric tons (10% plus or minus in sellers' option) of cracked fuel oil 700 CST of "ex-Yanbu Standard Quality" C and F one/two safe port(s) Singapore/Pasir Gudang range. To be of Yanbu standard quality, cracked fuel 700 CST must have no more than 1% water and sediment.

2.  For Fal Oil's operational convenience, a variation was agreed in respect of the first cargo and recorded in faxes of 13th and 14th February 2001, whereby the intended cargo would be lifted from Yanbu in the Centaur, but would be the subject of a ship-to-ship ("STS") transfer onto the Devon off Port Sudan, and:

    "1. B/L should be cut as per the quantity received by daughter vessel [i.e. the Devon] taking into account the vessel experience factor.

    2. Quality of each sample taken from individual tanks of daughter to meet the contractual quality.

    .....

    5. Buyer accepts Saybolt as independent inspector for the STS operations (for the inspection of quantity and quality in relation to items 1 and 2 above), and agrees to share the inspection fee with the Seller.

    ....."

3.  The Centaur loaded cargo at Yanbu on 25th February 2001, a STS transfer onto the Devon took place off Port Sudan on 26th February 2001 and the Devon arrived on 17th March 2001 at her first nominated discharge port of Singapore, her second nominated discharge port being Pasir Gudang. The percentage of water and sediment in samples taken from the Yanbu shore tanks on 20th and 22nd February 2001 was 0.2%. This was consistent with the range of water and sediment which was subsequently ascertained to be present in samples taken from the Centaur's tanks after loading at Yanbu. 0.2% of 85,000 tonnes is 170 tonnes. However, on discharge of the Devon in the Far East, her cargo was found to contain about 1,700 tonnes of water (mainly sea-water) - an excess over the reported Yanbu quantities of some 1500 tonnes. This discovery led to great delay in discharging and to a claim by Petronas to reject the whole cargo – hence Petronas's refusal to pay its price. The issues

before Morison J were (1) whether Petronas had established on the balance of probabilities that the cargo loaded onto the Devon at the STS contained more than the permitted contractual maximum of 1% water and sediment and (2) the nature of any contractual liability for demurrage by Petronas towards Fal Oil. (The order in terms also required the judge to determine Petronas's liability for demurrage, but this would raise further issues which were not addressed before him or us.) The judge held that (a) Petronas had failed to establish any excess of water and sediment in the cargo loaded at the STS point, and (b) the demurrage provision in the sale contract between Fal Oil and Petronas operated as a contract of indemnity (that is in respect of liability, if any, on Fal Oil's part under its charterparty), rather than as a free-standing provision. Petronas appeal in respect of (a), while Fal Oil appeal in respect of (b).

4.  The water discovered on discharge of the Devon included some fresh water arising from leaking coils on the Devon. But the bulk of the additional 1500 tons consisted of sea-water. Its discovery, in the absence of any known casualty or identifiable incident, represented a most unusual event. It becomes even more unusual, once it appears that the total quantities of liquid loaded on the Centaur at Yanbu and on the Devon at the STS point closely correspond, after making appropriate adjustments for cargo and atmospheric conditions, with the total quantity of liquid (including the 1500 tonnes) ascertained to have been in and discharged from the Devon's cargo-carrying tanks at Singapore and Pasir Gudang. On this point, the judge accepted the evidence of Petronas's expert, Mr Severn, who had calculated the following figures. The quantity metered by the terminal and used in the bill of lading by the shippers (Exxonmobil Sales and Supply Corporation) became after adjustment 75,484 tonnes. Saybolt as surveyors acting for Fal Oil at Yanbu had in fact calculated the Centaur's ship's loaded quantity, using the vessel's ullage tables, and had arrived at a total which led them to give notice to the terminal of an apparent discrepancy of some 230.49 tonnes (a relatively small quantity). But Mr Severn evidently attached no significance to this, taking as accurate the quantity given by the meters (which were recorded as having been proved by the surveyor during the loading). Mr Severn's adjusted quantity for cargo loaded on the Devon based on Saybolt's measurements at the STS point gave a figure of 75,953.988 tonnes, that is some 469.988 tonnes more than loaded at Yanbu. But Mr Severn's calculations for discharge at Singapore and Pasir Gudang gave a total adjusted tonnage only 41.973 tonnes in excess of the adjusted Yanbu load figure. Mr Severn considered that the reliable measurements were those at Yanbu and on discharge in the Far East. The judge was on that basis faced with a situation where any ingress of water must have been matched by an equivalent loss or discharge of fuel oil. Fal Oil ran a positive case, to the effect that this was likely to have occurred as a result of some accident on board the Devon, in particular as a result of defects in her piping or valves drawing or allowing the entry of water during discharge and/or an interchange of oil and ballast connected with recent modification to her ballast piping and cargo systems. But the judge did not accept any such theory, which also failed to explain where 1500 tonnes of oil had gone, and Fal Oil do not on this appeal pursue it. The judge ruled out the possibility of 1500 tonnes of oil being discharged into the sea at any stage, considering that this would have involved a major international incident. He concluded that there must have been a deliberate substitution of water for oil, but that it was impossible to say whether this occurred on the Centaur or the Devon. On that basis, he held that Petronas had failed to prove that the 1500 tonnes of sea-water had been loaded as cargo onto the Devon at the STS point.

*Scope of permission to appeal*

5.  Permission to appeal was granted by the single judge in terms which (as amended) stated:

    "1. The Defendant be granted permission to appeal with respect to the Judge's approach to the assessment of the inferences to be drawn in respect of three possibilities, namely theft on board the DEVON, failure to transfer the full cargo to the DEVON/theft on board the CENTAUR, or contamination at Yanbu.

    2. The Claimants be granted permission to appeal in relation to the demurrage issue.

    3. The permission granted at paragraph 1 above be subject to the condition that no primary findings of fact are challenged."

6.  This formulation led initially to some argument about what constituted a "primary" fact. The word may be capable of different meanings. For example it may signify at one extreme a judge's conclusions on a decisive factual element in a cause of action or at another extreme no more than a judge's finding based on direct oral or documentary evidence, in the light of which other inferences of fact might be drawn. It cannot mean the former in this case, since the decisive factual element in Petronas's set off

and counterclaim is the water content of the liquid loaded on the Devon at the STS point, which is clearly in issue in the light of paragraph 1 of the order granting permission to appeal. Equally, it cannot, in the present context, mean the judge's findings that "The measurements and sampling at Yanbu .... may be relied on" (paragraph 22(2)) and that "At that time [on loading at Yanbu] the water content was not more than 0.2%" (paragraph 26(2)) and that in consequence either the water must have entered after the STS point or the Centaur must have off-loaded 1500 tonnes or have concealed 1500 tonnes of oil on-board, in a ballast tank) from Mr Pantouvakis (the Saybolt surveyor) during the STS transfer. This is so, even though the judge described the first finding (in paragraph 22(2)) as a "hard" fact about which he felt "confident". If all or any of those findings were regarded as "primary findings of fact", not open to review on this appeal, the permission to appeal granted "with respect to the Judge's approach to the assessment of and the inferences to be drawn in respect of .... contamination at Yanbu" would be deprived of content. Further, many of the submissions directed at the limitations of the sampling after loading at Yanbu were and are equally applicable to the sampling undertaken at the STS point, so that either the permission to appeal "with respect to the Judge's approach to the assessment of and the inferences to be drawn in respect of .... failure to transfer the full cargo to the DEVON" would also be deprived of effect, or we would be in the odd position that we could take into account submissions about the limitations of sampling in relation to the STS point, but not take them into account in relation to the original sampling at Yanbu. In the result therefore, and rightly in my view, we heard substantial submissions about the extent to which any firm conclusions could be drawn, in the light of the sampling undertaken and the evidence as a whole, as to the water content of the cargo as loaded both at Yanbu and at the STS point.

*The first issue (the 1,500 tonnes of water)*

7.  It is Petronas's case on this appeal that (i) once the judge rejected Fal Oil's positive case regarding contamination on the Devon, he was bound to decide in favour of Petronas; (ii) that the judge overlooked the fact that it was always Petronas's case that "either the water was loaded with the cargo at Yanbu or there must at some stage have been a removal of 1500 mt of water from the system", and that this oversight led him wrongly to decide the case on the basis that there must necessarily have been a deliberate substitution of water for cargo; (iii) that it was not open to him, having regard to the way the case was conducted by Fal Oil, to decide the case on the basis that there was a possibility of oil having been deliberately replaced by water on the Devon, since this was the judge's own theory not advanced by either party; (iv) that he should have stood back and concentrated on the probable condition and content of the cargo loaded on the Devon, looking at all the evidence overall; and (v) that there were sufficient evidential indications that the additional 1500 tonnes were already admixed in the cargo by the STS point for Petronas to be entitled to succeed, however the matter should be approached.

8.  Fal Oil support the judge's reasoning and decision. They also maintain that an alternative logical approach to the resolution of this case would be to follow the cargo through from loading at Yanbu to the STS point, and to dismiss the claim if it appeared that nothing untoward occurred as between Yanbu and the STS point.

9.  I do not accept Fal Oil's alternative approach. The logic of the commercial relationship points in an opposite direction. Petronas as STS buyers had no direct concern with the position prior to the STS point, and no possible access to the cargo until after the STS loadpoint. Their problem here is that the presence of an additional 1500 tonnes of water was not identified at that point. But it was identified on discharge in the Far East. It is entirely logical for Petronas to seek to work back to the STS point from discharge in the Far East, by excluding any incident on the Devon. If Petronas can thereby show a prima facie case that the water was present (despite Saybolt's failure to detect it) at the STS point, an evidential onus arises on Fal Oil to adduce evidence to the contrary. At that point, Fal Oil are able to rely on the prior history of the cargo, including its loading at Yanbu, the shortness of the voyage from Yanbu to Port Sudan and the unlikelihood of any water having been loaded at Yanbu or having been exchanged for oil there or between Yanbu and Port Sudan. Once all the evidence was before the judge on such points, it was his task to look at it overall, and to decide what conclusions he could draw from it and as to the nature and water content of the cargo loaded on the Devon at the STS point.

10. Moving to Petronas's submissions, I take first the suggestion that, once the judge rejected Fal Oil's positive case of defects on the Devon, he was bound to conclude that the water was present in the cargo transferred at the STS transfer. This submission mirrors, and suffers from a similar defect to, Fal Oil's alternative case considered in the previous paragraph. Merely because Fal Oil have not made out their positive case as to the cause of contamination, it does not follow that Petronas have made out their case that the cargo transferred at the STS point was already contaminated. It is open to a judge to conclude simply that he does not know what the position is. Although a judge will only reach such a

conclusion rarely and reluctantly, it is necessary to recognise and to identify such cases where they exist: see *Rhesa Shipping Co. SA v. Edmunds* (*The Popi M*) [1985] AC 948.

11.  I turn therefore to the second criticism which I have identified, namely that the judge failed to consider the possibility of contamination at Yanbu, and that this led him to overlook the possibility of innocent contamination, rather than some deliberate switch. The quotation at paragraph 7(ii) above comes from paragraph 17 of Petronas's closing written submissions to the judge. The submissions went on to ask where "the missing oil" went, and to give the answer in paragraph 21: "It either remained on board CENTAUR or on board DEVON". However, in the course of 95 paragraphs of submissions there is only one further paragraph, numbered 68, which touches on the possibility of sea-water at Yanbu, in these terms:

>  "Some doubt may be cast on the validity of the inspections of CENTAUR at Yanbu. The entire operation was conducted in 30 minutes, which Mr Severn does not consider long enough to obtain a really coherent set of data. He does not believe that the surveyor would have had time to detect any free water had it been there."

This is also directed to the presence of water in the cargo on the vessel, albeit immediately after loading, rather than to the loading of water as part of the cargo.

12.  During closing oral submissions at trial, which were limited to one hour on each side, counsel for Petronas did not explicitly address any possibility that water had been loaded as part of the cargo. That does not mean that it was abandoned, but it was clearly not a possibility at the forefront of Petronas's case by this stage. In his first report, Mr Severn had expressed the view that "the only possibilities appear to be during loading at Yanbu (onto Centaur), during the short voyage from Yanbu to Port Sudan or during the STS from Centaur to Devon" (paragraph 4.3). During cross-examination, Mr Severn confirmed that one could eliminate the ingress of seawater into the shore tanks at Yanbu. He repeated his doubt about the brevity and therefore quality of the post-loading sampling of the Centaur's 12 tanks at Yanbu, and buttressed it with reference to apparent inconsistency between Saybolt's ballast report reporting the Centaur as having 19,000 tonnes before loading (and 2,700 tonnes after loading) at Yanbu, and other Saybolt documents suggesting that she "arrived" for loading at Yanbu with 23,100 tonnes ballast. But he agreed that he was unable to make any (positive) statement that the Centaur's cargo contained 1,700 tonnes of water when she sailed from Yanbu. The questioning and answers continued:

>  "Q. Can we also take it that there is no basis for saying that there had been any swap over of oil for water at that stage?
>
>  A. I think that is a fair conclusion, yes.
>
>  Q. Let us just look at paragraph 4 of your witness statement .... You say:
>
> >  "Accordingly, the only possibilities appear to be during loading at Yanbu (onto Centaur), during the short voyage from Yanbu to Port Sudan or during the STS from Centaur to Devon".
>
>  Those are the only possibilities you have set out. On what we have been discussing so far, can we therefore discount the first of these, namely loading at Yanbu?
>
>  A. Yes, I think I did that in my report anyway, where I was coming to the STS.
>
>  Q. Right, let us look at the second and third possibilities, shall we? ...."

13.  Mr Males QC for Petronas submits that Mr Severn cannot have meant to abandon a possibility of contamination by water during loading at Yanbu expressed in Mr Severn's own report to which Mr Severn referred in his answer. Mr Millett was prepared to accept that Mr Severn cannot have been intending to say that there was any possibility at all of such contamination at that stage, but was saying that it could be discounted. However, two matters are clear. First, no-one was by the end of the trial suggesting that there was any serious possibility that the terminal could or would have loaded out of the *shore tanks* a cargo including something approaching 1,700 tonnes of water. Second, no-one had advanced any positive evidence that such water entered the Centaur *during* her loading or any positive explanation, if it did so, for what happened to the equivalent quantity of oil metered by the terminal as

having been loaded. In reality, any suggestion that the water came on board during the course of loading at Yanbu would appear to have raised the same conundrum as the parties and the judge faced when trying to explain or identify the time of any subsequent admixture of water with the cargo. This conundrum arose unavoidably, once Mr Severn demonstrated that the quantity of liquid remained unchanged from loading on the Centaur at Yanbu to discharge in the Far East. Further, having established this equivalence of liquid quantities throughout the period from loading at Yanbu to the discharge in the Far East, Petronas could not and did not seek to pursue any alternative hypothesis before us.

