WATSON, FARLEY & WILLIAMS (NEW YORK) LLP
Counsel for Plaintiff
100 Park Avenue, 31st Floor
New York, NY 10017
Tel: (212) 922-2200
Fax: (212) 922-1512

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CENTRAMET TRADING S.A.,

                                    Plaintiff,

        - against -

EGYPTIAN AMERICAN STEEL ROLLING
COMPANY,

                                    Defendant,

07 CIV 6379 (RMB)

**PLAINTIFF CENTRAMET TRADING S.A.**

**MEMORANDUM OF LAW**

**IN OPPOSITION TO MOTION TO VACATE**

Of Counsel
Alfred E. Yudes, Jr.
Neil A. Quartaro

19092059 v1

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

FACTS ......................................................................................................................1

LEGAL ARGUMENT ............................................................................................11

**POINT I**
**THE FACTUAL ISSUES RAISED BY EASR ARE PROPERLY HEARD BY THE**
**ARBITRATORS**...................................................................................................11

**POINT II**
**THE COURT HAS MARITIME JURISDICTION** ...........................................12

**POINT III**...............................................................................................................19
**THE ATTACHMENT IS SUPPORTED BY THE FACTS AND**
**THE MERITS SHOULD BE HEARD IN ARBITRATION** ............................19

CONCLUSION .......................................................................................................22

i

## TABLE OF AUTHORITIES

### Cases

*Aston Agro-Industrial AG v. Star Grain Ltd.*, 2006 WL 3755156 (S.D.N.Y. 2006). ............................................. 17, 18

*Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F. 2d 196, 199 (2d Cir. 2005) ........................................... 13, 14

*Berwind-White Coal Mining Co. v. City of New York*, 135 F.2d 443, 446-447 (2d Cir. 1943) ................................... 16

*Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927) ........................... 15, 17

*Flota Maritima Browning de Cuba S.A. v. Snobl*, 363 F.2d 733, 735-36 (4th Cir. 1966), .................................. 16, 17

*Folksamerica Reinsurance Co., v. Clean Water of New York, Inc.*, 413 F. 3d 307, 313-314 (2d Cir. 2005) ............. 13

*French Republic v. Fahey*, 278 F. 947 (D.Md. 1922) ..................................................................................... 17

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 555 (2d Cir. 2000) .............. 14

*Ingersoll Milling Mach. Co. v. M/V Bodena*, 829 F.2d 293, 301 (2d Cir. 1987) ...................................................... 13

*Natasha, Inc., v. Evita Marine Charters, Inc.*, 763 F. 2d 468 (1st Cir., 1985) ...................................................... 16

*Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.*, 543 U.S. 12, 125 S.Ct. 385, 393, 160 L.Ed.2d 283 (2004) .............. 12

*PaineWebber Inc. v. Bybyk,* 81 F.3d 1193, 1198 (2d Cir. 1996) ....................................................................... 11

*Rea v. The Eclipse,* 135 U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890) ...................................................... 14

*Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co., Pvt. Ltd.*, (06civ4711) .................................. 19

*Simon v. Intercontinental Transport (ICT) B.V.,* 882 F.2d 1435, 1442 (9th Cir. 1989) ........................................ 14

*Sirius Ins. Co. (UK) Ltd. v. Collins,* 16 F.3d 34, 37 (2d Cir.1994) .......................................................... 13, 14, 16

*Sisson v. Ruby,* 497 U.S. 358, 364, 110 S.Ct. 2892, 2896, 111 L.Ed.2d 292 (1990) ........................................ 12

*Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 92 (2d Cir. 1999) 11

*Thypin Steel Co. v. Asoma Corp.,* 215 F.3d 273, 278-79 (2d Cir. 2000) ........................................................... 13

*Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 109 (2d Cir. 1997) ...................... 14

### Statutes

21 U.S.T. 2517 ........................................................................................................................................... 11

9 U.S.C. § 202 ........................................................................................................................................... 11

## INTRODUCTION

This is a simple case about a shipload of scrap steel shipped from Russia to Egypt in the late summer of 2006 under a sale and transportation agreement (the "Agreement"). As is common in international transactions, the Agreement contains a broad arbitration clause requiring the parties to arbitrate in London, England. Unlike many such agreements, the Agreement in this matter contained a separate demurrage clause obligating Defendant Egyptian American Steel Rolling Company ("EASR") to pay applicable demurrage under a charter party. In addition to accepting responsibility for demurrage under the Agreement, EASR negotiated a demurrage rate during the nomination of vessels and specifically endorsed the demurrage clause incorporating a charter party. EASR also reviewed and approved the planned charter agreement and endorsed the charter fixture note and returned it to Centramet. EASR and Centramet are also parties to the bills of lading covering the subject shipment, the language of which was directly controlled by EASR.

In this circumstance, it is submitted, the claims related to the merits of the case should be sent to arbitration, while the Rule B attachment should be upheld on the basis that Plaintiff clearly has a maritime claim and Admiralty jurisdiction is, in this case, present.