14.  In relation to the judge's conclusion that there must at some stage have been a deliberate substitution of water for oil, Mr Males emphasises the authorities in which courts have stressed that the more serious the conduct, particularly if it is criminal in nature, the weightier the evidence that will be required to prove it on the balance of probabilities. Accordingly, he submits, the judge should have looked first for any other possible explanation, rather than conclude that there had been a deliberate substitution of water for cargo by someone, even though he could not and did not claim to identify by whom. I for my part certainly see the potential attraction of an alternative explanation of the facts, if one could viably be suggested - for example that which would exist if it could be suggested that the cargo loaded on the Centaur at Yanbu consisted of no more than about 83,500 tonnes of oil (with a normal water/sediment content of up to about 200 tonnes) to which became added about 1500 tonnes of seawater, owing to some unknown defect in the pipes and/or sea valves of the Centaur. But such an explanation simply does not square with the terminal's metered quantity of 85,000 tonnes, which was used as the basis of the bill of lading quantity by Exxonmobil (and presumably therefore billed to and paid for by Fal Oil – if the contrary were not so, then Fal Oil would have been obliged to disclose the relevant documents). Mr Severn never suggested any possibility of contamination of oil prior to the terminal's meters, and he explicitly accepted the accuracy of the Yanbu terminal metered quantity. Petronas in their closing submissions summarised their position as follows (paragraph 14):

"Mr Severn's submissions are accepted by Fal, and are beyond doubt. The analysis is detailed and careful. It is based upon a comparison between b/l figures and shore-side discharge figures but it also takes into account matters such as:

(a) the terminal loading quantities at Yanbu (which were metered); ...."

15.  Accordingly, while it is true that the judge did not direct himself specifically to loading at Yanbu as a possible cause of contamination, and I would accept that it remained in the arena at the end of the trial despite Mr Severn's answer in cross-examination, I cannot see how it would have altered the fundamental parameters of the conundrum with which he had to wrestle. It may be also because this was generally understood at trial that loading at Yanbu received so little attention in the appellants' final submissions.

16.  This brings me to the third main criticism that I have identified as being made by the appellants, namely that it was not open to the judge, having regard to the way the case was conducted by Fal Oil, to decide the case on the basis that there was a possibility of oil having been deliberately replaced by water on the Devon, since this was the judge's own theory not advanced by either party. It is true that deliberate substitution of water for oil by the Devon, or even a deliberate covering up by the Devon of some loss of oil by pumping in water, was never part of Fal Oil's positive case. This is not a case where it was or could be suggested that any such substitution occurred because the carrying vessel stole some of the cargo for the purpose of using it as fuel oil. There was no motive for the crew to do this even if it had been feasible - both the Centaur and the Devon were on time charter to an associated company of Fal Oil, which would have been responsible for bunkers. But in any event the oil cargo loaded at Yanbu was too viscous to be used as fuel oil, at least without admixture with a lighter cargo which neither vessel had available. Substitution of 1,500 tonnes of cargo would therefore involve either concealment elsewhere on board or off-loading.

17.  Mr Severn, in giving evidence, pointed out that the attention given to the Devon in the Far East would have ensured that, if 1,500 tonnes of oil had remained on board in any tank, including a ballast tank, that would have been spotted. He suggested that this would not necessarily have been the case if such a quantity remained on board the Centaur after the STS transfer. He pointed out that, although the Centaur left Yanbu with 2,700 tonnes ballast, she was recorded as arriving at the STS point with only 70 tonnes ballast. The judge then asked him:

"Q. From your experience, let me be quite blunt, even if there be no evidence, if 1,500 tonnes goes walkabout, is it possible that it was put onto the Devon and pumped off into

some other vessel or some other arrangement so that it gets rid of its 1,500 tonnes?

A. If we are going to be blunt, yes, of course. There are two vessels involved. It would appear that one of those two vessels is somehow responsible, possibly covering up an incident involving leakage and/or loss of oil. Of course, I cannot eliminate either vessel as a possible candidate.

I would qualify that by saying that the whole incident would need to have to be deliberate from the outset as opposed to an accidental contamination because the operations of each vessel was such, had Devon done the dirty deed, I believe an accidental leakage would have been detected.

Q. Could it be done in such a way as to fool a reasonably competent cargo inspector …..?

A. It is the case in my experience that I have been on board vessels where there has been a deliberate attempt to conceal cargo. Yes, that could be concealed from a routine cargo survey, of course. I do not believe it would escape the attention of the investigative surveyors who went on board in Singapore. Again, I have no evidence to suggest that is the case."

18. Mr Males submits that the judge's question and Mr Severn's answer relating to the possibility of substitution on the Devon, involving either off-loading of cargo during the voyage or its concealment during discharging, were isolated references, which went unnoticed and were not followed up in closing submissions. Mr Millett points out that Mr Akka, counsel for Petronas below, submitted in his closing submissions that, given the lack of evidence relating to the Centaur, "it is entirely possible that there could have been a transfer of oil and water (deliberate or otherwise) and that the oil could have remained on board her" (paragraph 88). But this relates to the Centaur, not the Devon. Mr Millett accepts that a possibility of deliberate substitution or a deliberate cover up on board the Devon was not "at the forefront" of his closing submissions. However, his written closing submissions (paragraph 6) did refer to the first question and the answer by Mr Severn quoted in the previous paragraph, but went on to acknowledge that Mr Severn had discounted the possibility that the oil could have been concealed from the inspectors who looked so thoroughly all over the Devon during her discharge. Neither Mr Severn nor Fal Oil's closing submissions raised as a possibility off-loading by the Devon onto another vessel before arrival at Singapore. Mr Males submits that there was no suggestion by Fal Oil of this, and no examination of it, as a real possibility at the trial. Had there been, evidence from the master and crew of the Devon would have been material about her activities and movements, although Fal Oil, as voyage charterers from an associated company which had time-chartered that vessel, would have been better placed to adduce such information.

19. Mr Males submits that the judge was in these circumstances wrong, after concluding in paragraph 22 of his judgment that there must have been substitution of water for oil at some stage, to go on to say that "If it occurred on the DEVON, then the crew must have off-loaded 1500 tons of fuel to a third party en route to Singapore and topped up the cargo tanks with an equivalent amount of sea-water". He should not only have discounted (as he evidently did) any suggestion of concealment of cargo on board at the discharge port(s), but should also have put aside any thought of substitution involving discharge to another vessel en route. Before us, Mr Millett sought to maintain such a possibility on the basis that the Devon stopped for less than a day in the Indian Ocean. According to her radio report this was for the familiar reason that she needed to repair or replace a broken cylinder liner. Mr Millett suggested, for the first time on this appeal, that this might be an occasion when a discharge of 1,500 tonnes took place. There is nothing to commend this new and entirely uninvestigated suggestion. There is no reason to doubt the vessel's explanation, and, if she was going to steal cargo, one might have thought it unlikely that she would announce any stoppage at all. Still more cogently, we were told that the vessel was at the time 300 miles off the south west coast of India, hardly a plausible place for a transhipment of cargo.

20. In my view, there is therefore force in the points made by Mr Males in this area, but it relates more to the question what if any weight or degree of likelihood may be ascribed to the possibility of deliberate substitution by the crew of the Devon than to whether it was open to the judge to consider such substitution as a possibility at all. The possibility of a deliberate substitution or cover up at some stage was one that was being canvassed generally. Petronas's suggestion was that this could have occurred on the Centaur, despite the shortness of her voyage. The judge not surprisingly raised with Mr Severn the possibility that it might have occurred on the Devon's longer voyage. Neither party could suggest

any positive motive for such substitution on either vessel (other than the simple, but on the face of it more than a little implausible, motive of theft). Once the judge's suggestion was made and answered, it was in the arena as a possibility, and was touched on, albeit briefly, in Fal Oil's closing written submissions. The complaint thus becomes whether the judge gave appropriate weight to the possibilities before him, when concluding that Petronas had not made out their case.

21. That brings me to the criticisms that the judge should have stood back and concentrated on the probable condition and content of the cargo loaded on the Devon, looking at all the evidence overall, and that there were sufficient evidential indications that the additional 1,500 tonnes were already admixed in the cargo by the STS point for Petronas to be entitled to succeed, however the matter should be approached. Mr Males makes in this connection a series of submissions:

i) The information about the cargo loaded at Yanbu and transferred at the STS point and the information about the Centaur is exiguous and much more questionable than the information about the cargo's condition at the time of discharging in the Far East. Contamination during discharging in the Far East can be and was excluded as a serious possibility.

ii) Even though the mechanism cannot be precisely identified, the evidence did not exclude either of two possibilities: (a) the loading with the cargo at Yanbu of excess water, (b) the loss from the cargo of 1,500 tonnes of oil and/or the accidental or deliberate substitution of an equivalent quantity of water on the Centaur - accompanied in the latter case (because of the absence of any suggestion or likelihood that such a quantity of oil could have been discharged unnoticed into the sea) by concealment of the lost oil in a ballast tank (probably the forepeak).

iii) Substitution of water for oil during the Devon's voyage, assuming that it was in the arena, was highly implausible. It would have involved an illicit operation on passage, which had never been positively suggested or investigated and which could not have occurred without widespread crew complicity. Any accidental loss of oil on the Devon could be and was excluded because this could not have occurred unnoticed.

iv) Any deliberate substitution of water for oil at any point would have involved someone committing a serious criminal offence. But the court's task was not to identify any such offence or the offender. It was to decide on the balance of probabilities whether the water was present in the cargo loaded at the STS point. In that connection, the court was entitled to take into account the extreme improbability of any loss of oil or substitution of water for oil after the STS point, and simply to conclude that the water was in probability present at the STS point, even if it remained a complete mystery how it got there.

22. In relation to point (i), Mr Males stressed certain further matters:

(a) The only evidence of the water content of the cargo after loading at Yanbu derived from certificates of quality relating to the shore tanks on 20th and 22nd February 2001 (i.e. five and three days before loading), showing a 0.2% content, and composite samples taken from the Centaur after loading which, on analysis in Singapore on 15th-18th May 2001, showed the water content in individual tanks ranging between 0.15% and 0.25%. Mr Males reminded us of Mr Severn's evidence that these samples had all been collected from some 11 tanks in 30 minutes and that this threw doubt on their likely accuracy. He further reminded us of the judge's finding that:

"It is difficult to detect water in this type of fuel oil by carrying out running samples ..... Taking a sample in a ship's cargo tank involves judgment and experience and a cargo inspector, acting competently may not detect water that is there. This type of fuel oil makes it difficult to detect water using standard industry approved equipment. ...." (paragraph 22(3))

I note in parenthesis that this finding is amply borne out by the history of the Devon in the Far East. On arrival at Singapore, the first survey of the Devon's tanks failed to detect any significant water at all, using Mr Pantouvakis's method, even though it is now effectively common ground and certainly clear that the cargo contained as much as 1,700 tonnes. The water had by then of course had ample time to sink to the bottom, where it is to be

presumed that it was not detected. The problems of detection to which the judge was referring are associated with the difficulties of identifying both water mixed with oil and free water at the bottom of tanks.

(b) Not only was there the unexplained discrepancy in the reported ballast on the Centaur's arrival at Yanbu, there was also the odd difference in the figures reported for her ballast on sailing from Yanbu (2,700 tonnes) and on arrival at the STS point after the day's voyage to Port Sudan (70 tonnes). Mr Millett's response to this was that the Centaur could well have discharged ballast during her short voyage. He commented that the Devon discharged 4,500 tonnes of ballast during her (admittedly much longer) voyage to the Far East. Mr Males also pointed out that the Centaur's drafts as reported by Mr Pantouvakis at the STS point were identical with those reported after loading at Yanbu. However, the judge accepted that Mr Pantouvakis simply relied on what the crew told him in this respect, there being a 2 metre swell, and did not identify any trim change that would have resulted from any discharge of ballast.

(c) Mr Males also focussed on the surveys undertaken by Mr Pantouvakis at the STS point. Mr Pantouvakis attended on board the Centaur, measured the ullage figures and calculated the cargo quantity. His ullage report reported that he had found no free water. But Mr Males relies on (1) the judge's finding quoted in (a) above about the difficulty of detecting water in this type of fuel oil and by carrying out running samples, and (2) the associated fact that Mr Pantouvakis did not have with him any bottom sampler, and therefore had no reliable means of detecting any free water in the bottom 30 cms of the vessel's tanks.

(d) Petronas suggested that Mr Pantouvakis might have overlooked a quantity of oil, remaining on board the Centaur, if it had been put in the forepeak ballast tank. The judge said that he thought this unlikely, although he could not rule it out as a possibility. He indicated that he had formed a favourable view of Mr Pantouvakis as a hard working surveyor, who had "seen all sorts of attempts to pull the wool over his eyes". He said that he would be surprised if Mr Pantouvakis did not look into the forepeak tank, or check the cargo sounding rod which would have satisfied him that her cargo tanks were empty. Mr Males challenges this on the ground that Mr Pantouvakis acknowledged in oral evidence that, contrary to the impression given by his witness statement, he had not actually checked the tanks himself, but was a witness to the crew doing so. Nevertheless, Mr Pantouvakis also said, both in his statement and orally (albeit in response to a very leading question by Mr Millett in re-examination), that there was no smell of oil and no visible trace of oil on the tape on sounding any ballast tank. The judge accepted this evidence as showing that the position was likely to have been as he found it, and it seems to me that it was open to him to do so. This is so, independently of the mild support which it also receives from the fact that the documents relating to the Centaur's return to Yanbu after the STS transfer do not show the presence of any oil remaining on board her at that point.