## FACTS

Centramet Trading S.A. ("Centramet") and GST Commodities Trading Company ("GST") operate together to negotiate the sale and transportation of certain goods, including scrap metal. Declaration of Petr Terebov, dated September 18, 2007 ("Terebov Dec") ¶ 1-2. In June, 2006, GST concluded the Agreement with EASR for the sale and transportation by water of scrap steel. Terebov Dec. ¶ 3. This was the first contract that GST has entered into with EASR and throughout the negotiations Centramet and GST were represented by Petr Terebov,

1

who dealt with EASR and Beshay Steel interchangeably. *Id.* The Agreement was for the sale and transportation by water from Russia to Egypt of 20,000 metric tons of steel scrap at $303 per metric ton. EASR also agreed to pay any applicable demurrage. Terebov Dec. Ex. 1. The Agreement allowed partial cargoes to be delivered and it was anticipated that, in addition to the voyage at issue here, other vessels would be required to deliver the required quantities. *Id.*

The Agreement contains an arbitration clause stating:

> All disputes in connection with the present contract shall be finally settled under the rules of Conciliation and Arbitration of the International Chamber of Commerce, by one or more, appointed in accordance with said rules. . . .This contract shall be governed by and in accordance with the laws of England. The seat of Arbitration will be London, England.

Terebov Ex. No. 1.

The Agreement further provides that:

> Demurrage to be as per Charter Party covering the respective voyage and free dispatch respectively. Demurrage rate to be indicated at time of vessel's nomination.

Terebov Ex. No. 1.

Because the Agreement required EASR's assent to the terms of the Charter party, specifically the demurrage rates and discharge capacity, EASR specifically initialled the above clause. Terebov Dec. Ex. 1. Additionally, EASR had the right to approve or reject vessels, and a number of vessels were nominated to EASR. Terebov Dec. Ex. 1; Terebov Dec. ¶ 8-9. The first vessel nominated to EASR was M/V OCEAN BEAUTY. Terebov Dec. ¶ 8. The vessel was nominated by forwarding via email dated July 12, 2006, the demurrage and discharge rate details of the proposed fixture. *Id.* The email was then returned via fax bearing the endorsement of Beshay Steel, which is simply EASR by a different name. Terebov Dec ¶ 3 and Ex. 2;

2

Beshay Dec. ¶ 6. EASR has not disputed that its practice was to approve the charter party by endorsing the fixture note, or that this process was followed with M/V OCEAN BEAUTY.

The fixture for M/V OCEAN BEAUTY was not consummated and later on July 12, 2006, another vessel, M/V MERVE A (the "Vessel"), was nominated to EASR via email. Terebov Dec. ¶ 9. This email contained the entire fixture for the Vessel, and indicated a demurrage rate of $7500 per day. Terebov Dec. Ex. 3. As with the previously nominated vessel, the fixture for the Vessel was endorsed by Beshay Steel and returned via fax dated July 12, 2006. Terebov Dec. ¶ 9; Terebov Dec. Ex. 3. The endorsement indicated that the Vessel was acceptable, but that EASR would only agree to a demurrage rate of $7000 per day. Terebov Dec. Ex. 3.

EASR disputes that it endorsed the fixture for M/V MERVE A that showed a demurrage rate of $7,000 day. Declaration of Eng. Kamal Beshay, dated August 31, 2007, (the "Beshay Declaration") ¶ 21. Instead, EASR claims this document is forged, and advances a fixture for the Vessel noting a demurrage rate of $5000 per day, and bearing a purported endorsement by Beshay Steel agreeing to a demurrage rate of $1500 per day.[1] Prior to this litigation, the alternative fixture note advanced by EASR had not been seen by Centrament. Terebov Dec. ¶ 10. These accusations are irrelevant to the issues at hand because EASR does not dispute that, under the Agreement, it is responsible for paying demurrage. There is also no dispute that, shortly after receiving EASR's assent to the Vessel's charter terms, Centrament fixed the Vessel to carry the cargo covered by the Agreement with a demurrage rate of $7000 per day. Terebov

---

[1] Both the fixture notes proffered by Centramet appear to have been sent form the same fax, which is understood to be EASR's fax, and bear identical fax headers. *Compare* Terebov Ex. 8

Ex. 5, pg. 2. At no relevant time was the Vessel offered to Centramet (or EASR) with a demurrage rate below $7000 per day. Terebov Dec. ¶ 10.

The Beshay Declaration and Declaration of Nader Issa (the "Issa Dec.") contain a number of accusations of forgery, which are completely denied. Many of the claims border on the farcical, such as the claim that similar stamps bearing EASR's full name and an initial are evidence of forgery. Beshay Dec. ¶ 21. Stamps, of course, give nearly identical images each time they are used. EASR's claim that the contract amendment, produced at Beshay Ex. 19, is forged is similarly pointless, since the amendment appears to be purely technical and does not relate to any issues before either this Court or the Arbitrators. EASR is simply trying to cast aspersions on Centramet in a misguided effort to distract this Court from EASR's clear responsibility to pay demurrage under the Agreement.

Payment of the contractual purchase price was to be made by way of an irrevocable letter of credit in the amount of $6,060,000 issued by Arab African International Bank on behalf of EASR on June 25, 2006 and amended on July 9, 2006 (the "Letter of Credit"). Terebov Dec. ¶ 13. The Letter of Credit was drawable against documents including the following:

    a. two original and two copies of the Commercial Invoice

    b. three original bills of lading ("Bills of Lading") issued to the order of the Issuing Bank

    c. draught survey report issued in loading port by inspectorate.

*Id.*

---

*and* Terebov Ex. 9.