(e) There was no water in the Devon's cargo tanks before she loaded. During her loading, Mr Pantouvakis took samples from the Devon's manifold, and these were collected into canisters, one of which was retained by the Centaur, the other given to Fal Oil's agent at Port Sudan. Both were subsequently lost. The judge declined to draw any adverse inference from this, and it has not been suggested that we should do so. On completion of the loading, Mr Pantouvakis took samples from the Devon's tanks. Clause 2 of the variation fax dated 13th February 2001 required the independent surveyor to take or test the quality of each of the Devon's individual tanks. But Fal Oil's instructions to Saybolt, copied to Petronas, were simply for such a surveyor to conduct a quantity and quality survey "as usual". Mr Pantouvakis took samples from each of the Devon's tanks, but then composited them and split the resulting bulk into four parts. The judge found that this was in accordance with industry practice on a STS transfer. Again, however, Mr Pantouvakis did not have a bottom sampler. Further, the judge found that compositing samples (measuring out the samples from individual tanks in the right proportions) and then splitting them into four equally representative parts "on board a vessel in a swell cannot be easy and there is obvious scope for miscalculation and error". On testing in Singapore two of these composite samples gave a reading of only 0.25% water (i.e. about 212.50 tonnes).

(f) During the process of checking the Devon's tanks, Mr Pantouvakis heard frequent

"beep" sounds, indicating the presence of water at different levels, which led him to give notice to both vessels as follows (and subsequently led to the Devon giving notice of protest to the Centaur):

"In tk No 1C, 2P, 2S 5P traces of water

In tk No 2C approximate 2cm of traces of water of approximate 13.7m3

In tk No 3C approximate 5cm of traces of water of approximate 55.0m3

In tk No 4C approximate 14cm of traces of water of approximate 96.2m3

In tk No 5C approximate 9cm of traces of water of approximate 58.4m3

In tk No 5S approximate 3cm of traces of water of approximate 4.8m3

In tk No sl P approximate 105 cm of traces of water or approximate 30.8m3"

In tk sl S approximate 2cm of traces of water of approximate 12.1m3

Because of the nature of the cargo (High Density C.9995) and because it was not possible to verify exactly the total amount of the water the final amount of water will be verified at Discharging Port when the free water will be settled."

Mr Pantouvakis's preliminary estimation of quantities in the notice thus totalled some 272 tonnes, consisting according to his evidence of both free water and water and oil mixed. Petronas rely on Mr Pantouvakis's final paragraph, which is, they suggest, consistent with a possibility of larger quantities. Fal Oil point out in response that Mr Pantouvakis said that

"this quantity is the maximum of traces I found and because I was not sure that it is 100% of water, can be less or can be more. But most probably can be less, but I am not sure."

The judge seems to have regarded the water identified by Mr Pantouvakis as additional to the 0.2% measured at Yanbu. That assumption, which favoured Petronas, cannot be correct. 272 tonnes is only about 0.32%. Even on the judge's basis, the total percentage (based on a water content of 272 plus 170 tonnes) would only be about 0.52%. The analysis of Mr Pantouvakis's running samples revealed a water content of 0.3%. The judge pointed out that all these figures were well within specification and that the running samples did not show an "enormous quantity of water". Petronas submits that this misses the point, which is that there had been (a) sufficient water on loading the Devon (as distinct from the Centaur) to cause Mr Pantouvakis to give the notice he did and (b) that the volume of such water as noted by Mr Pantouvakis had increased by an estimated 100 tonnes over that which would follow from the percentage of 0.2% noted in the tanks and on loading of the Centaur at Yanbu. These are fair points. But there is, on the other hand, nothing in Mr Pantouvakis's notice and no positive evidence to suggest quantities beginning to approach those discovered in Singapore. Further, although the water content suggested by Mr Pantouvakis's notice and samples (0.32%) is somewhat greater than the water content of the cargo as reportedly loaded at Yanbu (0.2%), the evidence does not go so far as to establish that such a difference is itself a pointer to some untoward incident or influx of water occurring on the Centaur or during the STS transfer, rather than, for example, the result of the inherent inaccuracies in measuring water and sediment. There are other problems about understanding how as much as 1,500 tonnes of water could have been missed on the STS transfer. The in- and outlets for the cargo tanks of tankers such as the Centaur and Devon are at the tank bottoms. Mr Severn's principal explanation as to how and why Mr Pantouvakis could have missed the transfer of as much as 1,500 tonnes of extra water at the STS point was that this water must have come on board at a late stage in the transfer, so as to find itself in the bottom of the Devon, out of reach of detection by Mr Pantouvakis in the absence of any bottom sampler. But this involves the difficulty that, if the water came on board at any time after loading at Yanbu, it would have been at the bottom of the Centaur's cargo tanks (where the outlet/inlet pipes are) and would have been discharged first onto the Devon, and so (on Mr Severn's own evidence) have been likely to be detected even by the sampling which Mr Pantouvakis undertook on the Devon.

23. Standing back from the detail, I agree that the critical question, to which the judge had to direct his mind, was whether the cargo transferred to the Devon at the STS point contained some 1,700 tonnes of water. The judge thought that the answer to that question depended upon whether Petronas could show that the presence of this water was more probably due to deliberate substitution of water for oil on the Centaur as opposed to the Devon. I would agree with Mr Males that the judge went too far in considering that he could close off all other options and make the ultimate issue depend on so stark a choice. This is particularly so, when (a) contamination during loading on the Centaur remained in the arena and (b) deliberate substitution of water for oil on the Devon was never positively suggested by Fal Oil and was touched only marginally in evidence.

24. However, it is still necessary to consider whether Petronas have established as a matter of probability that the water was present and was loaded on the Devon during the STS transfer. The suggestion that the water may have come on board during the loading of the Centaur at Yanbu faces the difficulty that the mechanism is entirely unexplained and on its face implausible, and that (perhaps for this reason) the possibility received no real attention or emphasis at trial. The possibility of loss of oil to sea from either the Centaur or the Devon is at best very remote, so much so that neither party suggested it and the judge disregarded it. The possibility of deliberate substitution (on either vessel) is essentially speculative. The judge examined the evidence about the Centaur and the STS transfer and found nothing to enable him to conclude that the water was probably on board the Centaur or transferred to the Devon. Although there are some oddities about the Centaur's ballast, they are neither inherently suspicious nor capable of explaining the appearance of the water in lieu of oil. Although the judge could not rule it out as a possibility, he thought it unlikely that oil could have been concealed from Mr Pantouvakis on the Centaur, and one must again ask whether her owners and crew would have chanced so risky an exercise and why. It is true that concealment on the Devon in Singapore is even less likely, indeed it can be positively ruled out in view of the exhaustive surveys there undertaken. But merely because some scenarios can be completely excluded does not mean that any possibility that remains must "probably" be what happened. That would be to accept the fallacy which was exposed in *The Popi M.* The high point of Petronas's case was and is Mr Pantouvakis's conclusions and notice of protest regarding water at the STS point, which Mr Males described as "interesting". The evidence is capable of arousing the suspicion that Mr Pantouvakis, using inadequate, although standard methods of sampling, identified a small part of the huge volume of water which was later discovered in the Far East. But suspicion is not enough. It must be possible to say as a matter of probability that the 1,500 tonnes was already present. But from where it could have come, and how, one cannot begin to understand, bearing in mind the unlikelihood of its having been either loaded with the cargo in Yanbu or substituted for oil during the 24 hours voyage since Yanbu. On the other hand, of course, the water got into the cargo, and oil apparently loaded went apparently missing, at some point before the Devon discharged in the Far East. At the end of the day, although by somewhat different reasoning, I find myself driven to the same conclusion as the judge, that Petronas have simply failed to prove that the water was loaded onto the Devon by or at the STS point. The case is a mystery. Accepting Mr Severn's figures, as we must, one suspects that there must have been some incident or event at some stage about which someone must know, but what it was and when and how it could account for the apparent disappearance of 1,500 tonnes of oil and the appearance of an additional 1,500 tonnes of water is impossible to say, at least as a matter of probability. What is however critical is that it is impossible to say as a matter of probability that the cargo loaded on the Devon at the STS point was some 1,500 tonnes short of oil. I would therefore uphold the judge's decision in Fal Oil's favour on the first issue before him.

*The second issue (the nature of liability for demurrage)*

25. The sale contract dated 29th November 2000 contained the following provisions:

"10.LAYTIME:

LAYTIME ALLOWED SHALL BE A TOTAL OF 36 HOURS SHINC TO COMMENCE 6 HRS AFTER NOR IS TENDERED OR UPON BERTHING WHICHEVER IS THE EARLIER AND TIME SHALL CEASE TO COUNT AT DISCONNECTION OF HOSES.

11.DEMURRAGE: AS PER CHARTERPARTY PER DAY PRO RATA.

.....

15. OTHER TERMS AND CONDITIONS:

WHERE NOT IN CONFLICT WITH FOREGOING, INCOTERMS 2000
WITH LATEST AMENDMENTS FOR CNF SALES TO APPLY."

Incoterms for cost and freight sales provide:

**"A3 Contracts of carriage and insurance**

a) Contract of carriage

The seller must contract on usual terms at his own expense for the carriage of the goods
to the named port of destination by the usual route in a seagoing vessel .... of the type
usually used for the transport of goods of the contract description.

b) Contract of insurance

No obligation."

26.  There is no indication that Petronas knew anything about Fal Oil's chartering arrangements or
intentions when the sale contract was entered into. The sale contract contemplates that there would be
a relevant voyage charter, on usual terms. As at the time that the sale contract was made, it must have
been likely that (as was in fact the case) no such voyage charter had yet been entered into. Neither
party could therefore know its precise terms regarding laytime or demurrage, save that, under
Incoterms, they must be "usual". In the event, Fal Oil chartered in the Devon from an associated
company, Fal Shipping Co. Ltd (which as it appears time-charterer under some unknown
charterparty), for the first voyage under a voyage charter on the ASBATANKVOY form dated 22nd
February 2001. The voyage charter provided:

"PART I

....

B. Laydays: 25-26 FEBRUARY 2001

Commencing 0600 HRS Cancelling 1600 HRS

......

H. Total laytime in Running Hours 72 HOURS SHINC

I. Demurrage per day USD 18,000 P.D.P.R

.....

PART II

5. Laytime shall not commence before the date stipulated in Part I, except with the
Charterer's sanction. ....

6. NOTICE OF READINESS. Upon arrival at customary anchorage at each port of
loading or discharge, the Master or his agent shall give the Charterer or his agent notice
..... that the vessel is ready to load or discharge cargo, berth or no berth, and laytime, as
hereinafter provided, shall commence upon the expiration of six (6) hours after receipt of
such notice, or upon the vessel's arrival in berth ..... whichever first occurs. However,
where delay is caused to vessel getting into berth after giving notice of readiness for any
reason over which Charterer has no control, such delay shall not count as used laytime.

7. HOURS FOR LOADING AND DISCHARGING. The number of running hours specified
as laytime in Part I shall be permitted the Charterer as laytime for loading and discharging
cargo, but any delay due to the Vessel's condition or breakdown or inability of the
Vessel's facilities to load or discharge cargo within the time allowed shall not count as

used laytime. ..... Time consumed by the vessel in moving from loading or discharge port anchorage to her loading or discharge berth, discharging ballast water or slops, will not count as used laytime.

8. DEMURRAGE Charterers shall pay demurrage per running hour and pro rate for a part thereof at the rate specified in Part I for all time that loading and discharging and used laytime as elsewhere herein provided exceeds the allowed laytime elsewhere herein provided. If, however, demurrage shall be incurred at ports of loading and/or discharge by reason of fire, explosion, storm or by a strike, lockout, stoppage or restraint of labour or by breakdown of machinery or equipment in or about the plant of the Charterer, supplier, shipper or consignee of the cargo, the rate of demurrage shall be reduced one-half of the amount stated in Part I per running hour or pro rata for part of an hour for demurrage so incurred."

27.  The issue presented to the judge and now to us is whether the demurrage provisions in the sale contract operate by way of indemnity or give rise to independent obligations. It is not easy at this stage to know the practical implications of this issue. It seems likely that most if not all of the delay in discharging the cargo was due to the discovery that it contained some 1,700 tonnes of water. If that was present in the cargo loaded onto the Devon at the STS transfer point, then Petronas would appear to have a good defence to any claim for demurrage in respect of the resulting delay. If it was not, then the presence of the water must have been the Devon's fault. Petronas's case on that factual hypotheses is that, if the sale contract demurrage provisions operate as an indemnity, Fal Oil can have no liability to the Devon against which Fal Oil can require any indemnity. But before us Mr Males put the matter more widely, suggesting that, even if the sale contract demurrage provisions operated as independent obligations, Petronas would still have a defence to any demurrage claim by Fal Oil, since, he submitted, fault of the carrying vessel delaying discharge was a general implied exception to the running of laytime and the obligation to pay demurrage. (Fal Oil would have a similar defence vis-à-vis Fal Shipping Co. Ltd. under the, on this basis, independent charter.) If this be right, then the nature of the present sale contract demurrage provisions may be academic. Nonetheless, the preliminary issue requires us to determine their nature.

28.  We were referred to authority going back to *Suzuki & Co. v. Companhia. Mercantile Internacional* (1921) 9 Ll.L.R. 171 (CA) on appeal from Shearman J (1921) 8 Ll.L.R. 174. The judgments in that case in fact distinguished the Privy Council case of *Houlder Bros. v. The Commissioners of Public Works* [1908] AC 276, which it is also useful to mention. In *Houlder Bros.* Lord Atkinson, giving the Privy Council's advice, referred to Lord Blackburn's judgment in *Ireland v. Livingston* LR 5 HL 395, 407, according to which, depending on the nature of the particular contract, the seller may either act as agent for the buyer in arranging carriage (e.g. taking a commission) or may commit himself to a fixed price (in which case the seller will contract with the carrier for his own account). The contract in *Houlder Bros.* fell into the second category, which is (now at any rate) the familiar position. The present sale contract clearly also falls into the second category. Addressing laytime and demurrage provisions in such a sale contract, Lord Atkinson said at p.291:

"There is, however, no rule of law that the vendor in a c.i.f. contract may not secure for himself a profit under a demurrage clause contained in it. Neither is there any indisputable presumption of law that the parties to such a contract did not intend that he should receive such a profit. To use the words of Lord Blackburn in *Calcutta and Burmah Steam Navigation Co. v. de Mattos* (32) LJ (QB) 322, 328, in such contracts "there is no rule of law .... preventing the parties making any bargains they please."

29.  The argument that the laytime and demurrage provisions in *Houlder Bros.* were to be read as taking effect by way of indemnity on any view extremely weak. As Bankes LJ pointed out in *Suzuki*, the sale contract in *Houlder Bros.* made no express reference at all to the charterparty. It provided for discharge immediately on arrival of the carrying vessels at their discharge ports at specified rates of tons per day (120 tons for "sailers" and 250 tons for steamers), failing which demurrage was to be paid at respectively 4d or 6d per vessel's net registered ton per day. The code was on its face independent (and the buyers had also accepted as much in relation to prior contracts). But it is of interest to note Lord Atkinson's further observation at pp.289-290 that: "It is, moreover, difficult to see how the principle laid down would work in practice", in which connection he took as an example the situation of a charter of a sailing vessel providing for discharge at only 100 tons per day or for demurrage at only 3d per registered ton per day.