19092059 v1

The Letter of Credit was for the cargo only and did not provide for demurrage. Terebov Dec. ¶ 14. As is standard practice, the Bills of Lading covering the shipment contained a description of the goods. Terebov Ex. 7.

On August 3, 2006, GST's Bank Finansbank Holland NV, notified GST by letter that the letter of credit presentation documents had been refused due to several discrepancies, one of which was the Bills of Lading. Terebov Ex. 8. At this time, it was discovered that Additional Condition 7 of the Letter of Credit, which states "only commercial invoice and copy of the beneficiary's fax to show goods description, unit price, delivery term and value of goods" was being used by EASR to refuse payment under the Agreement and the Letter of Credit, alleging this implied that the Bills of Lading should not contain a description of the goods. Terebov Dec. ¶ 17; Terebov Dec. Ex. 6, p. 3.

The requirement that the Bills of Lading bear no description of the goods they covered is not a *bona fide* commercial requirement and effectively functioned as a trap, since the bank would not release payment under the Agreement and EASR refused to correct the situation without extracting significant price concessions. Terebov Dec. ¶ 18. GST attempted to rectify the discrepancies but bills of lading, which function as a document of title, must include a description of the goods they cover. Terebov Dec. ¶ 19.

In another attempt to place the merits of the demurrage dispute before this Court, the Beshay Declaration asserts that GST had agreed to release the cargo without production of the original Bills of Lading, relying on a letter fax of August 2, 2007 from GST. Beshay Dec. Ex. 14. However, this assertion is misleading and incorrect because the Agreement itself contains no provision for cargo to be delivered without production of Bills of Lading. See Terebov Dec. Ex.

5

1. Instead, item 7 of the documents to be produced in order to claim payment under the Letter of Credit states:

> Copy of benef. [beneficial] fax sent to the Shipping Agency to permit (sic) release of goods against Shipping Letter of Guarantee issued by the issuing bank in case of delay of the original documents.

Terebov Dec. Ex. 6, p. 2.

The August 2, 2007 letter fax relied on by EASR is addressed to the Vessel Owners' Agents, Active Marine, and not to EASR, and is in contemplation of receiving either payment or an appropriate guarantee of payment. Terebov Dec. ¶¶ 20-22. This was never done. The reason for such a requirement is simple: in this arms-length transaction, the cargo would only be released when EASR paid for it.[2] *See* Terebov Dec. Ex. 1. It is undisputed that EASR was refusing to pay, so delivery was made impossible under this provision. Moreover, there is simply no reason for delivery to be delayed if payment was effected, which was the whole point of the transaction. In any event, there is no evidence of an appropriate letter of guarantee that would have allowed the release of the cargo[3] and it is flatly denied that presentation of the Bills of Lading was waived without a corresponding payment under the Letter of Credit. Terebov Dec. ¶ 21.

The Vessel sailed from Novorossisk, Russia on July 29, 2006, arriving off Alexandria, Egypt on August 6, 2006 with her cargo of 9,274.897 metric tons of scrap metal. Terebov Dec. ¶ 23. The Vessel began to discharge the cargo on August 8, 2006 (without presentation of the

---

[2] In fact, it was EASR's refusal to pay as required by the Agreement that first led to discharge operations halting.

[3] EASR has offered an untranslated Arabic-language document as evidence that it provided a bank guarantee. Centramet denies ever receiving this document, but is unable to opine on its contents.

6

Bills of Lading) but on August 8, 2006, GST received a telephone call and letter from Mr. Nader Issa alleging that the cargo on the vessel was of poor quality. Terebov Dec. Ex. 9. Though Mr. Issa states that the cargo was seriously defective and that Centramet admitted this fact, Mr. Terebov denies ever making such a statement. *Compare* Nissa Dec. ¶ 4 *with* Terebov Dec. ¶ 25. Mr. Terebov's recollection is bolstered by EASR's own surveyors, who found that only 4.35% of the cargo was off grade, impure, or slag, which is completely within the normally accepted commercial tolerance for a scrap steel cargo. Terebov Dec. Ex. 10.   In fact, since some of the slag and oversize material is useful scrap, EASR's survey shows that 97.13% of the cargo was actually of acceptable grade. *Id.*

The real reason that EASR found "quality problems" and otherwise delayed discharge and payment was that the market price of steel scrap went down by $30 to $40 per metric ton at the beginning of August 2006. Terebov Dec. ¶ 27. The impossible Additional Condition 7 of the Letter of Credit allowed EASR to hold up payment and demand price concessions, most notably that the Agreement be modified by reducing the price to $270 per metric ton. Terebov Dec. ¶ 27. This "offer" was refused, but a concession of $2 to $4 per metric ton was offered. *Id.* In order to satisfy the strange demand that the Bills of Lading be modified so that they did not describe the goods they covered, the ship owner was approached.   Terebov Dec. ¶ 28. Unsurprisingly, the shipowner refused on the basis that owners' P&I club (similar to insurance) would not insure goods covered by bills of lading that did not describe the goods. *Id.*

By late August, the parties were able to resolve the issues surrounding delivery and payment. Terebov Dec. ¶ 30. EASR claimed to be having difficulties with sales and so proposed cancelling the balance of the contract (as M/V MERVE A's cargo was a partial

shipment of the Agreement quantity and further shipments were contemplated) and decreasing

the contract price for the arrived cargo by $15 per metric ton.  *Id.*  The terms of the agreement

were that:

> a.  EASR would make payment under the Letter of Credit in two tranches.  The first payment would cover the agreed price, leaving outstanding $15 per metric ton and less $100,000.
>
> b.  EASR would make payment under the amended Letter of Credit and a second payment of $100,000 against presentation of the draught survey report from the discharge port; and
>
> c.  EASR would pay the outstanding $15 per ton in cash for the cargo once it had been discharged.