30.  In *Suzuki* the terms of the contract dated 26th May 1919 appear most clearly from the first instance

report:

> "Shipment may be made in names other than that of Messrs. Suzuki & Co.....The rice to be discharged at Lisbon and/or Oporto at buyers' option. Discharge to be at the rate of 500 tons per weather working day, Sundays and Government holidays excepted, time to count 24 hours after arrival of steamer at first port of discharge to be given before steamer's arrival at Suez. Demurrage as per charter-party or freight agreement. The time taken by the steamer to shift from the first port to the second port of discharge not to count."

The charter dated 1st June 1919 contained similar laytime provisions regarding discharge, and specified: "Demurrage, if any, over and above the said laying days at £400 per day (or *pro rata* for part thereof)". In a separate clause it provided:

> "15. Charterers' responsibility to cease on steamer being loaded, provided the cargo is worth the freight, captain and owners having an absolute lien on the cargo for all freight, dead freight and demurrage which they are hereby bound to exercise."

Shearman J appears to have viewed the relationship with regard to carriage as within the first of Lord Blackburn's categories, saying at p.176:

> "The sellers, acting, as it appears to me, as agents for the buyers, entered into a charterparty with the owners of the ship. The buyers agreed to pay demurrage.
>
> The point taken by the sellers is that, notwithstanding the fact that there is a liability on the buyers to pay the shipowner, I ought, under the terms of the contract, to follow the decision in the *Houlder* case. I think that the decision in that case is sound, but the real question I have to decide is what is the kind of contract between these parties.
>
> It is not necessary to discuss the *Houlder* case, but I am of the opinion that the true meaning of the contract is that the parties will pay to the shipowner the demurrage due, and the only right of action which the charterers could have would be in respect of damages which, under the charterparty they could prove they had suffered by the defendants' breach of contract. ....."

31.  The Court of Appeal did not expressly refer to or endorse Shearman J's view of the relationship between the sellers and buyers, but said that the only question that arose was

> "one of construction as to whether the contract between the buyers and sellers, which refers to the question of demurrage, is a contract of indemnity or whether it is an obligation to pay irrespective altogether of what the sellers' position or responsibilities may be, if in fact the vessel is kept on demurrage".

Bankes LJ, giving the judgment, went on:

> "Of course, if in fact it is a contract of the latter description, it really provides for an addition to the price of the rice depending upon whether the ship is or is not delayed in its discharge; and one does not quite see why the parties should enter into such a contract.
>
> But it seems to me that the language, from the nature of things, points to a contract of indemnity rather than to a contract of the nature contended for by the appellants ....."

He distinguished *Houlder Bros.* as concerning a contract "of a very special nature", where there had also been a prior course of dealing.

32.  The reluctance of the Court of Appeal to decide in favour of the sellers/charterers in *Suzuki* is easy to understand. The idea of a CIF seller, who as charterer has the benefit of a cesser clause, recovering demurrage for which he has no possible exposure to the shipowner, is unappealing. The general words "Demurrage as per charter-party or freight agreement" lent themselves to a construction whereby liability for demurrage under the sale contract followed (and so "indemnified" the seller against) whatever was the liability (if any) of the sellers for demurrage under their charter. However,

nothing in the Court's brief reasoning expressly limits its scope to circumstances as stark as those where a cesser clause means that a seller claiming demurrage has itself no conceivable liability for demurrage, and it is difficult to see that there could be any basis for so construing wording as sparse as "demurrage as per charterparty or freight agreement".

33.   What is, for whatever reason, absent in the reasoning in *Suzuki* is any acknowledgement of the theoretical basis on which, and the good reasons why, parties may construct an independent scheme regarding demurrage. It is now well-established that it is a breach of contract to exceed the specified laytime, and demurrage is the agreed damages to be paid for delay in loading or discharging arising from any breach: see the speech of Lord Guest in *Union of India v. Compania Naviera Aelous SA* [1964] AC 868, 899, adopted by Lord Diplock in *Dias Co. Nav. SA v. Louis Dreyfus Corpn.* [1978] 1 WLR 261, 263 (quoted recently in *Kronos Worldwide Ltd. v. Sempra Oil Trading SARL* [2004] 1 Ll.R. 260, 264). In the context of a C&F sale contract, where the seller is not the shipowner, the underlying rationale of the inclusion of any laytime and demurrage provisions (whether on an independent or indemnity basis) is that the seller will have to arrange carriage on terms which may expose the seller to liability for demurrage to a shipowner or other third party. Parties may, however, find it simpler and more acceptable to agree and operate an independent scheme which means that, in the event that delay occurs, they will know precisely where they stand, rather than to contract on a basis which makes their rights inter se depend upon the rights and liabilities of one of them, and possible disputes under some actual or future contract with a third party.

34.   If (as here) the rate of demurrage depends on whatever charterparty the seller makes, that represents only a small qualification on the parties' initial certainty (itself mitigated by the fact that the rate must be "usual"). Once the charter is made, the rate is defined and the two contracts can operate independently. The reason for adopting a charterparty rate into an otherwise independent sale contract scheme (rather than making a best guesstimate of the future demurrage rate(s) to which the seller is likely to be exposed) is obvious. It is to ensure that the sale contract demurrage provisions approximate sensibly to those ultimately agreed. Future demurrage rates are inherently uncertain (especially in the case of a sale contract like the present for four deliveries over a significant future period). But making the seller's and buyer's rights and liabilities relating to demurrage depend not just upon the actual charter rate, but upon resolution of the position regarding demurrage as between the seller and a third party under the charter and/or other intermediate sale contract(s), introduces a quite different potential for uncertainty and dispute. As to the position which may (on the authority of *Mallozzi v. Carapelli* [1975] 1 Ll.R. 229 (Kerr J); affirmed [1976] 1 Ll.R. 407 to which I refer below) arise if a sale contract refers to a voyage charterparty rate and the seller never enters into such a charter (but for example uses a time-chartered vessel or his own vessel), that situation can hardly have been contemplated at the time of the sale contract; and, since it prevents any demurrage at all arising between seller and buyer (whether the sale contract demurrage provisions are viewed as operating independently or by way of indemnity), it represents on any view something of a windfall escape for the buyer (rather than a windfall bonus for the seller).

35.   Further, although Bankes LJ in *Suzuki* reinforced his conclusion that the sale contract provisions operated by way of indemnity by reference to the "windfall" nature of an undue addition to the price which could otherwise result, the general law of penalties offers potential protection against sale contract provisions for demurrage which lack a reasonable basis as a genuine pre-estimate of the recovering party's exposure. So, if a charter containing a cesser clause had already been agreed, or was likely to be arranged, arguments based on the law of penalties could clearly arise for consideration. In *Suzuki* one notes that the charter was made only six days after the sale contract, but the reports contain nothing to suggest either that the sale contract was made with the particular terms of the subsequent charter in mind or indeed that any argument based on the law of penalties was raised or considered. Bankes LJ's statement that, if the sale contract provisions operated independently of any liability for demurrage, then they really provided for an addition to the price, might, possibly, be understood as indicating that there was no question of such provisions being a genuine pre-estimate of any loss that the seller was likely to suffer by way of demurrage under any charterparty. On the other hand, it is of the nature of a liquidated damages provision that it may still be a genuine pre-estimate and enforceable, even though, in the particular circumstances which happen to materialise, it would not be possible to show any actual loss.

36.   I turn to subsequent authority, in which there is some recognition of the considerations mentioned in the last three paragraphs. Petronas rely on *Mallozzi v. Carapelli SpA*. The sale contract provisions there provided for laytime, by reference to a rate of discharge per day, and for "Demurrage/half despatch on loading at the rates indicated in the charter-party for buyer's account". However, the sellers chartered a carrying vessel on a time-chartered basis. Kerr J considered both *Houlder Bros.* and *Suzuki* and concluded that the sale contract before him was

"virtually indistinguishable from the *Suzuki* case because of the vital feature that liability to demurrage is imposed by reference to a charter-party and not directly under the contract itself" (p.246).

He also said:

"On this basis the present contracts fall into the class whereby the buyers are only made liable for demurrage on an indemnity basis if the sellers are themselves liable for demurrage under a charter-party."

He regarded *Suzuki* as recognising "that in c.i.f. contracts a provision of this kind can and should be construed as being in the nature of an indemnity". He also attached some importance to the words "for buyers account" as connoting an indemnity.

37.   In the Court of Appeal *Mallozzi* was decided on the much narrower ground that the sale contract only provided for demurrage at a charterparty rate, and there was no charterparty from which any rate could be derived. The Court, particularly the commercial judges on it (Megaw and Roskill LJJ), went out of their way to emphasise that they had not heard submissions in support of the proposition that the relevant clause was an indemnity clause, and that those submissions in support of the proposition did not in any way rest on that basis or on the authority of Suzuki. The actual decision in *Mallozzi* does not therefore lend Petronas any support.

38.   In *R. Pagnan & Fratelli v. Finagrain Co. Com. Agricole et Financiere SA (The Adolf Leonhardt)* [1986] 2 Ll.R. 395, the FOB sale contract between Pagnan as seller and Finagrain as buyer dated 17th January 1978 provided:

"Special conditions .... Time to count as per Centrocon charter party WIBON, WIPON, WIFPON. Demurrage/Despatch as per C/P. ......"

Finagrain sub-sold the goods under a contract dated 1st February 1978 with Exportkhleb, which was accordingly responsible for chartering in a carrying vessel to uplift the goods. Staughton J, agreeing with the GAFTA Board, considered (obiter) that the sale contract imposed an independent liability for demurrage on Pagnan, rather than a liability to indemnify Finagrain for any demurrage liability which Finagrain might have to its sub-buyer (Exportkhleb). He said:

"Issue (3) is whether the sellers have an independent obligation to pay demurrage to the buyers, or whether they are only obliged to indemnify the buyers against liability to V/O Exportkhleb. ...... My answer would be that the sellers have an independent obligation, as the Board of Appeal held. I do not find it surprising that a buyer should contract to receive demurrage at a different rate, or on different conditions, than those governing his liability to pay a shipowner or a sub-buyer. Normally one might perhaps expect the terms to be the same, as I said in *Eurico S.p.A. v Phillp*, [1986] 2 Lloyd's Rep. 387, immediately before the argument in this case; but they may be different. What persuades me that an independent obligation was intended here is the reference in the sale contract to the Centrocon charter-party, scilicet in its printed form. Whatever terms might be agreed between the buyers and a shipowner, or their sub-buyers, it was all Lombard Street to a china orange that they would not be precisely the printed terms of the Centrocon form. The buyers had not, when they contracted with the sellers, concluded their sub-sale, at any rate in point of form; it makes good sense that they should bargain for an independent obligation in the terms of the printed form, if only as an approximation to what they might agree with their sub-buyers."

The underlying thinking here is that it is not surprising to find a party, who may become liable to demurrage (either directly under a charterparty or indirectly by reason of a sub-contract), stipulating not for an indemnity, but for provisions of independent operation which approximate to (or represent a "genuine pre-estimate" of) what he anticipates is likely to be his own liability. That, as I have explained, fits with the concept of demurrage as liquidated damages: see paragraphs 33-35 above.

39.   Then there is *Ets. Soules et Cie v. Intertradex SA* [1991] 1 Ll.R. 378. The sale contract contained both a laytime provision and an expressly stated rate of demurrage (US$3,000 per day pro rata with half despatch). Hobhouse J pointed out that there was no cross-reference to any charter, and so no question of the demurrage provision being drafted on some basis of indemnity. It appears that the

buyers had conceded this. On appeal, there was an attempt to withdraw the concession, but Neill LJ expressed the view that the concession was rightly made (p.388) while Staughton LJ, without expressing any final opinion, saw good grounds for treating it as correct (p.385), mentioning considerations similar to those which he had identified in *The Adolf Leonhardt*.

40.  In *Gill & Duffus SA v. Rionda Futures Ltd.* [1994] 2 LI.R. 67, the sale contract contained detailed provisions regarding laytime and notice of readiness and went on:

> "Despatch and demurrage at discharge to be for buyer's account. Demurrage as per C/P half despatch. ..... Demurrage to be settled as incurred by buyers every 15 days."

Clarke J was influenced by the detailed provisions regarding laytime and notice of readiness, and concluded that in that context the expression "demurrage as per C/P" meant no more than that the rate of demurrage in the relevant charter-party should be the rate of demurrage for the purpose of he contract of sale. After referring to *Mallozzi*, he said that,

> 'whatever inference might be drawn from the use of the words "for buyer's account" if they stood alone, here they do not. In this contract, .... there are both detailed provisions for the commencement and calculation of laytime and an express provision that demurrage was to be "settled as incurred by buyers every 15 days". In these circumstances the parties cannot in my judgment have intended that the limit of the buyers' obligations was whatever was paid by the buyers."

Thus in Clarke J's view the terms of this particular sale contract provided, as a matter of construction, for an independent demurrage liability, not an indemnity.

41.  The last case which it is necessary to mention in any detail is *OK Petroleum AB v. Vitol Energy SA* [1995] 2 LI.R. 160, where two sale contracts each provided for laytime consisting of a specified number of hours SHINC, and (in the one case) for "Demurrage As per Charter Party" and (in the other) for "Demurrage. As per Charter Party rate, terms, and conditions pro rata for part cargo". The two charters (entered into in each case after the relevant sale contract) incorporated standard terms, which included a time bar provision excluding charterers' liability for demurrage unless a claim was notified within 90 days of discharge. Colman J ultimately concluded that the incorporation of demurrage as per charter party or as per charter party terms and conditions could not in any event embrace a collateral provision like a time bar. But in the course of his analysis he endorsed counsel's concession that the demurrage provisions in the sale contracts should not be read as indemnity provisions. He gave as his reason the inconsistency between the sale contract and charterparty regimes, the latter aggregating load and discharge port laytime and the former allowing half the total charterparty laytime for discharging. (In that respect the case mirrors the present sale contract and charter.) But this reasoning seems to me vulnerable to the criticism that it defines the nature of the sale contract demurrage provision by reference to the nature of whatever charter the sellers made *subsequent to* entering into the sale contract. It is one thing to point out, as Staughton J did in *The Adolf Leonhardt*, that, since there could be no certainty what terms a future charter might contain, the parties might well by the sale contract have decided upon an independent scheme which involved a genuine pre-estimate of or approximation to the sort of charterparty terms regarding laytime and demurrage which they believed it likely would be available. It is another to define the nature of particular sale contract provisions by reference to whatever charter may actually happen to be made in future.