Terebov Dec. ¶ 30.

The resolution of the cargo payment issue did not address the issue of demurrage.  Terebov Dec.

¶ 30-31.  However, demurrage was discussed at the meeting and EASR did not object to paying

it (demurrage had started, and was continuing, to accrue but had not yet reached great sums).  *Id.*

Of course, as EASR also had a contractual obligation to pay demurrage under the Agreement, it

did not seem necessary to make a further agreement.  *Id.*

EASR's protestations to the contrary, at no time did Centramet waive the demurrage bill

or otherwise include this sum in some other payment.  Terebov Dec. ¶ 32.  In fact, at the time the

amended price for the cargo was negotiated, the amount of the demurrage bill was not even

known.  *Id.*  It stretches the imagination to believe that Centramet would have taken on the major

commercial risk of allowing EASR an unlimited amount of free time to unload MERVE A.  *Id.*

There is no doubt that EASR knew that it was incurring demurrage because EASR requested, in

the purported message of August 22, 2006, that:

> After your bank sends this swift, the owner of MV Merve send a message to the maritime agent in alexandria MATINA SHIPPING AGENCY confirming that he gives him 9 days to resume discharging free from any demurrage for all the time lost till the day they resume discharging, starting from the day they re-start discharging.

Terebov Dec. ¶ 33.

While garbled, the purpose of the above request is clear: EASR is asking for nine days free of demurrage. Terebov Dec. ¶ 33. It is implicit in this request that demurrage would run again after expiry of the requested free time (the old shipping maxim is "once on demurrage, always on demurrage"). *Id.* This is obviously inconsistent with EASR's argument that all matters arising under the Agreement (including future demurrage) were settled by August 16, 2006. Beshay Dec. ¶ 17 and Exs. 16 & 17.

The original documentation was eventually sent to Egypt and cargo discharge operations restarted on August 31. Beshay Dec. ¶ 17; Terebov Dec. ¶ 34. Payment was received under the Letter of Credit as per point 30(a) of the Terebov Declaration. Id. However, EASR failed to produce the discharge port survey, frustrating attempts to recover the final $100,000 under the Letter of Credit. *Id.* EASR also failed to pay the $15 MT it had agreed, but recovery of those sums is not being sought at this time. *Id.*

The discharge of the cargo was delayed several times as the Vessel was sent to anchor between August 9, 2006 and August 30, 2006 due to the events described above. Terebov Dec. ¶ 35; Beshay Dec. Ex. 12. Subsequent discharge was interrupted again between September 5, 2006 and September 8, 2006 and between September 11, 2006 and September 23, 2006. Terebov Dec. ¶ 35; Beshay Dec. Ex. 12. The Vessel's cargo discharge operation was finally

19092059 v1

completed on September 30, 2006. *Id.* All of these delays were ultimately attributable to, or the responsibility of, EASR.

Following a meeting with the Vessel's agents in early September, Centramet made an advance demurrage payment of $50,000. Terebov Dec. Ex. 12. On October 6, 2006, Centramet was invoiced for the outstanding amount of $276,299.75. Terebov Dec. Ex. 13. These invoices were forwarded directly to EASR, as were other demands for payment, including at an in-person meeting. Terebov Dec. ¶ 37. The invoice notes that the demurrage rate is $7000 per day. Terebov Dec. Ex. 13.

In an effort to collect the outstanding demurrage, the Vessel owner threatened arbitration in London under the charter party, securing its demurrage claim against Centramet by way of a Rule B attachment proceeding filed in the Southern District of New York and seeking $276,299.75 in outstanding demurrage, plus anticipated interest and costs. Terebov Dec. ¶ 48; Terebov Dec. Ex. 17. The attachment was granted and Centramet's funds were seized. *Id.* The Vessel owner's demurrage claim against Centrament was settled, with Centramet paying all outstanding demurrage to the Vessel owners. Terebov Dec. ¶ 49; Terebov Dec. Ex. 18. In total, Centramet paid $326,299.75 in demurrage and $18,323 in port costs for the extra time the Vessel spent in Alexandria. Terebov Dec. ¶ 43 and Exs. 13 & 14.

In the instant matter, arbitration in London has been initiated by Centramet, and EASR is due to respond by October 4, 2007 (the "London Arbitration"). Smallwood Dec. ¶11. The only claim advanced in the London Arbitration is the demurrage claim for which Centramet seeks security herein. Smallwood Dec. Ex. 1.

## LEGAL ARGUMENT
### POINT I

## THE FACTUAL ISSUES RAISED BY EASR ARE PROPERLY HEARD BY THE ARBITRATORS

"The Federal Arbitration Act ["FAA"] creates a 'body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198 (2d Cir. 1996) (*quoting Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). An arbitration agreement subject to the 1956 New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("Convention") is enforceable under Chapter 2 of the FAA. *See* 9 U.S.C. § 201. An enforceable agreement to arbitrate exists under the Convention and the FAA if: (1) there is a written agreement; (2) the writing provides for arbitration in the territory of a signatory of the convention; (3) the subject matter is commercial; and (4) the subject matter is not entirely domestic in scope. *See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 92 (2d Cir. 1999); *see also* 9 U.S.C. § 202. If these conditions are satisfied, a federal court must compel arbitration of any dispute falling within the scope of the agreement pursuant to the terms of the agreement.