42.  This examination of the authorities leads to conclusions, which I can summarise as follows:

> i) Provisions in a sale contract regarding laytime and demurrage should be approached without any pre-conceptions or presumption as to their likely nature. That follows from general principle, as well as from the passage quoted above from *Houlder Bros.*
>
> ii) The scope and effect of such provisions is a question of construction: see *Suzuki*.
>
> iii) The underlying rationale of any sale contract demurrage provision is that the receiving party may suffer loss under a charter or other third party contract. However, this is consistent with the provision operating either by way of indemnity or independently. An independent provision can, subject to the law on penalties, be justified as a genuine pre-estimate of the receiving party's exposure.

iv) Although the authorities distinguish generally between (a) provisions operating as an indemnity and (b) independent provisions, the precise nature and effect of any demurrage provision depends upon the context and wording of the particular provisions, including the scope of any reference to or incorporation of the demurrage provisions of any charterparty or other third party contract.

v) In the absence of any cross-reference in the sale contract provisions to a charterparty or other contract under which demurrage liability may arise, the natural inference is that the sale contract fall within category (b): cf *Houlder Bros* and also the dicta in *Ets, Soules*. But it is of course conceptually possible to have an implied as well as an express cross-reference of this nature.

vi) In cases where there is some form of cross-reference to a charterparty or other third party contract under which demurrage liability may arise, the nature, purpose and effect of the cross-reference become critical. There are two broad situations, corresponding with categories (a) and (b) mentioned in conclusion (iv) above. In the first, the sale contract creates a liability for demurrage by way of "indemnity", that is to pay only if and so far as such a liability exists under the charter or other third party contract (although *Suzuki* is the only clear reported example in the authorities). It would no doubt also be conceptually possible for sale contract provisions to operate by way of "indemnity", but subject to the additional qualification or precondition that any liability for demurrage can and should only arise so far as consistent with other sale contract terms (e.g. as to the length of permissible laytime). But such a construction is likely to lead to the practical problems identified in *Houlder Bros.* and the authorities provide no positive example of it. The second situation (exemplified by a number of authorities) is one where the sale contract provisions simply refer to or incorporate provisions of a charterparty or other third party contract (or at least one of such provisions, e.g. as to the rate of demurrage) in an otherwise independent sale contract scheme. The extent of any such reference or incorporation is then itself of course a matter of construction.

vii) Thus, for example (although it is unnecessary to express a view on the correctness or otherwise of the actual construction put on any previous contract differently worded to the present), in *Suzuki* the words "demurrage as per charterparty or freight agreement" were interpreted as meaning that the case fell within category (a). In contrast, in *Gill & Duffus* Clarke J considered that the particular provisions for demurrage there in view brought the sale contract within category (b). It is also unnecessary to comment on Staughton J's obiter view in *The Adolf Leonhardt* that the obligation "Demurrage/Despatch as per C/P" in the particular contract there in issue was also to be construed as independent. However, the existence in a sale contract of its own laytime code is clearly a relevant factor (even though it was also present in *Suzuki*), and I find useful Staughton J's general explanation as to why it may be appropriate to treat sale contract laytime and demurrage provisions as an independent code.

43.  Applying these principles to the present case, I conclude that the present sale contract provisions constitute an independent code, falling clearly within category (b). First, the sale contract was made independently of, and without knowledge of the terms of, any charterparty. Since the sale contract covered four shipments, there might well have been four very different charterparties. The sale contract contained a specific laytime code (clause 10), which would not necessarily coincide with whatever charterparty had been or might in future be made. The two did not coincide in the case of the first shipment with which we are concerned, since laytime was under the charterparty reversible and so allowed a total of 72 hours for loading (with which Petronas were not concerned at all) and discharging.

44.  Second, as soon as one has a situation where the laytime provisions may not coincide, problems (identified in *Houlder Bros.*) arise about treating sale contract demurrage provisions as operating by way of indemnity in respect of charterparty liability. In effect, in order for the present sale contract to fall within category (a), the sale contract laytime would have to be read, not as a period after which demurrage would become payable, but as a minimum discharging period which must elapse before demurrage *might* become payable; it would then only actually become payable, provided that demurrage was at the same time payable under the charterparty. On this basis, in the present case, demurrage would only be payable if and when the whole reversible laytime of 72 hours had been used up under the Fal Oil charterparty. Thus, if Fal Oil loaded the Devon in, say, 24 hours, Petronas would in effect have laytime of 48 (not 36) hours available before they could have to pay demurrage in respect of slow discharging. On the other hand, if the charterparty entered into had only allowed 48 hours reversible laytime, and Fal Oil had used up 24 hours laytime at the load port, Fal Oil would become

liable to Fal Shipping under the charter for demurrage after a further 24 hours of discharging, but Petronas could not become liable for demurrage to Fal Oil until after 36 hours discharging. The sale contract cannot be construed by reference to the charterparty that was actually made. But the existence in the sale contract of its own laytime code, likely to create such problems in the event that the demurrage provisions are construed as operating by way of indemnity, is a relevant factor: see paragraph 42(vii) above.

45. Thirdly and most importantly, the present sale contract demurrage clause (clause 11) in my view clearly incorporates a rate, and no more. In that regard, the present case is on any view readily distinguishable from *Suzuki*, where demurrage was provided to be "as per charter-party or freight agreement" simpliciter. The reference to a rate takes one to clause I in Part I of the present charterparty, providing for $18,000 per day and pro rata. It may also take one to the more detailed provisions of clause 8 in Part II, which I have set out in paragraph 26 above, although this was not the subject of specific submissions before us. If so, the references in clause 8 to loading would have to be ignored, but otherwise there would seem to be no problem in incorporating into or applying under the sale contract the provision that demurrage should be at half rate under the conditions specified in clause 8 of Part II.

46. Fourthly, once it is concluded that the express words of the laytime and demurrage provisions do no more than refer to the charterparty rate, their natural reading and effect is as an independent obligation. So read, they have an understandable and acceptable rationale as a code containing an agreed approximation or pre-estimate of the loss which the sellers, Fal Oil, would be likely to suffer in the event of delay in discharging. There is no need to force them into category (a). We have not heard or been concerned with any suggestion that the present sale contract provisions were not, as and when agreed, a genuine pre-estimate of the seller's likely exposure: see paragraphs 33-35 above.

47. I would therefore allow the appeal in respect of the second issue relating to the nature of the demurrage liability under the present sale contract, and hear counsel on the appropriate form of declaration to give effect to this conclusion.

*Conclusion*

48. It follows that I would dismiss Petronas's appeal on the first issue and allow Fal Oil's appeal on the second issue.

**Lord Justice Buxton:**

49. I gratefully adopt the account of the history and documentation that is set out by Mance LJ. I venture to add some few words of my own.

*The "contamination" appeal*

*Methodology*

50. We were pressed with various observations in this court, made in different cases addressing different difficulties that had arisen at the trials from which those appeals were brought, which it was alleged the judge had failed to respect, and which should have driven him to a different conclusion. I am afraid that I did not find this part of the argument at all helpful. An experienced commercial judge scarcely needs telling that, faced with two conflicting accounts of an incident, he should analyse the evidence to try to see which account is the more persuasive (Cf *Cooper v Floor Cleaning* [2003] EWCA Civ 1649[15]); or that, having reached the end of a difficult and enigmatic case, he should "stand back" and see if a further review enables him to make progress (as, it was suggested, did Phillips J in *The Theodegmon* [1990] 1 Lloyds Rep 52, and Clarke J in *The Kapitan Sakharov* [2000] 2 Lloyds Rep 255). Nor is he to be criticised if he takes these nostrums as read, without enunciating them. He is to be criticised if it is clear, or tolerably clear, that if he had taken either of those steps he would or should have reached a different result. But that is not this case. As my Lord has demonstrated, the judge did analyse the evidence, in a manner very far different from that of the trial judge in *Cooper v Floor Cleaning*, and reached the conclusion, that was open to him, that it yielded no clear answer; and any overall review at the end of the case would not have compelled the judge to revisit earlier conclusions, most notably about events at Yanbu, because his view of those events was based on cogent evidence that he would not have been justified in rejecting simply in order to find a more convenient answer to the puzzle that the case presented.

*Misloading at Yanbu?*

51.   I start with this issue, because it occupied a very large part of the appellant's submissions before us. If the judge could have been persuaded that the missing oil never went on board, preferably by error rather than by fraud, then that would exempt him from further embarrassing enquiry into the respective activities of the Centaur and the Devon, and provide an easy answer to the question of whose responsibility it was that the cargo was insufficient. But the judge was precluded from that conclusion by the evidence that he received; or, if that is to put it too high, in rejecting that conclusion he was at least well within his proper area of judgement, and well outside any area in which this court could interfere. The much-controverted statement of Mr Severn that the possibility of error on loading at Yanbu had to be discounted, set out by my Lord in his §12, was not a casual or unthinking observation, but accepted by him to be a necessary conclusion from the loading records at Yanbu and the analysis of water content on loading. It would have been a remarkably strong step for the judge to reject that evidence in order to reach a conclusion favourable to Mr Severn's clients.

52.   I therefore think that the judge was right to conclude that error at Yanbu was excluded; to analyse the case thereafter on the basis that the right cargo had been loaded on to Centaur; and not to revert to events at Yanbu just because analysis of subsequent events faced him with serious difficulties. I would reach that conclusion in any event, on the basis of the normal approach of this court to findings of fact. I do not therefore find it necessary to pursue the debate as to whether the judge's conclusion on the Yanbu issue were findings of "primary" fact, and therefore protected in this court in any event by the terms of the grant of permission to appeal. I would, however, emphasise my respectful agreement with my Lord's conclusion, in his §6, that it was in any event right for the court to hear the substantive case on the points that might be affected by the scope of the grant of permission.

*Burden of proof*

53.   Petronas resist payment for the cargo on grounds of its insufficiency; and in addition, so we understood, claims the cost of putting right the contamination. Petronas must therefore establish that the cargo was contaminated when it passed the Devon's manifold. Petronas seek to do that by demonstrating, as was the case, that the cargo was contaminated on first inspection by them, and that there was no evidence of any contaminating incident between passing on to the Devon and that inspection. That approach is reinforced by the only positive theory of contamination advanced by Fal Oil, leakage of seawater into the Devon, having been decisively rejected.

54.   If there were no other evidence about the history of the cargo, then it might be open to a court to assume (though I doubt whether it would be compelled to do so) that, in the absence of any evidence of contamination between going on to Devon and Petronas's inspection, the cargo was contaminated when it reached Devon. But there is other evidence about the history of the cargo. First, there are the judge's findings about the position at Yanbu. Second, the judge investigated the evidence as to the quantity and condition of the cargo on Centaur at the STS and concluded, largely on the basis of the evidence of Mr Panto(vakis, that it was unlikely either that the cargo loaded on to Devon was already contaminated, or that the missing 1500 mt of oil had been successfully concealed on Centaur. These were both conclusions that were plainly open to the judge, based as they were on the evidence of a witness whom he had seen and heard. The judge was entitled to conclude that, just as there was nothing that demonstrated interference with the cargo when on the Devon, so there was nothing that demonstrated interference with the cargo when on the Centaur: bearing in mind, in the latter case, that the cargo had been shown to have been intact when loaded on to Centaur.

55.   Accordingly, even if the judge had adopted the approach indicated at the beginning of §54 above, he could not have found that Petronas had discharged the burden of proof. It might well have been enough for the judge to have stopped there. He did, however, do what the guidance referred to in §49 above requires, and examined whether there was any other approach to the evidence that would yield a different conclusion. Since the evidence excluded accident, the judge was driven to conclude that the only other explanation was misconduct either on Centaur or on Devon: see § 22(4) of the judgment. Since there was no evidence of such misconduct on either vessel, and no material from which the judge could conclude without impermissible speculation that one vessel was more likely to have been guilty than the other, the analysis in §27 of the judgment was all that was available.

*The judge's own theory?*

56.   It was suggested to us that, by even contemplating misconduct on the Devon as a possibility, the judge had gratuitously introduced into the case a theory for which there was no evidence, and which had

never been addressed by either of the parties. I do not think that that criticism is justified. Misconduct on the Devon entered the case as a possibility, but no more than that, by the logical process reviewed in §54 above. Just as there was no evidence positively to support the theory, so there was no evidence that excluded it. Faced with the unusual circumstances of this case, the judge would have been wrong, once misconduct on the Devon had presented itself as a logical possibility, to have excluded that possibility entirely just because of the history of the case, and thus to have been forced back on to misconduct on the Centaur, in respect of which there was equally no positive evidence. If the judge had gone further than the modest steps that he took, and made positive findings that the cargo had been stolen on the Devon, then he would indeed have nodded; but that is what he did not do.

57.  I would therefore dismiss Petronas's appeal on the first issue for those brief reasons, as well as for the much fuller reasons explained by my Lord.

*The demurrage appeal*

58.  On this part of the case I have the misfortune to take a view that departs from that which commends itself to Mance LJ. I need hardly say that I reach that conclusion only with the greatest diffidence.

59.  I would venture to make three preliminary observations. First, the review of the authorities set out by my Lord in his §§ 28-41 indicates that they yield no clear solution to the present issue. Second, therefore, it is necessary to investigate the reasons for and commercial justification of a provision for demurrage in a C&F contract. Third, where contracts are made by the exchange of formalised documents, such as the sale contract and charterparty in the present case, enquiry as to the effect of and reasons for the provisions has to be directed not so much to the intentions of the immediately contracting parties as to the reasonable commercial purpose of the use of those provisions in contracts of this type.

60.  The first issue, therefore, is why it should be thought necessary or appropriate for there to be any demurrage clause at all in the sale contract. The price is a C&F, delivered, price, the cost of delivery therefore resting with the seller. There are no provisions as to time of delivery, or as to delay in delivery, until the vessel arrives at the port and gives notice of readiness: as to the time and reasonableness of which there are no express obligations between buyer and seller. In that context and against that background, the sudden intervention of delay provisions at one stage of the contract appears to be anomalous. The reason for such provisions is as explained by my Lord in §33 above: the seller will have to arrange carriage, and he may, and very likely will, do so by chartering vessels on terms that will expose him to a potential liability to pay demurrage to the owner.