In the instant matter, there is no question that the parties have an enforceable arbitration agreement. EASR concedes that it entered into at least one of three iterations of the Agreement presented by EASR. Beshay Dec. ¶ 3. All of the iterations call for U.K. law (two for English law, and one for U.K. law), and two of them call for London arbitration. Beshay Dec. Exs. 1-3. EASR does not appear to object to the London, England Arbitration on jurisdictional grounds, and the arbitration has been initiated by Centramet. Smallwood Dec. Ex. 1. England is a signatory of the Convention. 21 U.S.T. 2517, TIAS 6997, 330 U.N.T.S. 38 (1970). There is no

11

dispute that the subject matter is commercial and entirely non-domestic.  Accordingly, the requirements for ordering the merits of this dispute to arbitration are met.

Notwithstanding the well-developed body of law enforcing arbitration agreements, EASR attempts to place various issues related to the merits of the demurrage dispute before this Court by accusing Centramet and/or GST of ridiculous forgeries, most of which have no bearing on the matters before this Court.   Centramet submits that, under Rule B and its related caselaw, the issues are relatively straightforward.  Since it is uncontested that all disputes under the Agreement must be referred to arbitration, the merits of the demurrage dispute are reserved for that panel.  All of the other arguments raised, including the accusations of forgery, by EASR are red herrings, cast into this proceeding in a desperate attempt to avoid what is almost certain to be a summary award by an arbitration panel in London. The only issue that remains is whether or not the exercise of Admiralty subject matter jurisdiction in this case is proper.

## POINT II
## THE COURT HAS MARITIME JURISDICTION

The Supreme Court has observed that there are few "clean lines between maritime and non-maritime contracts." *Norfolk S. Ry. Co. v. James N. Kirby, Pty Ltd.,* 543 U.S. 12, 125 S.Ct. 385, 393, 160 L.Ed.2d 283 (2004). Admiralty jurisdiction over contracts involves a conceptual analysis, rather than a set of clear cut rules. *Id.* Accordingly, the Supreme Court has promulgated an approach that requires a factual review in order to determine if a given contract can be said to have a sufficient maritime nexus to support the exercise of admiralty jurisdiction. *Sisson v. Ruby,* 497 U.S. 358, 364, 110 S.Ct. 2892, 2896, 111 L.Ed.2d 292 (1990) (Scalia, J., concurring).

12

While "'[t]he precise categorization of the contracts that warrant invocation of the federal courts' admiralty jurisdiction has proven particularly elusive,'" *Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 301 (2d Cir. 1987) (quoting *CTI-Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377, 379 (2d Cir. 1982)), the abiding instruction of the Supreme Court is that Courts should look to the contract's "'nature and character'" to see "whether it has 'reference to maritime service or maritime transactions,'" *Norfolk S. Ry. Co.,* 125 S.Ct. at 393 (quoting *N. Pac. S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co.,* 249 U.S. 119, 125, 39 S.Ct. 221, 63 L.Ed. 510 (1919)).

**Threshold Inquiry**

A number of cases in the Second Circuit appear to require District Courts to conduct a threshold inquiry before turning to the contract at issue: "[b]efore attempting to categorize contractual rights as maritime or non-maritime, a federal court must first consider whether an issue related to maritime interests has been raised." *Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.,* 968 F. 2d 196, 199 (2d Cir. 2005); *Thypin Steel Co. v. Asoma Corp.,* 215 F.3d 273, 278-79 (2d Cir. 2000); *Sirius Ins. Co. (UK) Ltd. v. Collins,* 16 F.3d 34, 37 (2d Cir.1994). Recently, the Second Circuit conducted the threshold enquiry in examining Admiralty subject matter jurisdiction in regard to a contract alleged to be maritime in nature, but noted that it is uncertain whether this requirement survives the Supreme Court's *Kirby* decision. *Folksamerica Reinsurance Co., v. Clean Water of New York, Inc.,* 413 F. 3d 307, 313-314 (2d Cir. 2005). In any event, the issue currently before the Court is a Rule B attachment seeking security for a demurrage claim being advanced in the London Arbitration. Demurrage is unquestionably a

13

maritime issue. Thus, in the event this Court finds that the threshold enquiry standard survived

the Supreme Court's decision in *Kirby*, Centramet's demurrage claim easily passes this test.


**The Agreement is a Mixed Contract**

Prior to the development of modern admiralty jurisprudence, admiralty "jurisdiction was

said to be reserved to 'contracts, claims, and services purely maritime.'" *Rea v. The Eclipse,* 135

U.S. 599, 608, 10 S.Ct. 873, 34 L.Ed. 269 (1890). This test has, however, been expanded

considerably so that admiralty jurisdiction is held to cover the separable maritime portions of

mixed contracts that are not primarily maritime, if these can be separately litigated without

prejudice. *Atlantic Mutual,* 968 F.2d at 199; *Transatlantic Marine Claims Agency, Inc. v. Ace*

*Shipping Corp.,* 109 F.3d 105, 109 (2d Cir. 1997) (recognizing "two exceptions to the general

rule that 'mixed' contracts fall outside admiralty jurisdiction"); *Simon v. Intercontinental*

*Transport (ICT) B.V.,* 882 F.2d 1435, 1442 (9th Cir. 1989); *Sirius,* 16 F.3d at 36.