61.  That rationale strongly disposes me to think that the demurrage provisions in the sale contract should be viewed as being in the nature of an indemnity. They are included, not because of any inherent characteristic of the C&F contract itself, but because the seller, in performing that contract, may suffer collateral and as yet unquantified expense against which it is thought reasonable that the buyer should protect him. That is the very essence of an indemnity. Of course it is the case that, as Lord Atkinson said in *Houlder Bros* in the passage quoted in §28 above, once launched upon a demurrage clause the parties are free as a matter of law to make any bargain that they please securing to the seller, or withholding from him, a profit under that clause. But why should it be assumed, or even be likely, that the parties would have used that freedom to formulate provisions, included in the contract in order to protect the seller against demurrage liability, in terms that far exceed that objective, by conferring on the seller the possibility of a windfall profit if he does not incur demurrage liability at all?

62.  My Lord points out, in his §33, that at the time of entering into the sale contract the parties will probably not know the terms of the charterparty, or even whether transportation is to be secured by charterparty at all; as opposed, for instance, by use of the seller's own shipping. They may therefore prefer to operate a scheme that lets them know on contracting precisely where they stand in the event of delay, rather than contract on a basis that depends on the seller's future liabilities. However, with deference, I would venture to think that the uncertainty at the time of contracting as to the terms, or even the existence, of the seller's future charterparty makes it more, rather than less, unlikely that the buyer is to be taken to accept an independent, open-ended, liability in respect of the seller's demurrage. Why should the buyer accept such an obligation, when he has no means of knowing whether, and if so in what terms and amount, there is going to be a cost to the seller at all?

63.  Both of these questions were in my respectful view posed by Bankes LJ, speaking for a very strong commercial Court of Appeal, in *Suzuki*, in the terms set out in §31 above: questions to which in my equally respectful view subsequent cases have given no answer. Nor, with deference, do I think that

any illumination is to be found from the law of penalties. It seems very unlikely that the issue of whether buyers generally are to be assumed to have agreed to a clause obliging them to pay damages for demurrage whether or not the seller had suffered actual loss can reasonably be influenced by the availability to those buyers of the sparse comfort that the clause might not be enforceable in cases where its circumstances or outturn can be characterised as oppressive: see *Chitty on Contracts (29th edition)* § 26-109.

64.  Where there is no cross-reference at all in the sale contract to the or any charterparty, then the argument that the sale provisions are indeed intended to be independent is much stronger: see my Lord's § 42(v). But once there is explicit reference in the sale contract's provisions for payment of demurrage damages to the provisions in the charterparty that address the same category of loss, then the connexion between the two is much harder to resist. In our case, only the rate of demurrage and not the laytime provisions track the charterparty. But I would make two observations. First, if the provisions are intended to be independent, there is no good reason to refer to the charterparty rate at all, as opposed to a rate specific to the sale contract. Indeed, as was demonstrated in *Mallozzi*, such reference may be a positive barrier to enforcement of the provision in the sale contract. Second, on the facts of the present case there is no insuperable difficulty, I would say no difficulty at all, in applying provisions that provide for different laytimes. The sale contract permits 36 hours laytime. That is a floor, or ceiling, to Petronas' liability. They then have to cover such liability as the seller incurs under the charterparty by reason of being delayed over the 36 hours. The seller cannot complain if he is therefore handicapped by different laytime provisions in his charterparty, because he enters into those charterparties knowing the terms of his sale contract and the implications of its laytime provisions.

65.  I would therefore uphold the conclusion of the judge, shortly stated though it was. I respectfully agree with him in his §30 that that conclusion reflects the commercial reality of this transaction.

**Lord Justice Judge:**

66.  I agree with the judgments of Mance and Buxton LJJs upholding Morison J's decision in favour of Fal Oil on the first issue. I cannot usefully add anything. In view of their disagreement on the demurrage issue, notwithstanding a degree of hesitation about expressing views which may be entirely academic, I cannot avoid explaining, if briefly, and without repeating the material closely analysed in the previous judgments, why I agree with Mance LJ.

67.  We are primarily, but not exclusively, concerned with the contract of sale dated 29 November 2000. This made express provision for laytime and demurrage.

       "10. LAYTIME:

       LAYTIME ALLOWED SHALL BE A TOTAL OF 36 HOURS SHINC TO COMMENCE 6
       HRS AFTER NOR IS TENDERED OR UPON BERTHING, WHICHEVER IS EARLIER
       AND TIME SHALL CEASE TO COUNT AT DISCONNECTION OF HOSES.

       11. DEMURRAGE: AS PER CHARTERPARTY PER DAY PRO RATA."

68.  To my untutored eyes, the eight words which comprise the whole of condition 11 appear simple enough. The condition defines the rate on which it is agreed that demurrage will be calculated and payable if, but only if, liability to pay demurrage arises under the contract of sale. It does not create any further or additional obligation. It does not claim to be, nor expressly state that it is to be, treated or deemed to be a provision relevant to any obligation which may arise under the equivalent clause in the charterparty. And just as the language does not purport to create any such obligation, I can see nothing in principle, nor in the authorities, which compels me to the conclusion that it does.

69.  Condition 11 therefore is concerned with rates or methods of calculating demurrage. The rate is fixed by reference to the demurrage agreed (or in this case, as we now know, to be later agreed) in the charterparty. The parties agreed that, if liability for demurrage arose between them, it would be paid at the same rate as the rate for demurrage agreed in the charterparty. As a matter of fact, that provides a link between the contract of sale and the charterparty, but does so without undermining the contract of sale as an independent, freestanding contractual arrangement of its own. When the charterparty was eventually concluded, the daily demurrage rate was fixed at US$ 18,000 pro rata.

70.  At the time when the contract of sale was agreed, the charterparty rate was unknown. That does not

present an insuperable difficulty. The parties appreciated that a charterparty would inevitably come into existence, and there was nothing to prevent them agreeing the rate of any potential liability for demurrage as between themselves by reference to it. Seen through the eyes of both parties, I do not discern any commercial naivety in using a separate, independent but linked charterparty as an agreed reference point by which the rate of demurrage in this contract of sale should be fixed. If improper advantage were taken of the condition it would be capable of remedy. However, it is not here suggested that the charterparty was blemished in this, or any other way, or that the agreed rate might be regarded as a penalty clause, or indeed that resort may be needed to the Inco Term 2000 to which reference is made in condition 15 of the contract of sale.

71. For these reasons, which mirror paragraphs 45 and 46 of Mance LJ's judgment, the contract with which we are concerned was an independent, sensible, prearranged method of anticipating and calculating the loss recoverable for demurrage in the contract of sale: no more, and no less. Accordingly, I too would allow the appeal on the demurrage issue.

LORD JUSTICE MANCE: For the reasons contained in the written judgments which have been handed down in draft an order will be made along the lines of the draft which has been submitted by counsel, completed as follows: paragraphs 1 and 2 will be as per the draft, in other words:

"1 The first appeal shall be and is hereby dismissed.

2 The second appeal shall be and is hereby allowed."

Paragraph 3 will be as per the draft but deleting the last sentence to which Petronas object and replacing it by the words to the effect that "the demurrage claim will be remitted to the Commercial Court for it to hear and determine further argument on any outstanding issues, including the issue whether any and, if so, what further amendment of Petronas's defence is required or should be permitted in relation to Fal Oil's demurrage claim".

Paragraph 4: an order will be made in the alternative form sought by Petronas.

Paragraph 5: an order will again be made in the alternative form sought by Petronas with the deletion of the words "to the Court or" (which this Order makes otiose). In other words, the effect of those two paragraphs of the order will be that there will be a limited condition of stay. The only addition ought, we think, to be that, in relation to the order in paragraph 4, there should be interpolated after the words "in relation to the First Appeal" the words "(any such application for permission to appeal to the House of Lords to be prosecuted with reasonable despatch)".

Paragraph 6: Petronas's application for permission to appeal to the House of Lords shall be refused. In other words, an order is made in the form sought by Fal Oil.

Paragraph 7: the order will neither be in the form sought by Fal Oil, nor in the form sought by Petronas. Instead it will be ordered that "Each side shall bear its own costs of dealing with and corresponding in relation to the scope of appeal prior to the hearing of the appeal (save for costs already covered by Lord Justice Thomas' order dated 19 January 2003) such costs specifically to include those of and in relation to the subject matter of Ince & Co's letter dated 12 March 2004 to the Civil Appeals Office and the correspondence enclosed therewith."

Paragraph 8 - a new paragraph: "Subject to paragraph 7, Petronas shall pay Fal Oil's costs of appeal on both issues. There will be no variation of the costs order below."

A new point has been made relating to judgment rate interest. I am not confident that that has been addressed by all members of the court. I may be wrong in thinking it has been. At the moment the order will be for judgment rate interest. I shall confirm with the other members of the court that that was also their intention, and in the meanwhile the order should not be drawn up. I am not confident that it has been considered but it may well have been and I think it better therefore to make that reservation. I say that partly because just before coming into court I have been given yet another e:mail skeleton argument making submissions, and I am not confident that that, amongst other things, has been seen by the other members of the court.

There were one or two typographical amendments to the draft judgment of Lord Justice Judge which he has asked me to mention in court. In paragraph 68, third line, the first and second comma should be

removed; in other words, the comma after the word "calculated" should be deleted and the comma after the word "payable" should also be deleted. The third and fourth commas in that line remain. In paragraph 69 in the seventh line there should be a comma after the word "Independent". In paragraph 70 in the sixth line there should be an additional comma after the word "separate".

(Court adjourned)

NOTE: Having further consulted Lords Justice Judge and Buxton, I confirm that no order will be made varying the usual judgment rate of interest.

**Order: Appeal Allowed.**
**(Order does not form part of the approved judgment)**

BAILII: Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: http://www.bailii.org/ew/cases/EWCA/Civ/2004/822.html

"HCMP 5"

ICLR: King's/Queen's Bench Division/1992/PETROFINA S.A. v. A.O.T. LTD. - [1992] Q.B.
571

[1992] Q.B. 571

### [QUEEN'S BENCH DIVISION]

### PETROFINA S.A. v. A.O.T. LTD.

**1990 March 19; April 3.**

**Phillips J**

*Arbitration - Award - Application for leave to appeal - Exclusion agreement - C.i.f. contract
for sale of oil - Claim for demurrage - Whether "arising out of any agreement relating to the
carriage of goods in a ship" - Whether claim within Admiralty jurisdiction - Whether exclu-
sion agreement ousted - Arbitration Act 1979 (c. 42), ss. 3(1), 4(1) - Supreme Court Act
1981 (c. 54), s. 20(2)(h)*

*Ships' Names - Maersk Nimrod*

The defendants commenced arbitration proceedings against the plaintiffs, the parties hav-
ing agreed to exclude the right of appeal provided by section 1(3) of the Arbitration Act
1979. The defendants' claim was for moneys alleged to be due pursuant to the demurrage
provisions of a c.i.f. contract under which they had sold the plaintiffs a large consignment

of oil. The c.i.f. contract incorporated by reference some of the demurrage provisions in the charterparty under which the vessel carrying the oil was chartered. The demurrage provisions of the charter included a time bar clause. The plaintiffs contended that the time bar clause had been incorporated in to the c.i.f. contract and that the defendants' claim was out of time. The arbitrators dealt with the time bar issue as a preliminary point and in an interim final award held that the time bar clause had not been incorporated into the c.i.f. contract and that the defendants were not time-barred.

On an application by the plaintiffs for leave to appeal against the interim final award, on the question whether the exclusion agreement was inapplicable under section 4(1)(a) of the Act of 1979[1] as the defendants' claim fell within the Admiralty jurisdiction of the High Court as defined by section 20(2) of the Supreme Court Act 1981[2]: −

*Held*, refusing leave to appeal, that a c.i.f. contract for the sale of goods did not constitute an "agreement relating to the carriage of goods in a ship" within the meaning of section 20(2)(h) of the Supreme Court Act 1981; that, although the court could sever such a contract so as to bring within section 20(2)(h) a claim which arose out of a part of the contract which did constitute an "agreement relating to the carriage of goods in a ship," that part of the c.i.f. contract dealing with demurrage, out of which the claim arose, did not constitute such an agreement; that, as a matter of ordinary and natural meaning, the defendants' claim could not be described as "arising out of" the charterparty for the purposes of section 20(2)(h); and that, accordingly, the defendants' claim did not fall within the Admiralty jurisdiction of the High Court and the validity of the parties' agreement to exclude any right of appeal against the arbitrators' award was unaffected by section 4(1)(a) of the Arbitration Act 1979 (post, pp. **576A-B, 577C, 578C-D, H-579A, 580F, 582D-E**).

---

1   Arbitration Act 1979, s. 3(1): see post, p. 573C-D S. 4(1): see post, p. 573D-E

2    Supreme Court Act 1981, s. 20(1)(a)(2)(h): see post, p. 575A-B

[1982] Q.B. 577 Page 572

The Zeus (1888) 13 P.D. 188, D.C. and *Gatoil International Inc. v. Arkwright-Boston Manu-facturers Mutual Insurance Co.* [1985] A.C. 255, H.L.(Sc.) applied.

The following cases are referred to in the judgment:

Aifanourios, The, 1980 S.C. 346

*Antonis P. Lemos, The* [1985] A.C. 771; [1984] 2 W.L.R. 825; [1984] 2 All E.R. 353, C.A.; [1985] A.C. 771; [1985] 2 W.L.R. 468; [1985] 1 All E.R. 695, H.L.(E.)

*Eschersheim, The* [1976] 1 W.L.R. 430; [1976] 1 All E.R. 920, H.L.(E.)

*Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co.* [1985] A.C. 255; [1985] 2 W.L.R. 74; [1985] 1 All E.R. 129, H.L.(Sc.)

*Johnson v. Taylor Brothers & Co. Ltd.* [1920] A.C. 144, H.L.(E.)

*Queen of the South, The* [1968] P. 449; [1968] 2 W.L.R. 973; [1968] 1 All E.R. 1163

*Zeus, The* (1888) 13 P.D. 188, D.C.