The first of the exceptions[4] recognized by the Second Circuit and many other Federal

courts, which Centramet contends governs the Agreement, is that a Federal court can exercise

Admiralty jurisdiction over a 'mixed' contract if "... the claim arises from a breach of maritime

obligations that are severable from the non-maritime obligations of the contract." *Hartford Fire*

*Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 555 (2d Cir. 2000). As

was eloquently stated by Judge Learned Hand:

> [I]n so far as the maritime obligations [of a contract] may . . . be
> separately adjudicated, there is no objection to the jurisdiction of
> the admiralty pro tanto. This is clearly intimated in *Turner v.*
> *Beacham,* Fed. Cas. No. 14,252, and *The Pennsylvania,* 154 F. 9

---

[4]  The other exception, not raised here, is where the shore-based portions of the contract at issue are merely incidental to the maritime portions of the contract.

19092059 v1

> (C.C.A. 2), though the decisions did not require such a holding. <u>The mere fact that the contract covers a subject-matter of both kinds is not therefore decisive; that would make the mere form control. The substantial question is whether the maritime obligations can be separately enforced without prejudice to the rest.</u>

*Compagnie Francaise de Navigation a Vapeur v. Bonnasse*, 19 F.2d 777, 779 (2d Cir. 1927) (emphasis added).

In the case at bar, there is no doubt that the Agreement is a mixed contract. While it does provide for the sale of 20,000 MT of steel scrap on a CIF basis, the Agreement has a significant maritime component in that it requires EASR to pay demurrage "per the Charter Party covering the respective voyage . . .". Terebov Dec. Ex. 1. There is no dispute that EASR specifically initialed the Agreement's demurrage clause. *Id.* While EASR disputes that it endorsed the fixture note for the Vessel, EASR does not deny that its practice was to endorse fixture notes in order to approve demurrage rates, and that it endorsed the fixture note for the first vessel nominated to Centramet. (*Compare* Terebov Dec. Ex. 3 *with* Terebov Dec. Ex. 4). The inescapable conclusion is that EASR also reviewed, approved and endorsed the fixture note for the Vessel, which actually carried EASR's cargo. In sum, EASR:

- Negotiated a demurrage rate during the nomination of vessels;
- Entered into a contract requiring the goods purchased to be carried by water pursuant to a charter party incorporated by reference;
- Specifically endorsed the demurrage clause incorporating a charter party;
- Reviewed and approved the planned charter agreement;
- Endorsed the charter fixture note and returned it to Centramet
- Arranged for the precise language contained in negotiable bills of lading covering the goods shipped.

Centramet submits that these facts, combined with the fact that Centramet's claim is for

15

demurrage only (thus passing the threshold test), support this Court's exercise of Admiralty jurisdiction over this dispute.

There is no shortage of cases finding Admiralty jurisdiction over the severable maritime provisions of a mixed contract. *See, e.g.*, *Sirius Ins. Co. (UK) Ltd. v. Collins* 16 F.3d 34 (C.A.N.Y. 1994) (upholding Admiralty jurisdiction over insurance contract providing for both maritime and shoreside coverage); *Berwind-White Coal Mining Co. v. City of New York*, 135 F.2d 443, 446-447 (2d Cir. 1943) (finding Admiralty jurisdiction over separable maritime portion of mixed contract); *Flota Maritima Browning de Cuba S.A. v. Snobl,* 363 F.2d 733, 735-36 (4th Cir. 1966), *cert. denied,* 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966) (finding Admiralty jurisdiction under mixed contracts doctrine over separable maritime claims under lease-purchase agreement); *Natasha, Inc., v. Evita Marine Charters, Inc.*, 763 F. 2d 468 (1st Cir., 1985) (upholding Admiralty jurisdiction over mixed contract providing for sale and charter of vessel).

## The Cases Cited by EASR Do Not Support Vacateur

Tellingly, EASR does not discuss this well-developed body of law in its brief to the Court, choosing to discuss only the second exception to the mixed contracts doctrine. Instead of simply conceding that the doctrine exists, is good law, and supports maritime jurisdiction in this matter, EASR states "[I]t has been widely held that a commodity sale and purchase contract, such as the one entered into by EASR, even if the contract requires maritime transport and contains a demurrage clause relating to the shipment of the commodity, is not maritime". EASR's Memorandum in Support of Motion to Vacate, p. 11. To demonstrate how widely held

16

this principle of law is, EASR cites to a 1927 Maryland District Court decision, an unreported slip opinion, and an unpublished oral opinion. None of these cases support EASR's Motion to Vacate.