### Application

On 11 December 1989 arbitrators published an interim final award in respect of an arbitration dispute between the plaintiffs, Petrofina S.A., and the defendants, A.O.T. Ltd., in arbitration proceedings in which the defendants claimed $57,000 pursuant to the demurrage provisions of a c.i.f. contract for the sale of 50,000 tonnes of fuel oil. By an originating motion dated 12 January 1991 the plaintiffs applied for leave to appeal against the award.

The application was heard in chambers and judgment was delivered in open court.

The facts are stated in the judgment.

*Richard Siberry Q.C.* for the plaintiff buyers.

*Simon Rainey* for the defendant sellers.

Cur. adv. vult.

3 April 1990. PHILLIPS J. read the following judgment. This judgment addresses a point of general interest which is why, at the invitation of the parties, I am delivering it in open court.

On 20 April 1989 the defendants ("the sellers") commenced arbitration proceedings against the plaintiffs ("the buyers"). Their claim is for some $57,000 alleged to be due pursuant to the demurrage provisions of a c.i.f. contract under which they sold to the buyers 50,000 tonnes of fuel oil, shipped at Odessa and delivered at Fiumicino. That c.i.f. contract incorporated by reference at least some of the demurrage provisions in the Asbatankvoy charterparty under which the vessel carrying the fuel oil, the *Maersk Nimrod*, was char-

tered. The demurrage provisions of that charter included a time bar clause. The buyers took the point that this clause was incorporated into the c.i.f. contract and that the sellers' claim was out of time and barred. The sellers denied that the time bar clause was incorporated into the c.i.f. contract.

*[1992] Q.B. 571 Page 573*

The arbitrators, Messrs. Hardee and Bishop, at the invitation of the parties, dealt with the time bar issue as a preliminary point. They published an interim final award on 11 December 1989 holding that the time bar clause was not incorporated in the c.i.f. contract and that, accordingly, the sellers were not confronted by a time bar.

The buyers now seek leave to appeal against this award. The sellers meet this application with a contention that I have no jurisdiction to grant leave to appeal because the parties have, by agreement, excluded the right to appeal. They further contend that, in any event, this is not an appropriate case for the grant of leave to appeal. The parties wish me in my judgment to rule both on the question of jurisdiction and on the question of whether, jurisdiction aside, this is a proper case for the grant of leave to appeal, and I shall do so.

**The exclusion agreement**

Section 1(3) of the Arbitration Act 1979 provides for a right of appeal, with the leave of the court, on a question of law arising out of an arbitration award. Sections 3 and 4 provide, in so far as material:

"3(1) Subject to the following provisions of this section and section 4 below - (a) the High Court shall not, under section 1(3)(b) above, grant leave to appeal with respect to a question of law arising out of an award . if the parties to the reference in question have entered into an agreement in writing (in this section referred to as an 'exclusion agreement') which excludes the right of appeal under section 1 above in relation to that award .

"4(1) Subject to subsection (3) below, if an arbitration award or a question of law arising in the course of a reference relates, in whole or in part, to - (a) a question or claim falling within the Admiralty jurisdiction of the High Court . an exclusion agreement shall have no effect in relation to the award or question unless either - (i) the exclusion agreement is entered into after the commencement of the arbitration in which the award is made ."

It is common ground that on 19 April 1989, the day before the arbitration was commenced, the parties concluded an exclusion agreement. The buyers contend, however, that that agreement has no effect because the interim award relates to a claim falling within the Admiralty jurisdiction of the High Court. The issue that I have to resolve is whether the sellers' claim in the arbitration is a claim which falls within the Admiralty jurisdiction of the High Court.

The sellers' claim

The contract for the sale of the fuel oil was concluded by telex. The relevant terms of that contract were as follows:

"*Delivery* One safe berth c.i.f. Fiumicino by vessel acceptable to receivers but such nomination not to be unreasonably withheld. Delivery period off Fiumicino 3/11 May 1988

"*Laytime Allowance* 36 + 6 hrs. N.O.R. SHINC

"*Laytime Demurrage* If any, as per charterparty rate terms and conditions."

[1992] Q.B. 571 Page 574

The charterparty referred to was that under which the *Maersk Nimrod* was chartered to carry the fuel oil. The c.i.f. contract was one of a string and the sellers were, accordingly, not party to that charterparty. In so far as material, it provided:

> "Laydays: Commencing 27 April 1988 Cancelling 29 April 1988 (2400). Loading Port(s) 1/2 safe port(s) Soviet Black Sea . (H) Total laytime in running hours: 72 hours SHINC-6 hour notice time each port, even if on demurrage. (I) Demurrage per day/pro rata: U.S.$12,000."

The time limit clause, which formed the subject matter of the interim award, was an additional typed clause which provided:

> "8. *Claims Clause.* Charterers shall be discharged and released from all liability in respect of claims owners may have under this charterparty for demurrage, unless claim has been presented in writing to charterers with all supporting documents, duly signed by all parties concerned, within 90 days from completion of discharge of cargo carried under this charterparty."

In the course of arguing the preliminary question whether this clause was incorporated into the c.i.f. contract the parties canvassed an issue as to the nature of the substantive demurrage provision. The sellers argued that it was an indemnity provision. It entitled the sellers to pass on to the buyers any demurrage which became payable under the charterparty. It followed that the time bar clause could not sensibly be incorporated in the c.i.f. contract. If a timely claim was brought against charterers under the charterparty, it could be passed down the string under the terms of the c.i.f. contract. If no timely claim was made there was nothing to pass down the string. The buyers challenged this contention and the arbitrators determined the issue in favour of the buyers. They held that the demurrage provisions in the c.i.f. contract imposed obligations which stood independently of the demurrage

obligations in the charterparty. The laytime calculations under the charterparty, which embraced both loading and discharge, would differ from the laytime obligations under the c.i.f. contract. Demurrage payable under the latter would not necessarily reflect demurrage payable under the former.

The sellers have served on the buyers a respondents' notice seeking to preserve their right to revive the indemnity argument should leave to appeal be given. Before me, however, they have based their arguments on the premise that the arbitrators have correctly concluded that the demurrage obligation in the c.i.f. contract is an independent obligation. It may well be that the doctrine of issue estoppel would have obliged them to adopt this approach even if they had not wished to do so.

Is the claim within the Admiralty jurisdiction?

The Admiralty jurisdiction of the High Court is now determined by section 20 of the Supreme Court Act 1981. The buyers contend that the

[1982] Q.B. 571 Page 575

sellers' claim for demurrage falls within the Admiralty jurisdiction by virtue of the following provisions of section 20:

> "(1) The Admiralty jurisdiction of the High Court shall be as follows, that is to say - (a) jurisdiction to hear and determine any of the questions and claims mentioned in subsection (2); . (2) The questions and claims referred to in subsection 1(a) are - . (h) any claim arising out of any agreement relating to the carriage of goods in a ship or to the use or hire of a ship; ."

To fall within this head of Admiralty jurisdiction, which I shall call paragraph (h), a claim must be one *arising out of* an agreement and that agreement must be one *relating to* the

carriage of goods in a ship or to the use or hire of a ship. Much of the argument in the present case - and indeed in other cases dealing with this or similar heads of Admiralty jurisdiction - has turned on the nature of the connection that the two phrases "arising out of" and "relating to" imply.

The buyers contend that it is possible to identify no less than three agreements relating to the carriage of goods in a ship out of which the sellers' claim can properly be said to arise within paragraph (h). These are: (1) the c.i.f. contract; (2) that part of the c.i.f. contract which makes provision for the payment of demurrage; and (3) the charterparty.

The sellers accept that their claim "arises out of" agreements (1) and (2) but deny that those agreements can properly be said to be "relating to the carriage of goods in a ship" within paragraph (h). The sellers agree that the charterparty is an agreement "relating to the carriage of goods in a ship" but deny that their claim is one "arising out of" that agreement within paragraph (h).

### The c.i.f. contract

The first submission of Mr. Siberry for the buyers is that a c.i.f. contract is an agreement relating to the carriage of goods in a ship so that any claim arising out of a c.i.f. contract is within section 20(2)(h) of the Act of 1981. If this is correct, as Mr. Siberry accepted, a claim for non-conformity of the goods shipped or documents tendered under a c.i.f. contract would fall within the Admiralty jurisdiction. This is a novel and startling submission, but not to be rejected on that ground alone. The duties of a vendor under a typical c.i.f. contract were summarised by Lord Atkinson in *Johnson v. Taylor Brothers & Co. Ltd.* [1920] A.C. 144, 155-156:

> "the vendor in the absence of any special provision to the contrary is bound by his contract to do six (sic) things. First, to make out an invoice of the goods sold. Second, to ship at the port of shipment goods of the description contained in the contract. Third, to procure a contract of affreightment under which the

goods will be delivered at the destination contemplated by the contract. Fourth, to arrange for any insurance upon the terms current in the trade which will be available for the benefit of the buyer. Fifthly, with all reasonable despatch to send forward and tender to the buyer these shipping documents, namely, the invoice, bill of lading and policy of assurance, delivery of which to the buyer is symbolical of delivery

[1982] Q.B. 671 Page 676

of the goods purchased, placing the same at the buyer's risk and entitling the seller to payment of their price."

Modern trading practices, particularly in the oil trade, have produced some variations in this picture, but essentially it remains the same today. One of the seller's duties is to procure for the buyer the benefit of a contract of carriage by sea of the goods sold. Thus one can say, speaking broadly, that one of the matters to which the c.i.f. contract relates is the carriage of goods by sea. Even so, one would not naturally speak of a c.i.f. contract as being an "agreement relating to the carriage of goods in a ship" for that phrase suggests that the carriage of goods by sea is the central matter to which the agreement relates. Only if the phrase "relating to" is to be given an unnaturally wide meaning can Mr. Siberry's first submission be made good. I turn, then, to the authorities to see what guidance they afford on this question.

The history of the statutes conferring Admiralty jurisdiction on the English High Court can be found in the judgment of Brandon J. in *The Queen of the South* [1968] P. 449, 454 and there are many decisions on the statutory provisions in question. In addition there are decisions on similar provisions conferring Admiralty jurisdiction on the county court. The jurisdiction conferred by section 20 of the Supreme Court Act 1981 is, however, jurisdiction enacted to give effect to the International Convention relating to the Arrest of Seagoing

Page 11

Ships made at Brussels on 10 May 1952 (1960) (Cmnd. 1128) and one must be careful not to attach too much weight to decisions on statutes enacted prior to that date.

In *Gatoil Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co.* [1985] A.C. 255 the issue was whether a contract of marine insurance covering a cargo of oil during its carriage from Iran to various destinations was an "agreement relating to the carriage of goods in any ship" under section 47(2)(*e*) of the Administration of Justice Act 1956, the statutory provision conferring Admiralty jurisdiction in Scotland, which was equivalent to the English statutory predecessor of paragraph (*h*) of section 20(2) of the Act of 1981. The House of Lords held that no distinction fell to be drawn between this head of jurisdiction in England and in Scotland. Lord Keith of Kinkel, in the leading speech, reviewed the English authorities on the statutory predecessors to paragraph (*h*) and one Scottish decision, *The Aifanourios*, 1980 S.C. 346, where the Court of Session had refused to hold that a claim on a contract of marine insurance fell within the Admiralty jurisdiction. In that case the court declined to give the words "relating to the use . of any ship" in section 47(2)(*d*) of the Act of 1956 a broad construction, and Lord Keith agreed with this approach. He said [1985] A.C. 255, 270-271:

> "It is necessary to attribute due significance to the circumstance that the words of the relevant paragraphs speak of an agreement 'in relation to' not 'for' the carriage of goods in a ship and the use or hire of a ship. The meaning must be wider than would be conveyed by the particle 'for.' It would, on the other hand, be unreasonable to infer from the expression actually used, ;in relation to,' that it is intended to be sufficient that the agreement in issue should be in some way connected, however remotely, with the carriage of goods

[1992] Q.B. 571 Page 577

> in a ship or with the use or hire of a ship, and I think there is much force in the view expressed by Lord Wylie in *The Aifanourios*, 1980 S.C. 346 as to the inference to be drawn from the presence of certain other paragraphs in section 47(2). There must, in my opinion, be some reasonably direct connection with

such activities. An agreement for the cancellation of a contract for the carriage of goods in a ship or for the use or hire of a ship would, I think, show a sufficiently direct connection. It is unnecessary to speculate what other cases might be covered. Each case would require to be decided on its own facts. As regards the contract of insurance founded on in the instant appeal, I am of opinion that it is not connected with the carriage of goods in a ship in a sufficiently direct sense to be capable of coming within paragraph (e)."

This passage is not of great assistance as a touchstone for determining whether or not a case falls within paragraph (h) of section 20(2) of the Act of 1981 where the issue is nicely balanced. It does, however, suffice to confirm my conclusion that a c.i.f. contract for the sale of goods does not constitute an agreement relating to the carriage of goods in a ship within the meaning to be given to that phrase in paragraph (h).

**The demurrage agreement**

Mr. Siberry appreciated the possibility that the court might decline to hold that the entirety of a c.i.f. contract falls within paragraph (h) of section 20(2) of the Act of 1981 and developed an alternative argument, equally novel but more attractive. His submission, in effect, was as follows. Where an agreement relates to a number of matters and one of those matters is the carriage of goods in a ship one can, in effect, sever the contract and bring within paragraph (h) a claim that arises out of that part of the contract which constitutes an agreement "relating to the carriage of goods in a ship." Two questions arise. (1) Is severance permissible? (2) If so, does that part of the c.i.f. contract which deals with demurrage constitute an "agreement relating to the carriage of goods in a ship?"

**Is severance possible?**

In *The Queen of the South* [1968] P. 449 the issue was whether a contract for the provision of mooring services, which normally involved the use of boats ("ships" within the Act) constituted an "agreement relating . to the use or hire of a ship" within the identical paragraph (*h*) in section 1(1) of the Administration of Justice Act 1956. Brandon J. held that the agreement fell within paragraph (*h*). He said, at p. 456:

> "Counsel for the interveners, in disputing these arguments, sought to draw a distinction between an agreement relating to the use of a ship, and an agreement relating to the rendering of services in the course of which a ship was used. He said that the former was within paragraph (*h*), but the latter was not. He further said that the agreement in the present case was in the second category. I did not think that his argument based on this distinction was convincing. I can see that there might be an agreement for services, in the course

[1982] Q.B. 571 Page 572

> of which there was only some incidental and minor use of a ship, which it might be inappropriate to describe as an agreement relating to the use of a ship. In the present case, however, it seems to me clear, on the written and oral evidence before me, that the whole of the services rendered by the plaintiffs were based on the use of motor boats owned and operated by them. It is true that in some cases the men engaged in mooring and unmooring did their work on a quay or on a buoy. But they were landed on the quay or on the buoy from a motor boat and taken off again by the same means."