*French Republic v. Fahey*, 278 F. 947 (D.Md. 1922) is of questionable authority in this matter.[5] The *French Republic* Court cited only three cases, none of which related to the mixed contract doctrine. *Id.* Additionally, since *French Republic* was decided in 1922, the Fourth Circuit decided *Flota Maritima Browning de Cuba S.A. v. Snobl*, 363 F.2d 733, 735-36 (4th Cir.), *cert. denied*, 385 U.S. 837, 87 S.Ct. 82, 17 L.Ed.2d 71 (1966), which upholds the separation of maritime and non-maritime causes of action under a mixed contract. The holding of *Flota Maritima* thus requires an analysis of the mixed contracts that is glaringly absent from *French Republic*, calling its analysis and holding into substantial doubt. Thus, to the extent that *French Republic* calls for the dismissal of cases involving contracts not wholly maritime, it has been overruled in the Fourth Circuit by *Flota Maritima*. Of course, as an out-of-district lower court decision, it carries no precedential authority of its own accord but, in any event, *French Republic* is not good law in the Second Circuit because it predates Judge Learned Hand's decision in *Compagnie Francaise* and is clearly preempted by that decision.

EASR also directs this Court to *Aston Agro-Industrial AG v. Star Grain Ltd.*, 2006 WL 3755156 (S.D.N.Y. 2006). Unfortunately for EASR, *Star Grain* is distinguishable on its facts and does not provide significant guidance in this matter but, in any event this Court is not required to accord the decision any precedential weight. The only obligation under the sale

---

[5] Tellingly, *French Republic* has never been cited for the proposition that mixed contracts such as the one at issue are not separable.

17

agreement in *Star Grain* was to pay for the cargo, which led Judge Daniels to observe that the "demurrage clauses do not explicitly contain any obligation on either party to compensate the other for demurrage owed to the vessel [and] merely set forth the rate at which any demurrage charge would be calculated should it occur". 2006 WL 3755156 *4. In the instant matter, the Agreement expressly obligates EASR to pay demurrage pursuant to the charter party. The clause of the Agreement referring to demurrage was specifically initialed by EASR and the vessel's fixture note was reviewed and signed by EASR. It is impossible to read the Sale Agreement here as not obligating EASR to pay demurrage. Additionally, Centramet's employee, Petr Terebov, met with EASR representatives who did not initially object to their obligation to pay the demurrage bill. There is also the fact that, in the instant case, it is undisputed that Centramet actually paid the demurrage it is seeking to recover from EASR, unlike in *Star Grain* where the demurrage had not been paid. 2006 WL 3755156 *4. Setting the instant matter and the *Star Grain* decision even further apart is the key distinction that the buyer's liability for demurrage in *Star Grain* could be determined without reference to the charterparty. In the case at bar, by contrast, the charter or fixture note must be read with the Contract in order to calculate demurrage.

Further distinguishing the *Star Grain* case is the nature of the attachment. In *Star Grain*, the plaintiff was seeking to attach funds pursuant to an arbitration award that awarded the plaintiff damages based only on the C.I.F. terms of that sale agreement, in effect the purchase price. The instant matter concerns a demurrage claim, not a cargo damage/risk of loss case as was before the *Star Grain* Court. Additionally, there is no underlying arbitration decision being enforced in the instant matter, as the parties are currently going to arbitration in London and no

19092059 v1

ruling or award has yet issued.

Doubtless aware that its lack of jurisdiction argument is supported by the thinnest of arguments, EASR desperately cites to a transcript of an oral argument made before Judge Lynch in *Shanghai Sinom Import and Export v. Exfin (India) Mineral Ore Co., Pvt. Ltd.*, (06civ4711). As a threshold matter, Centramet notes that an oral opinion such as this does not establish precedent. In any event, Judge Lynch's decision is factually distinguishable from the matter at hand. Judge Lynch specifically noted that there was no allegation that the defendant breached the maritime portion of the contract at issue. Instead, the plaintiff before Judge Lynch filed suit on the basis of non-delivery of goods, an issue not present in the instant case, which would appear to fail the threshold test discussed *supra*. In the instant matter, Centramet is seeking the recovery of only those monies it spent to satisfy the demurrage claims of the vessel owner, squarely alleging that EASR breached the maritime provisions of the Contract. It is undisputed that EASR agreed to pay demurrage and initialed the demurrage clause in the Contract. EASR disputes that it specifically endorsed the fixture note for the Vessel, but does not dispute that it was EASR's practice to review and approve the fixture notes for vessels carrying cargo to EASR. EASR disputes that it approved a demurrage rate of $7,000 per day, but does not dispute that its practice was to approve the demurrage rate for vessels carrying its cargo or that the Vessel was used to do so.

## POINT III

### THE ATTACHMENT IS SUPPORTED BY THE FACTS AND THE MERITS SHOULD BE HEARD IN ARBITRATION

In a spectacular display of irrelevant misdirection, EASR's final attempt to sway this Court is made by launching a series of attacks on the credibility of Centramet, accusing it of

19

forgery and misrepresenting the amount owed in order to manufacture a claim. EASR's

allegations here are untrue, belied by the documents, and in any event properly heard in

arbitration. EASR alleges that the entire matter was settled on August 16, 2006, prior to the

accumulation of an additional approximately 45 days of further demurrage. However, a careful

reading of EASR's argument and the August 16, 2006 agreement shows that the only thing that

was settled was payment of the purchase price for the cargo. In order to give credence to

EASR's version of events, the issue of demurrage was settled even though it was not mentioned

in the cargo price adjustment and even though it would have been commercially unreasonable to

grant EASR an open-ended period of time to discharge the Vessel.