Brandon J. did not have to consider whether, if services involving the use of a ship were only an incident of an agreement relating mainly to matters outside the Admiralty Jurisdiction, a claim could nevertheless be brought within paragraph (*h*) in relation to that part of the agreement which related to the use of a ship. It is not difficult to envisage such a contract - e.g. a contract for the provision of services to a North Sea oil rig some of which might involve the use of vessels, others the use of helicopters and others still involve no

maritime element whatsoever. In such a case I see no reason in principle why a claim aris-ing out of that part of the contract involving the use of a vessel should not be brought within the Admiralty jurisdiction. On the contrary, it would seem illogical that the existence of Admiralty jurisdiction should turn on whether there was between the parties a single agreement dealing comprehensively with all the services to be provided or a series of agreements each dealing with a separate type of service.

Accordingly, I hold that severance is possible and that a party can invoke as an agreement within section 20(2)(*h*) of the Act of 1981 an agreement which forms one incident of a wider contract.

Does the demurrage claim fall within paragraph (h)?

That part of the c.i.f. contract which relates to demurrage requires the buyers to make a payment to the sellers if the buyers take more than 36 hours to discharge the cargo. The amount of the payment falls to be calculated at the same rate and subject to the same terms and conditions as demurrage payable by the charterer to the shipowner under the charterparty of the *Maersk Nimrod*. Although the liability to pay demurrage under the c.i.f. contract is independent of the charterer's liability to pay demurrage under the charterparty, the one is likely to reflect the other and the facts giving rise to liability in both cases will be the same - delay in discharging the vessel in the final stage of a marine adventure consist-ing of the loading of the oil in the Black Sea, carriage of the oil to Fiumicino and discharge of the oil at Fiumicino. Having regard to these facts, the buyers submit that the demurrage agreement is an "agreement relating to the carriage of goods in a ship" within paragraph (*h*) of section 20(2) of the Act of 1981.

My reaction to this submission, in the absence of authority, is that one would not naturally describe the buyers' agreement to pay demurrage as an agreement "relating to the car-riage of goods in a ship." A more natural description would be "an agreement relating to the discharge of

[1992] Q.B. 571 Page 579

goods from a ship." If anything, the agreement comes closer to being "an agreement relat-
ing to the use of a ship" although the distinction is a fine one. Perhaps the reason why Mr.
Siberry did not rely on that limb of paragraph (h) was that to do so would have brought him
into head-on collision with The Zeus (1888) 13 P.D. 189.

In The Zeus the Divisional Court was concerned with the extent of the Admiralty jurisdic-
tion conferred on the county court by section 2 of the County Courts Admiralty Jurisdiction
Amendment Act 1869 (32 & 33 Vict. c. 51), which gave jurisdiction "as to any claim arising
out of any agreement made in relation to the use or hire of any ship, or in relation to the
carriage of goods in any ship." The assertion of Admiralty jurisdiction was made by the
owners of the Zeus against the owners of a colliery who had given the owners a guarantee
that they would load the Zeus within 48 hours or be liable to usual "demurrage for each
hour exceeded." This rate fell to be determined by reference to the charterparty under
which the Zeus was loading. That charterparty provided:

> "The vessel to be loaded in 48 hours . the loading to be on conditions of colliery
> guarantee herewith, which owner agrees to accept, and settle with the colliery
> agent for payment of any demurrage that may be due . and if the steamer is not
> dispatched within the stipulated time she is to lay five days on demurrage at
> and after the rate of 16s.8d. per hour."

The county court judge held that the claim under the colliery guarantee fell outside his Ad-
miralty jurisdiction. The Divisional Court agreed. Sir James Hannen P. gave a brief judg-
ment, at p. 190:

> "The question in this case arises out of an agreement to deliver on board a ship
> a certain quantity of coals, and we have to decide whether or not that agree-
> ment is one in relation to the use or hire of the ship. We should disturb the

natural meaning of the words of the statute if we said that the agreement has relation to the use or hire of the ship. It is merely an engagement to deliver coals at a particular place. Reliance has been placed upon the fact that it provides for the payment of demurrage. But we must look at the facts, and remember that demurrage is a word of different meanings. It is a word, for instance, which is used not only in relation to carriage by ships but by railway trucks, and a charge is made for their detention under that name. What it seems to mean here is, that it is a penalty to be paid if the contract is not performed within a limited time. But unless it can be established that the agreement is one in relation to the use or hire of a ship the fact that the word 'demurrage' is used is immaterial."

The facts of *The Zeus*, 13 P.D. 188 are similar to the facts of the present case, save that (i) *The Zeus* dealt with delay during loading, whereas this case deals with delay during discharge - a difference of no materiality - and (ii) the agreement in *The Zeus* was an agreement to which the shipowners were party, whereas in this case the agreement was between buyers and sellers. That difference made it easier to argue

*[1992] Q.B. 57: Page 580*

in *The Zeus* that the agreement related to the use of a ship than it is in the present case.

Mr. Siberry sought to meet this decision in two ways. First, he submitted that I should adopt a broader approach to construing the similar provision of paragraph (h) of section 20(2) of the Act of 1981 than that which was appropriate to a decision dealing with the ambit of county court Admiralty jurisdiction. He referred me to the fact that the High Court in the last century followed a policy of giving a restricted meaning to words conferring Admiralty jurisdiction on the county court and to Lord Diplock's observation that such an approach was not appropriate when considering the present High Court jurisdiction in *The Eschersheim* [1976] 1 W.L.R. 430, 438. Lord Wilberforce made a similar observation in

*Gatoil International Inc. v. Arkwright-Boston Manufacturers Mutual Insurance Co.* [1985] A.C. 255, 263. The problem with this is that in the *Gatoil case* Lord Keith of Kinkel referred to the decision in *The Zeus*, 13 P.D. 188 with approval as providing relevant guidance to the interpretation of paragraph (*h*). He said [1985] A.C. 255, 270:

> "*The Zeus*, 13 P.D. 188 is perhaps a particularly important decision in this con-
> nection. It did not purport to proceed on a consideration of the unlikelihood of
> Parliament having intended to confer on the county court a jurisdiction which
> the Admiralty Court itself did not possess."

Mr. Siberry submitted that Lord Keith had overlooked the fact that the judgment in *The Zeus* turned on the words "in relation to the use or hire of a ship," not "in relation to the carriage of goods in a ship." I have already indicated that the distinction between "in rela-tion to the use of a ship" and "in relation to the carriage of goods in a ship" is a fine one when dealing with the operation of loading or discharging goods. In *The Zeus* the plaintiffs sought to found jurisdiction on the former phrase without success. I can see no warrant for the suggestion that Lord Keith was misled into expressing approval of that decision by an oversight. I consider that I am obliged to treat the approach of the Divisional Court in *The Zeus* as applicable to the similar words in paragraph (*h*) of section 20(2) of the Act of 1981 and I do so the more readily as it coincides with the conclusion that I would have reached in the absence of authority. That part of the c.i.f. contract dealing with demurrage did not constitute an "agreement relating to the carriage of goods in a ship" within paragraph (*h*).

Does the sellers' claim arise out of the charterparty?

Prior to 1985 there were one or two instances of a plaintiff successfully invoking Admiralty jurisdiction under section 20(2)(*h*), or its predecessors, in respect of a claim in tort arising out of an agreement to which the plaintiff and defendant were party. There was no case where a plaintiff had succeeded in founding such jurisdiction on an agreement to which neither the plaintiff nor the defendant was party.

*The Antonis P. Lemos* [1985] A.C. 711 demonstrated that this could be done. The buyers
rely on this decision as establishing their case that
*[1992] Q.B. 571 Page 581*

the sellers' claim is one arising out of the charterparty, although the sellers were not privy
to the charterparty. It is necessary to consider the complicated facts of that case with care.

The defendants were the owners of the *Antonis P. Lemos*. They placed their ship at the
disposal of a company called Containertank. Containertank chartered the ship under a
time charter to Sammisa Co. Ltd. Sammisa Co. Ltd. sub-chartered the ship on a time-trip
basis ("the time-trip charter") to the plaintiffs. The plaintiffs nominated the vessel to fulfil a
voyage charter that they had made for a voyage carrying corn from North America to Alex-
andria. The voyage charter guaranteed that the vessel would have a maximum draft of 32
feet on arrival at Alexandria. There was no contractual nexus between the plaintiffs and the
defendants, but the effect of the chain of charters was that the master was, de facto, re-
sponsible for the loading of the cargo in North America and the plaintiffs were, de facto, in
a position to make known their loading requirements to the master. The master was aware
of the draft guarantee given by the plaintiffs but loaded too much cargo so that the vessel
failed to comply with the guarantee, rendering the plaintiffs liable to lightening costs at Al-
exandria. These they claimed to recover from the defendants as damages for negligence.

The Court of Appeal, in a judgment delivered by Parker L.J. [1985] A.C. 711, 715, held that
the claim fell within the Admiralty jurisdiction under paragraph (*h*) of section 20(2) of the
Act of 1981, identifying both the voyage charter and the time-trip charter as being "agree-
ments relating to the carriage of goods in a ship" out of which the plaintiffs' claim arose.
The House of Lords upheld this decision. In the leading speech Lord Brandon of Oakbrook
[1985] A.C. 711, 722, held that under paragraph (*h*): (i) a claim could arise out of an
agreement notwithstanding that the claim was not brought *under* the agreement; (ii) a
claim could arise out of an agreement even if that agreement was not one concluded be-

tween the plaintiff and the defendant; (iii) in contradistinction to the words "relating to," the words "arising out of" should be given the broad meaning of "connected with;" and (iv) on the facts, Parker L.J. had been correct in holding that the plaintiffs' claim was one arising out of both the voyage charter and the time-trip charter. Parker L.J. had explained this conclusion as follows, at p. 717:

> " . I would hold that such a claim plainly arises out of the voyage charterparty, or the charterparty of 16 October, or both. I do so principally because, in the absence of the contractual guarantee and the master's or owners' awareness of it, it would, as it seems to me, be quite impossible to contend that there was a duty to load only such quantity as would enable the vessel to arrive at Alexandria with a maximum draught of 32 ft. This was not seriously disputed by the defendants."

He described this, at p. 719E, as the application of the ordinary meaning of the words in paragraph (h).

The decision of the House of Lords in The Antonis P. Lemos [1985] A.C. 711 throws little light on the degree of connection that must exist between a claim and an agreement to found jurisdiction under section

[1982] Q.B. 571 Page 582

20(2)(h) of the Act of 1981. Mr. Rainey for the sellers submitted that a claim cannot be said to arise out of an agreement unless reference to the agreement is necessary to found the cause of action, although he did not accept that where such reference was necessary the claim would always arise out of the agreement.

In the present case he submitted that the only relevance of the charterparty was that some of the contractual provisions relating to demurrage were incorporated into the c.i.f. contract

from the charterparty. A claim could be pleaded setting out these terms without reference to the charterparty at all. Mr. Siberry submitted that the authorities showed that attempts to produce a definition of "arising out of" had been unsuccessful. All that one could say was that there had to be a reasonably close connection between the claim and the agreement. In this case there was sufficient proximity. If the issue turned on whether one had to refer to the agreement in order to establish one's claim he succeeded, for it was necessary for the sellers to refer to the demurrage provisions in the charterparty.

I agree with Mr. Siberry that the authorities do not provide a definition of "arising out of" that can be applied to determine whether the necessary degree of proximity exists between claim and agreement. In my judgment my task is simply to ask whether, giving the English language its ordinary and natural meaning, the sellers' claim arises out of the charterparty. In my judgment it does not. It arises out of the c.i.f. contract under which the claim is brought and, more particularly, out of the agreement to pay demurrage which forms part of that contract. The claim is independent of the charterparty, which is only relevant in that it provides the demurrage rate and the other terms, if any, that bear on the computation of demurrage.

For these reasons my conclusion is that the sellers' claim is not one which falls within the Admiralty jurisdiction of the High Court and that the parties have, by agreement, validly excluded any right of appeal against the arbitrators' award.

Leave to appeal

Had I concluded that I had jurisdiction so to do I would have granted the buyers leave to appeal against the arbitrators' interim final award.

*Application dismissed.*

*No order for costs.*

*Solicitors: Stephenson Harwood; Crossman Block.*

[Reported by Martin Condron Esq., Barrister]

---- End of Request ----

Print Request: Current Document: 1

Time Of Request: Sunday, August 19, 2007  09:06:31

31-08-2007   19:11     FROM-PENLAW          +33 1 44 51 59 71      T-454   P.099/100   F-561
SENT BY: ;                              022 7917872;        17-AUG 06 15:50;            PAGE 1/1

*"HCMP 6"*

# GST COMMODITIES TRADING CO.

Langham House, #401, 302 Regent Street, London W1B 3HH, United Kingdom

**To:**     Egyptian American Steel Rolling Co.
**Fax:**    00202 620 1592                                    *via fax*
**Date:**   16.08.2006
**Re:**     m/v Merue A

Dear Sirs,

With reference to our several discussions related to the quality of steel scrap shipped on the above mentioned vessel, being not conforming to the signed contract and the quality mentioned in the above mentioned L/C. And after checking it in the port of Alexandria, we agree to make a discount of $ 15/MT on the price of the above mentioned L/C for the total shipped quantity on the board mv Merue A (Bill of Lading #1,2,3; total quantity 9'274,897 mts) and to cancel the rest of the above L/C and contract as a final settlement and solution.

Please immediately instruct your bank to send the swift/telex message to our bank to accept the discrepancies (some documents show the description of goods) after deducting $ 15 per ton.

Best regards,
GST Commodities Trading Co.

31-08-2007  19:11    FROM-PENLAW                        +33 1 44 51 59 71    T-454  P.100/100  F-561
SENT BY: .;
     17 08 06 15:45                    022 7917872;          17-AUG-06 16:01;              PAGE 1/1
                                                                                           CTP. 1

# GST COMMODITIES TRADING CO.

Langham House, #401, 302 Regent Street, London #1B 3BB, United Kingdom

To:     Egyptian American Steel Rolling Co.                    via fax
Fax:    00202 620 1592
Date:   16.08.2006
Re:     m/v Merve A

Dear Sirs,

Hereby we inform you that all time lost due to clarification of quality claim will be on our account.

Best regards,
GST Commodities Trading Co.

2