EASR's statement that paragraph 13 of the Verified Complaint is untrue likewise requires

a suspension of belief. If EASR is to believed, after discharge was halted because EASR had not

effected payment, Centramet agreed to allow discharge of the cargo on an unpaid, unsecured

basis. The simple fact is that EASR did not present either the Bills of Lading or a suitable

indemnity.[6] If it had, Centramet would have been happy to be paid for the cargo, which was the

goal of the entire transaction. Similarly EASR's claim of innocence with respect to the physical

operation of discharge is belied by EASR's own documents. Beshay Dec. Ex. 12 is a

handwritten statement of facts for the Vessel's discharge in Alexandria, with the final summary

annexed. As a review of this document makes clear, the Vessel experienced numerous delays

waiting for trucks to carry the cargo, waiting for the Bills of Lading, and moving to and from

anchorage due to EASR's discharge delays. Beshay Dec. Ex. 12. Notably, the statement of facts

indicates that the total delay for this voyage was 53 days. *Id.* EASR's claims of a non-

---

[6] EASR has proffered, at Beshay Ex. 14, a handwritten Arabic language document it claims is
the bank guarantee. Mr. Terebov denies have received this document, which would create an
issue of fact for the arbitrators. Counsel notes the unusual nature of a handwritten bank

complying cargo are also undermined by its own survey report, which shows 4.35% of the cargo had potential quality issues (even here, some of the slag and oversize material is useful scrap, which is why EASR's survey shows that 97.13% of the cargo was actually of acceptable grade). EASR's conclusion that it is not responsible for demurrage under the Agreement is conclusory, not supported by the documents, and is directly contradicted by Mr. Terebov.

Not content with simple misleading statements, EASR also embarks on a tortured mathematical exercise which offers to prove that only 8.2 days of demurrage can be claimed against it. For example, EASR argues it is entitled to "free time" even after demurrage days commenced, which is contrary to the law that once demurrage commences, there is no free time, or "once on demurrage, always on demurrage". *See, e.g. Texaco Panama, Inc. v. Sun Oil Co. of Pennsylvania*, 572 F.Supp. 982 (D.C.Pa. 1983) (noting "general rule is 'once on demurrage, always on demurrage'").

Mr. Terebov, at paragraphs 38 through 42 of his Declaration, explains his understanding of the demurrage calculations, but the plain fact is that the Agreement requires EASR to pay the demurrage bill, and the demurrage bill is for 48.42 days. Centramet respectfully submits that, even if there is an issue related to the calculation of demurrage that might reduce the figure below that claimed by the Vessel owner (which is denied but being verified), such an issue is for the arbitrators.

Another issue for the arbitrators is EASR's statements and accusations regarding the demurrage rate. Though EASR takes every opportunity to insist that it never agreed to a demurrage rate of $7,000 per day, there is no question that this was, in fact, the demurrage rate

---

guarantee provided without translation.

19092059 v1

for the Vessel. There is also no question that the Agreement obligates EASR to pay demurrage. The only issue that EASR really raises here is the amount of demurrage, which, it is respectfully submitted, is a matter for the arbitrators.[7] The same is true for the additional port costs resisted by EASR, which EASR claims it is not responsible for. These port costs were strictly related to the slow discharge operation by EASR and are clearly recoverable as EASR's expense.

EASR flatly denies that Centramet demanded payment of the outstanding demurrage invoices. Centramet, for its part, details two meetings and appends a fax sent to EASR requesting payment. Centramet has stated that email communications were sent as well, but due to an unrelated theft of a laptop computer, these electronic records are not available (Centrament has, however, produced a police report documenting the theft). EASR does not argue that a failure to claim the amounts from EASR impacts Centramet's claim, so this appears to be yet another irrelevant accusation without no purpose except maligning Centramet. In any event, the essence of EASR's third argument is simple: Centramet's counsel should be sanctioned because he doesn't believe EASR's claims. While it is clear that some facts are in dispute, there are no claims advanced here that are knowingly false. Undersigned counsel has examined every document supplied by both parties, has requested and received additional supporting documents, and has conducted interviews to examine the claims advanced herein. There is a reasonable factual basis for every allegation in the Verified Complaint.

## CONCLUSION

EASR's Motion to Vacate is essentially two arguments. The first asks for the Rule B attachment to be vacated on the ground that Admiralty jurisdiction is lacking, the second asks

---

[7] To the extent that EASR is arguing that Centramet is oversecured, Centramet has made out a prima facie case for the amount claimed by showing the invoice bearing that amount and

19092059 v1

this Court to vacate the attachment because EASR alleges that some of the underlying documents are not genuine. The first argument is unavailing because EASR clearly immersed itself in the maritime portions of the Agreement, which can and should be severed from the non-maritime obligations of the Agreement. The second argument carries even less weight and asks this Court to exercise its equity power to assess sanctions and vacate the attachment, based solely upon EASR's unproven and self-serving accusations of forgery. Centramet submits that it has effectively disposed of these arguments, and that, for the reasons above, the Rule Attachment should be upheld.

Dated: New York, New York
      September 18, 2007

WATSON, FARLEY & WILLIAMS (NEW YORK) LLP

By: _____

Alfred E. Yudes (AEY-4152)
Neil A. Quartaro (NAQ-9640)
100 Park Avenue, 31st Floor
New York, NY 10017
Tel: (212) 922-2200
Fax: (212) 922-1512

---

evidence that the stated sum was, in fact, paid.

19092059 v1