377-07/MEU/LJK
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
Egyptian American Steel Rolling Co.
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax

Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
CENTRAMET TRADING S.A.,

                          Plaintiff,

              -against-

EGYPTIAN AMERICAN STEEL ROLLING
COMPANY,

                       Defendant.
-------------------------------------------------------x

**07 CIV 6379 (RMB)**

**KAHN REPLY AFFIRMATION**

      LAWRENCE J. KAHN, an attorney at law, affirms under penalty of perjury as follows:

      1.     I am an attorney admitted to practice before this Court and am a partner of the law firm of Freehill Hogan & Mahar, LLP, attorneys for Defendant EGYPTIAN AMERICAN STEEL ROLLING COMPANY ("EASROC"). I am not a party to the action, am over 18 years of age and reside at 80 Pine Street, New York, New York. I submit this Reply Affirmation on behalf of EASROC and in further support of EASROC's motion to vacate the attachment obtained by Plaintiff CENTRAMET TRADING S.A. ("Centramet")

      2.     I make this Affirmation based upon my own personal knowledge.

3.    In opposing EASROC's motion, Centramet has attempted to distinguish the decision by Judge Daniels in Aston Agro-Industrial AG v. Star Grain Ltd., 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. Dec. 20, 2006) on the basis of purportedly different facts.

4.    I was counsel of record for Plaintiff Aston Agro-Industrial in Star Grain. The Star Grain Court held that where the requirement to pay demurrage is merely a price term in a contract for the sale and purchase of a commodity, a claim for the payment of demurrage does not invoke the maritime jurisdiction of the Court.

5.    Although Centramet claims that there are factual differences between the cases, the pertinent facts are actually the same in both cases, and many of the differences alleged by Centramet are entirely fictional.

6.    I attach hereto as Exhibit 1 a true and correct copy of the Verified Complaint in the Star Grain matter.

7.    I attach hereto as Exhibit 2 true and correct copies of the two contracts between Aston Agro-Industrial and Star Grain that were at issue in the Star Grain matter.

8.    I attach hereto as Exhibit 3 a true and correct copy of the arbitral award that was rendered in London in favor of Aston Agro-Industrial and against Star Grain, awarding Aston Agro-Industrial its claimed demurrage. The award consists of a base award and an appellate award.

9.    All of the exhibits attached hereto are public records associated with the Star Grain matter.

10.    The contracts in Star Grain plainly required Star Grain to pay demurrage to Aston Agro-Industrial, and required reference to the charter parties for the establishment of the demurrage rate.

11.    The contracts in <u>Star Grain</u> plainly focused on maritime transportation matters. *To wit:*

- the contracts specified how the ocean bills of lading were to be marked;

- that certificates of the cleanliness of the ships' holds and quantity evidencing analysis of cargo were to be issued as a condition of the contracts;

- the contracts further acknowledge that ocean bills of lading issued in accordance with the terms of the charter party for the vessel, pursuant to which Aston arranged for the ocean transportation of the cargo with the respective owners of the ships, were acceptable to Star Grain;

- the contracts required that the vessels carrying the wheat be "classified";[1]

- the contracts required that the vessels carrying the wheat be "ISM certified bulk carriers";[2]

- the contracts required that the ships' holds "shall be inspected for cleanliness before loading by an international surveying company";[3]

- the contracts required that the vessels had to give three days' notice prior to arrival at the loading and discharge ports;[4]

- the contracts described additional ocean transportation requirements, specifying the rate at which the vessels were to discharge the cargo ("at a uniform rate of 1,000 MT/WWD of 24 working hours THUFM FHEX EIU"),[5] and how each vessel's working time was to count:

---

[1] Classification is a reference to a ship being in good standing with a Classification Society which inspects and certifies ships as meeting certain standards in respect to seaworthiness, etc.

[2] In order for a vessel to be ISM certified it must be demonstrated to meet certain operational standards as promulgated by the International Maritime Organization, a branch of the United Nations.

[3] It is a frequent requirement that a vessel's holds pass a cleanliness inspection as a pre-condition to carrying food cargoes.

[4] This is another typical requirement in a marine transportation contract, which is given so the party responsible for loading/discharging the cargo can make appropriate arrangements with stevedores at the load and discharge ports. In <u>Star Grain</u>, the contracts were on "free out" terms meaning that Star Grain, as buyer, was responsible to arrange for the discharge.

[5] All these abbreviated terms are widely used in maritime commerce. "WWD" for example is a "weather working day, a term of art referencing days worked by stevedores in loading or discharging vessels when there is a weather-related delay.

> NOR shall be tendered and accepted during official working hours WIPON WISON, WICCON, WIFPON.[6] Laytime[7] to count at 08:00H next working day after serving valid NOR.  Time shall not count on Thursday and days before holidays after 12:00H until Saturday or the first working day after the holiday at 08:00H.

- the contracts also detail that "in case vessel arrives at discharge port before receipt of original documents,[8] buyer shall start discharge without any delay by issuing a LOI in favor of ship owners in accordance with PandI[9] text";

- also included was a provision that "the charter party rate for demurrage and dispatch shall be declared upon official vessel nomination with fractions calculated in proportion.

12.     In all, approximately half of the contracts' terms and verbiage concerned matters that dealt exclusively with maritime transportation.

13.     The <u>Star Grain</u> and GST-EASROC contracts are remarkably similar in terms of setting the demurrage rate.  The clauses are compared side-by-side below.

| STAR GRAIN CLAUSES | GST-EASROC CLAUSE |
|---|---|
| "The charter party rate for demurrage and dispatch shall be declared upon official vessel nomination…" | "Demurrage to be as per charter party covering the respective voyage and free dispatch respectively.  Demurrage rate to be indicated at time of vessel's nomination." |

---

[6] Again, these abbreviations are all terms of art. "NOR", for example, is a vessel's notice of readiness, typically transmitted by a ship to shore when the vessel arrives at port and is ready to load or discharge cargo.  WIPON stands for "whether in port or not" and the other abbreviations are like references to when an NOR may be properly tendered.

[7] Laytime refers to the time allowed in the contract for the vessel to be worked in loading or (as in <u>Star Grain</u>) discharging operations, without incurring any additional charges for demurrage.

[8] "Original documents" here refers to the original ocean bills of lading.

[9] "LOI" refers to a letter of indemnity.  It is not uncommon for ocean cargo to arrive at a discharge port before the original ocean bills of lading, which, if an LOI is not given and accepted, could result in a delay in the consignee's receipt of the cargo.  In <u>Star Grain</u>, the parties agreed that the vessel's marine protection and indemnity ("PandI") insurer's standard terms would govern any such LOI.

14.    Also similar to both cases is the fact that in both matters, the plaintiff sought an attachment in order to secure a claim for demurrage, the merits of the claim to be for London arbitrators.    In both cases, the only claim being asserted against the defendant was for demurrage (*see* Ex. 1).    The only difference is that in <u>Star Grain</u> the arbitration had already occurred (awarding Aston Agro-Industrial its claimed demurrage, *see* Ex. 3)[10] and that here, the arbitration has only just commenced.

15.    Centramet has only recently commenced arbitration against EASROC, and EASROC's time to respond has not yet run.    EASROC has confirmed that it will appear and defend against Centramet's claim in the London arbitration.

Dated: New York, New York
         September 25, 2007

_____
Lawrence J. Kahn

---

[10] Regrettably, the arbitral award does not make it clear that demurrage was paid by Aston Agro-Industrial up the chain to the vessel owner.

**E X H I B I T  1**

109-06/PJG/LJK
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
Aston Agro-Industrial AG
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Peter J. Gutowski (PG 2200)
Lawrence J. Kahn (LK 5215)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
ASTON AGRO-INDUSTRIAL AG,

                              **06 CIV 2805 (GBD)**

                  Plaintiff,

                              **VERIFIED COMPLAINT**

        -against-

STAR GRAIN LTD.,

                  Defendant.

-----------------------------------------------------x

      Plaintiff ASTON AGRO-INDUSTRIAL AG ("ASTON"), by and through its

attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against

Defendant STAR GRAIN LTD. ("STAR GRAIN"), alleges upon information and belief

as follows:

      1.    This is an admiralty and maritime claim within the meaning of Rule 9(h)

of the Federal Rules of Civil Procedure and also falls within the Court's admiralty and

maritime jurisdiction pursuant to 28 U.S.C. §1333 in that it involves a claim for the

breach of a maritime contract for the charter of a vessel, which claim, following arbitral

proceedings between the parties, was reduced to a Final Arbitration Award. Jurisdiction

is also proper pursuant to the New York Convention on the Recognition and Enforcement

of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Arbitration Act,

9 U.S.C. §1 *et seq.* and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331.

2.    At all times relevant hereto, Plaintiff ASTON was and still is a business entity organized in a foreign country with an address at Charmerstrasse 14, 6300 Zug, Switzerland.

3.    At all times relevant hereto, Defendant STAR GRAIN was and still is a business entity organized under the laws of a foreign country with an address at 25 Kasr el-Eni Street, Cairo, Egypt.

4.    The parties entered into two contracts for the carriage of Russian wheat. The first, no. 496 and dated August 4, 2003, was for 5,000 MT CIF free out one safe berth Dakheila, Egypt.  The second, no. 498 and dated August 14, 2003, was for 4,500 MT CIF free on one safe berth Dakheila, Egypt.

5.    The first shipment was transported aboard the M/V SIRIUS, which arrived on August 14, 2003, and the second shipment was transported aboard the M/V ALENA, which arrived on August 21, 2003.

6.    Due to alleged water damage to the cargo, the buyers of the wheat would not discharge the cargoes or release the ships until they had received full payment for the damage.   Consequently, the vessels were held with cargo on board until they were released on October 1 and 11, respectively.  As a result, demurrage accrued.

7.    Despite due demand by ASTON, STAR GRAIN refused to pay for the accrued demurrage.

8.    The parties' contracts provided that disputes be resolved by arbitration before GAFTA (the Grain and Feed Trade Association), and both parties, represented by counsel, arbitrated their dispute.

9.    At the conclusion of the arbitration, the tribunal found in favor of ASTON and against STAR GRAIN and directed STAR GRAIN to pay demurrage of $106,758.06 and $81,071.78 with compound interest thereon at 5%.

10.    STAR GRAIN appealed the initial award in ASTON's favor and GAFTA issued an Appeal Award that required STAR GRAIN to pay ASTON $187,829.84 plus interest at the rate of 4% compounded quarterly from November 6, 2003 until paid, plus the fees and expenses of both the original arbitration and the appeal, and to also pay ASTON's legal costs.

11.    Upon information and belief, and after investigation, Defendant STAR GRAIN cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and or sub-charter hire, of belonging to, due or for the benefit of Defendant STAR GRAIN (hereinafter, "ASSETS"), including but not limited to ASSETS at, being transferred through, or being transferred and/or wired to or from HSBC Bank, ABN Amro Bank, BNP Paribas, Deustche Bank Trust Company, Standard Chartered Bank, Union Bank of California, American Express Bank, Citibank, JP Morgan Chase Bank, Wachovia Bank, Bank of America, The Bank of New York, or

other banks or garnishees whose identities may become known to Plaintiff's counsel in the future.

12.    The total amount sought by Plaintiff to be attached pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims against Defendant STAR GRAIN include:

a.    the final arbitration award in the amount of $187,829.84;

b.    compounded interest at 4% from November 6, 2003 pursuant to the final arbitration award of $18,782.98;

c.    arbitral fees and expenses from the initial arbitration pursuant to the final arbitration award of £9343.01 or $16,293.19;

d.    arbitral fees and expenses from the appeal of the arbitration pursuant to the final arbitration award of £6592.46 or $11,468.58;

e.    legal costs of $90,000;

For a total claim of **$324,374.59**. Plaintiff also reserves its right pursuant to Rules B and E to seek additional security should the foregoing amount prove insufficient to secure the full amount of Plaintiff's claim.

13.    The New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* provides that foreign arbitral awards may be recognized and enforced as judgments of the United States. Accordingly, the GAFTA final arbitration award is entitled to summary recognition and enforcement as a judgment of this Court.

WHEREFORE, Plaintiff prays:

A.    That process in due form of law according to the practice of this Court may issue against Defendant STAR GRAIN, citing it to appear and answer the foregoing, failing which a default will be taken against it for the principal amount of the claim of $324,374.59 plus interest, costs and attorneys fees;

B.    That if Defendant STAR GRAIN cannot be found within the District pursuant to Supplemental Rule B, that all tangible and intangible property of Defendant, up to and including the claim of $324,374.59 be restrained and attached, including, but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or being transferred from or for the benefit of Defendant held by or moving through HSBC Bank, ABN Amro Bank, BNP Paribas, Deutsche Bank Trust Company, Standard Chartered Bank, Union Bank of California, American Express Bank, Citibank, JP Morgan Chase Bank, Wachovia Bank, Bank of America, The Bank of New York, and/or other garnishee(s) which may subsequently be identified and upon whom a copy of the Process of Maritime Attachment and Garnishment issued herein may be served;

C.    That the GAFTA final arbitration award be recognized as a Judgment of this Court pursuant to 9 U.S.C. §201 *et seq.*; and

D.    That Plaintiff have such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
     April **11** , 2006

> FREEHILL HOGAN & MAHAR, LLP
> Attorneys for Plaintiff,
> Aston Agro-Industrial AG
>
> By: _____
>     Peter J. Gutowski (PG 2200)
>     Lawrence J. Kahn (LK 5215)
>     80 Pine Street
>     New York, NY  10005
>     (212) 425-1900
>     (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York   )
                   ) ss.:
County of New York  )

      LAWRENCE J. KAHN, being duly sworn, deposes and says as follows:

      1.     I am associated with the law firm of Freehill Hogan & Mahar, LLP, attorneys for the Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

      2.     The sources of my information and the grounds for my belief are communications from our clients and documents provided by our clients regarding the claim.

      3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                              Lawrence J. Kahn

Sworn to before me this
_11_ day of April, 2006

Notary Public

HAZEL S. ROSENTHAL
Notary Public, State of New York
No. 01RO4641128
Qualified in Queens County
Certified in New York County
Commission Expires Dec. 31, 2006

**E X H I B I T  2**

19-03-2004  17:21    FROM-RAYFIE                3632396

CONTRACT N° 496
04 AUGUST 2003

| BUYER  | STAR GRAIN LTD |
|        | ABACUS HOUSE, 4 ARTEMIDOS AVENUE |
|        | CY6030, LARNACA, CYPRUS |
| SELLER | ASTON AGRO-INDUSTRIAL AG |
|        | CHAMERSTRASSE 14 |
|        | 6301 ZUG, SWITZERLAND |

COMMODITY  RUSSIAN WHEAT

QUANTITY   5,000 ± 10% AT SELLER'S OPTION AT CONTRACT PRICE

QUALITY    SPECIFICATIONS:

| PROTEIN        | MIN     | 12.0%      |
|----------------|---------|------------|
| MOISTURE       | MAX     | 13.0%      |
| TEST WEIGHT    | MIN     | 76 KGS/HL  |
| W              | MIN     | 140        |
| HAGBERG        | SECONDS | 190        |
| GLUTEN         | MIN     | 25.5       |
| FOREIGN MATTER | MAX     | 2%         |

FREE FROM LIVE INSECTS AND WEEVILS
FREE FROM COTTON SEEDS AND POISONOUS SEEDS
FREE FROM FOREIGN ODOURS AND IRON FILING.

PRICE      US$ 163.00/MT CIF FREE OUT 1 SB DAKHEILA, EGYPT
           US DOLLARS ONE HUNDRED SIXTY THREE ONLY

## PAYMENT TERMS

1. 100% OF CONTRACT VALUE CALCULATED AT ACTUAL LOADED
   TONNAGE IS PAYABLE AGAINST PRESENTATION OF DOCUMENTS VIA
   BNP PARIS GENEVA BY FAX TO ARAB INTERNATIONAL BANK,
   TAHRIR BRANCH, ACCOMPANIED BY A CLAIM DRAWN ON BUYER, FAX
   N°+20 28 75 32 28.

2. THE TRANSFER SHALL BE MADE BEFORE THE CLOSE OF BUSINESS
   NEXT WORKING DAY AFTER RECEIPT OF THE PAYMENT CLAIM.

3. ORIGINAL DOCUMENTS WILL THEN BE AUTOMATICALLY FORWARDED
   TO BUYER THRU THE BANKING SYSTEM

19-03-2004  17:22   FROM-RAYFII          3632396      +019126:244L        T-357  P 3.17956  F-393

CONTRACT N° 496
04 AUGUST 2003

### SHIPPING DOCUMENTS

SELLER SHALL PRESENT THE FOLLOWING SHIPPING DOCUMENTS FOR
COLLECTION VIA THE BANKING SYSTEM AT HIS COST:

1) COMMERCIAL INVOICE + 3 COPIES

2) CERTIFICATE OF ORIGIN ISSUED OR CERTIFIED BY THE CHAMBER
   OF COMMERCE LEGALIZED BY THE EGYPTIAN CONSULATE + COPY.

3) COMPLETE SET OF 3/3 BILLS OF LADING + 6 COPIES DULY
   MARKED "CLEAN ON BOARD" AND "FREIGHT PREPAID" ISSUED TO
   THE ORDER OF OPENING BANK, NOTIFY BUYER.

4) PHYTOSANITARY CERTIFICATE ISSUED BY A COMPETENT AUTHORITY
   + COPY

5) FUMIGATION CERTIFICATE + COPY

6) OFFICIAL NON-RADIATION CERTIFICATE STATING THAT RADIATION
   OF SHIPPED CARGO IS WITHIN INTERNATIONAL PERMISSIBLE
   LIMITS + COPY

7) CERTIFICATE OF HOLD CLEANLINESS + COPY

8) CERTIFICATE OF WEIGHT + COPY

9) CERTIFICATE OF QUALITY EVIDENCING ANALYSIS OF CARGO +
   COPY

10) INSURANCE CERTIFICATE + COPY

### SPECIAL CONDITIONS

A. CHARTER PARTY BILLS OF LADING ARE ACCEPTABLE

B. THIRD PARTY DOCUMENTS ARE ACCEPTABLE EXCEPT INVOICE TO BE
   ISSUED BY SELLER.

C. ALL IMPORT TAXES, DUTIES, AND LICENSES IN THE COUNTRY OF
   DESTINATION SHALL BE AT BUYER'S RESPONSIBILITY AND COST.

### SHIPMENT CONDITIONS

SHIPMENT    IN ONE SPOT SHIPMENTS ETS 05 AUGUST 2003

VESSELS     CLASSIFIED, I&M CERTIFIED BULK CARRIER.

HOLDS       SHALL BE INSPECTED FOR CLEANLINESS BEFORE LOADING BY AN
            INTERNATIONAL SURVEYING COMPANY AT SELLER'S OPTION AND
            COST

PRE ADVICE  VESSEL SHALL SERVE THREE DAYS PRE-ADVICE FOR ARRIVAL AT
            DISCHARGE PORT.

2

2

1-08-04 18:17  KAPO                              ID=3632396                          P13
19-03-2004  17:22    FROM-RAYFIE        3632396    +01912C1244A      T-357  1  e 2005  F-143

CONTRACT N° 456
04 AUGUST 2003


DISCHARGE       AT A UNIFORM RATE OF 1,000 MT/WWD OF 24 WORKING HOURS
                THUPM FHEX EIU.

TIME COUNT      NOR SHALL BE TENDERED AND ACCEPTED DURING OFFICIAL
                WORKING HOURS WIPON WIBON, WIDCON, WIFPON, LAYTIME TO
                COUNT AT 08:00H NEXT WORKING DAY AFTER SERVING VALID NOR.
                TIME SHALL NOT COUNT ON THURSDAY AND DAYS BEFORE HOLIDAYS
                AFTER 12:00 H UNTIL SATURDAY OR THE FIRST WORKING DAY
                AFTER THE HOLIDAY AT 08:00H.

LOI             IN CASE VESSEL ARRIVES AT DISCHARGE PORT BEFORE RECEIPT
                OF ORIGINAL DOCUMENTS; BUYER SHALL START DISCHARGE
                WITHOUT ANY DELAY BY ISSUING A LOI IN FAVOUR OF SHIP
                OWNERS IN ACCORDANCE WITH PANDI TEXT.

DEMURRAGE       THE CHARTER PARTY RATE FOR DEMURRAGE AND DISPATCH SHALL
                BE DECLARED UPON OFFICIAL VESSEL NOMINATION WITH
                FRACTIONS CALCULATED IN PROPORTION.
                POSSIBLE CLAIMS SHALL BE SETTLED WITHIN 14 DAYS FROM
                RECEIPT OF A CLAIM SUBSTANTIATED BY SOF AND CLAIMANT'S
                INVOICE.


GENERAL CONDITIONS

ORIGIN          RUSSIA

PACKING         IN BULK

INSURANCE       SELLER SHALL PROVIDE ALL RISKS INSURANCE AT HIS COST.

INSPECTION      QUALITY, WEIGHT, AND CONDITION OF WHEAT ARE FINAL AT THE
                TIME AND PLACE OF LOADING ACCORDING TO CERTIFICATES
                ISSUED BY AN INTERNATIONAL SURVEYING COMPANY AT SELLER'S
                OPTION AND COST.

FUMIGATION      SHALL BE EXECUTED BY A COMPETENT AUTHORITY AND SHALL BE
                FINAL AT PORT OF LOADING BY ALUMINIUM PHOSPHIDE AT
                SELLER'S COST.

RADIATION       THE NON-RADIATION CERTIFICATE SHALL BE AN OFFICIAL
                CERTIFICATE EVIDENCING LEVEL OF RADIATION WITHIN
                ACCEPTABLE INTERNATIONAL NORMS.

RULES           ALL ITEMS NOT IN CONFLICT WITH THE ABOVE ARE SUBJECT TO
                GAFTA CONTRACTS N° 48


3

CONTRACT N°496
04 AUGUST 2003

ARBITRATION  ALL DISPUTES ARISING FROM THIS CONTRACT WILL BE RESOLVED
AMICABLY BETWEEN BUYER AND SELLER. IN CASE OF FAILURE,
SUCH DISPUTES SHALL BE REFERRED TO ARBITRATION IN LONDON
IN ACCORDANCE WITH GAFTA N°125 OF WHICH BOTH PARTIES
ADMIT TO HAVE KNOWLEDGE AND HEREBY ACCEPT.

ON THIS DAY THIS CONTRACT WAS SIGNED OVER THE HANDS OF RESPONSIBLE
OFFICERS FROM BUYER AND SELLER

BUYER: STAR GRAIN LTD                    SELLER: ASTON AGRO-TRADING AD

4

1356

## CONTRACT N° 498
## 14 AUGUST 2003

**BUYER**   STAR GRAIN LTD

ABACUS HOUSE, 4 ARTEMIDOS AVENUE

CY6030, LARNACA, CYPRUS


**SELLER**  ASTON AGRO-INDUSTRIAL AG

GOTTHARDSTRASSE 3

6300 ZUG, SWITZERLAND


**COMMODITY**  RUSSIAN WHEAT

**QUANTITY**   4,500 ± 10% MT AT SELLER'S OPTION AT CONTRACT PRICE

**QUALITY**    SPECIFICATIONS:

| PROTEIN | MIN | 12.0% |
|---------|-----|-------|
| MOISTURE | MAX | 13.50% |
| TEST WEIGHT | MIN | 76 KGS/HL |
| W | MIN | 160 |
| HAGBERG | SECONDS | 210 |
| GLUTEN | MIN | 25 |
| FOREIGN MATTER | MAX | 5% |

FREE FROM LIVE INSECTS AND WEEVILS

FREE FROM COTTON SEEDS AND POISONOUS SEEDS

FREE FROM FOREIGN ODOURS AND IRON FILING.

**PRICE**   US$ 168.50/MT CIF FREE OUT 1 SB DAKHEILA, EGYPT

US DOLLARS ONE HUNDRED SIXTY EIGHT AND FIFTY ONLY


**PAYMENT TERMS**

100% OF CONTRACT VALUE CALCULATED AT ACTUAL LOADED
TONNAGE IS PAYABLE AGAINST PRESENTATION OF DOCUMENTS AT
THE COUNTERS OF ARAB INTERNATIONAL BANK, CAIRO.


**DOCUMENTARY CONDITIONS**

SELLER SHALL PRESENT THE FOLLOWING SHIPPING DOCUMENTS FOR
COLLECTION VIA THE BANKING SYSTEM AT HIS COST:

1)   COMMERCIAL INVOICE + 3 COPIES

2)   CERTIFICATE OF ORIGIN ISSUED OR CERTIFIED BY THE CHAMBER
OF COMMERCE LEGALIZED BY THE EGYPTIAN CONSULATE + COPY.

1

26

CONTRACT N° 498
14 AUGUST 2003

   3) COMPLETE SET OF 3/3 BILLS OF LADING + 6 COPIES ONLY MARKED "CLEAN ON BOARD" AND "FREIGHT PREPAID" ISSUED "TO ORDER", NOTIFY "STAR GRAIN LTD",

   4) PHYTOSANITARY CERTIFICATE ISSUED BY A COMPETENT AUTHORITY + COPY

   5) FUMIGATION CERTIFICATE + COPY

   6) OFFICIAL NON-RADIATION CERTIFICATE STATING THAT RADIATION OF SHIPPED CARGO IS WITHIN INTERNATIONAL PERMISSIBLE LIMITS + COPY

   7) CERTIFICATE OF HOLD CLEANLINESS + COPY

   8) CERTIFICATE OF WEIGHT + COPY

   9) CERTIFICATE OF QUALITY EVIDENCING ANALYSIS OF CARGO + COPY

   10) INSURANCE CERTIFICATE + COPY

### SPECIAL CONDITIONS

   A. CHARTER PARTY BILLS OF LADING ARE ACCEPTABLE

   B. THIRD PARTY DOCUMENTS ARE ACCEPTABLE EXCEPT INVOICE TO BE ISSUED BY SELLER.

   C. ALL IMPORT TAXES, DUTIES, AND LICENSES IN THE COUNTRY OF DESTINATION SHALL BE AT BUYER'S RESPONSIBILITY AND COST.

### SHIPMENT CONDITIONS

| | |
|---|---|
| SHIPMENT | IN ONE SPOT SHIPMENT ETS 14 AUGUST 2003 |
| VESSELS | CLASSIFIED, ISM CERTIFIED BULK CARRIER. |
| HOLDS | SHALL BE INSPECTED FOR CLEANLINESS BEFORE LOADING BY AN INTERNATIONAL SURVEYING COMPANY AT SELLER'S OPTION AND COST |
| PRE ADVICE | VESSEL SHALL SERVE THREE DAYS PRE-ADVICE FOR ARRIVAL AT DISCHARGE PORT. |
| DISCHARGE | AT A UNIFORM RATE OF 1,000 MT/WWD OF 24 WORKING HOURS THUEM PHEK EIO. |
| TIME COUNT | NOR SHALL BE TENDERED AND ACCEPTED DURING OFFICIAL WORKING HOURS WIPON WIBON, WICCON, WIFPON. LAYTIME TO COUNT AT 08:00H NEXT WORKING DAY AFTER SERVING VALID NOR. TIME SHALL NOT COUNT ON THURSDAY AND DAYS BEFORE HOLIDAYS |

27

CONTRACT N°498
14 AUGUST 2003

|  |  |
|---|---|
|  | AFTER 12:00 H UNTIL SATURDAY OR THE FIRST WORKING DAY AFTER THE HOLIDAY AT 08:00H. |
| LOI | IN CASE VESSEL ARRIVES AT DISCHARGE PORT BEFORE RECEIPT OF ORIGINAL DOCUMENTS; BUYER SHALL START DISCHARGE WITHOUT ANY DELAY BY ISSUING A LOI IN FAVOUR OF SHIP OWNERS IN ACCORDANCE WITH PANDI TEXT. |
| DEMURRAGE | THE CHARTER PARTY RATE FOR DEMURRAGE AND DISPATCH SHALL BE DECLARED UPON OFFICIAL VESSEL NOMINATION WITH FRACTIONS CALCULATED IN PROPORTION. |
|  | POSSIBLE CLAIMS SHALL BE SETTLED WITHIN 14 DAYS FROM RECEIPT OF A CLAIM SUBSTANTIATED BY SOF AND CLAIMANT'S INVOICE. |

GENERAL CONDITIONS

|  |  |
|---|---|
| ORIGIN | RUSSIA |
| PACKING | IN BULK |
| INSURANCE | SELLER SHALL PROVIDE INSURANCE AT HIS COST IN ACCORDANCE WITH GAFTA 72 SECTION 1: CARGO CLAUSES (ALL RISKS). |
| INSPECTION | QUALITY, WEIGHT, AND CONDITION OF WHEAT ARE FINAL AT THE TIME AND PLACE OF LOADING ACCORDING TO CERTIFICATES ISSUED BY AN INTERNATIONAL SURVEYING COMPANY AT SELLER'S OPTION AND COST. |
| FUMIGATION | SHALL BE EXECUTED BY A COMPETENT AUTHORITY AND SHALL BE FINAL AT PORT OF LOADING BY ALUMINIUM PHOSPHIDE AT SELLER'S COST. |
| RADIATION | THE NON-RADIATION CERTIFICATE SHALL BE AN OFFICIAL CERTIFICATE EVIDENCING LEVEL OF RADIATION WITHIN ACCEPTABLE INTERNATIONAL NORMS. |
| RULES | ALL ITEMS NOT IN CONFLICT WITH THE ABOVE ARE SUBJECT TO GAFTA CONTRACTS N°48 |
| ARBITRATION | ALL DISPUTES ARISING FROM THIS CONTRACT WILL BE RESOLVED AMICABLY BETWEEN BUYER AND SELLER. IN CASE OF FAILURE, SUCH DISPUTES SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH GAFTA N°125 OF WHICH BOTH PARTIES ADMIT TO HAVE KNOWLEDGE AND HEREBY ACCEPT. |

5

28

**E X H I B I T  3**

BASE AWARD

# Award of Arbitration



The Grain and Feed Trade Association
Gafta House, 6 Chapel Court, Chapel Place
Rivington Street, London EC2A 3DQ
United Kingdom

COPY

ARBITRATION NO: 13-282

## IN THE MATTER OF THE ARBITRATION ACT 1996

### and

## IN THE MATTER OF AN ARBITRATION PURSUANT TO THE ARBITRATION RULES NO. 125 OF THE GRAIN AND FEED TRADE ASSOCIATION

BETWEEN:

**CLAIMANTS**  **ASTON AGRO-INDUSTRIAL AG**, Zug, Switzerland
(SELLERS)

-v-

**RESPONDENTS**  **STAR GRAIN LIMITED**, Larnaca, Cyprus
(BUYERS)

WE, THE UNDERSIGNED, HAVING BEEN APPOINTED AS ARBITRATORS, DO HEREBY FIND AND AWARD AS FOLLOWS:

The juridical seat of the arbitration is England.

### A.  THE DISPUTE

The dispute concerns the Sellers' claims for demurrage at discharge under two contracts.

### B.  THE CONTRACTS - TERMS AND PERFORMANCE

#### Contract No 496 - Shipment Per M.V. Sirius

1.  THE CONTRACT TERMS

By a contract dated 4th August 2003 ("Contract No 496") the Sellers agreed to

THE GRAIN AND FEED TRADE ASSOCIATION

**Gafta**

ARBITRATION NO. 13-282

sell 5,000 metric tons 10% more or less Russian wheat CIF free out 1 safe berth Dakheila, Egypt to the Buyers. The contract contained the following provisions relevant to the dispute:

"SHIPMENT CONDITIONS

... ...

| | |
|---|---|
| DISCHARGE | AT A UNIFORM RATE OF 1,000 MT/WWD OF 24 WORKING HOURS THUPM FHEX EIU. |
| TIME COUNT | NOR SHALL BE TENDERED AND ACCEPTED DURING OFFICIAL WORKING HOURS WIPON WIBON; WICCON; WIFPON. LAYTIME TO COUNT AT 08:00H NEXT WORKING DAY AFTER SERVING VALID NOR. TIME SHALL NOT COUNT ON THURSDAY AND DAYS BEFORE HOLIDAYS AFTER 12:00 H UNTIL SATURDAY OR THE FIRST WORKING DAY AFTER THE HOLIDAY AT 08:00H. |
| DEMURRAGE | THE CHARTER PARTY RATE FOR DEMURRAGE AND DISPATCH. SHALL BE DECLARED UPON OFFICIAL VESSEL NOMINATION WITH FRACTIONS CALCULATED IN PROPORTION. POSSIBLE CLAIMS SHALL BE SETTLED WITHIN 14 DAYS FROM RECEIPT OF A CLAIM, SUBSTANTIATED BY SOF AND CLAIMANTS INVOICE. |
| GENERAL CONDITIONS RULES | ALL ITEMS NOT IN CONFLICT WITH THE ABOVE ARE SUBJECT TO GAFTA CONTRACT No 48. |
| ARBITRATION | ALL DISPUTES ARISING FROM THIS CONTRACT WILL BE RESOLVED AMICABLY BETWEEN BUYER AND SELLER. IN CASE OF FAILURE, SUCH DISPUTES SHALL BE REFERRED TO ARBITRATION IN LONDON IN ACCORDANCE WITH GAFTA No 125 OF WHICH BOTH PARTIES ADMIT TO HAVE KNOWLEDGE AND HEREBY ACCEPT" |

2.    PERFORMANCE

2:1    By a charterparty dated 26th June 2003, on the "SYNACOMEX 90" form with amendments and additions Sellers chartered M/V "SIRIUS" for the carriage of about 5,000 metric tons wheat with a demurrage rate of USD 2,200.00 per day pro rata.

Page 4

THE GRAIN AND FEED TRADE ASSOCIATION

Gafta

ARBITRATION NO. 13-282

2:2 The vessel arrived at the outer roads of Alexandria and tendered NOR on 14th August at 16:00.

2:3 Discharge started on 19th August at 19:00. At 19:45 on the same day it was observed that some of the cargo was wet and caked. Discharge was suspended and according to the Joint Survey Statement of 21st August a survey by the Buyers (as receivers), the shipowners, the cargo underwriters and the stevedore company took place on board M/V "SIRIUS".

2:4 Samples were taken and Reports of Analysis issued by Intertek Caleb Brett in respect of five samples taken from goods in hold 2 state:

"Sample delivered tested positive for the chlorides, which indicates that wetness resulted is probably from seawater."

2:5 Discharge was discontinued and the vessel was kept idle at Alexandria between 22nd August and 10th October with cargo on board to be finally released from Alexandria on 11th October.

2:6 Sellers calculated the demurrage due to them under Contract No. 496 at USD 106,758.06 and sent their respective invoice No. 2003.359/2 dated 21st October 2003 on 22nd October 2003 to the Buyers for payment

Contract No 498 - Shipment Per Mv Alena

1. THE CONTRACT TERMS

By a contract dated 14th August 2003 ("Contract No 498") Sellers agreed to sell 4,500 metric tons, 10% more or less Russian wheat CIF free out 1 safe berth Dakheila, Egypt to Buyers on terms identical with Contract No 496 as to shipping conditions and general conditions.

2. PERFORMANCE

2:1 By a charterparty dated 3rd July 2003 on the "SYNACOMEX 90" form with amendments and additions Sellers chartered M/V "ALENA" for the carriage of

THE GRAIN AND FEED TRADE ASSOCIATION

# Gafta

about 4,300 metric tons wheat with a demurrage rate of USD 2,300.00 per day pro rata.

2:2 The vessel arrived at the outer roads of Alexandria and tendered NOR on 21st August at 5:00.

2:3 Discharge started on 25th August at 19:00 and was suspended around 13:00 on 26th August due to damaged cargo in hold 1. According to the statement of 27th August a Joint Survey by the Buyers (as receivers), the shipowners, the cargo underwriters and the stevedore company took place on board M/V "ALENA" that day.

2:4 Samples were taken and Reports of Analysis issued by Intertek Caleb Brett in respect of two samples taken from goods in hold 1 state:

"Sample delivered tested positive for the chlorides which indicates that wetness resulted is probably from seawater."

2:5 Discharge was discontinued and the vessel was kept idle at Alexandria between 26th August and 1st October with cargo on board to be finally released from Alexandria on 2nd October.

2:6 Sellers calculated the demurrage due to them under Contract No. 498 at USD 81,074.78 and sent their respective invoice (No 2003.393/2 dated 21st October 2003) on 22nd October 2003 to the Buyers for payment.

## C.   THE ISSUES

The dispute revolves around the following issues which will be considered more closely below:-

➤ Could the Buyers effectively defend the Sellers demurrage claims under both sale contracts on the basis :-

➤ (ISSUE No.1) that the Egyptian Authorities refused to permit the discharge of damaged goods

COPY

THE GRAIN AND FEED TRADE ASSOCIATION

Ga/ta



> (ISSUE No.2) that Sellers are not liable for demurrage under the relevant charterparties and

> (ISSUE No.3) that Sellers are in breach of their duty under the GAFTA Contract No. 48 Clause 8 SHIPMENT AND CLASSIFICATION to ship the goods in a first class vessel thus giving rise to counterclaims by the Buyers equivalent to the claims for demurrage

**D.     ISSUE No.1**

Are Sellers entitled to demurrage in respect of time lost due to the Egyptian Authorities' refusal to allow the discharge of damaged goods?

1.      CLAIMANT SELLERS' SUBMISSIONS

1.1     Sellers submitted that Buyers purported to reject the damaged cargo and although offered guarantees from cargo underwriters and Owners' P&I Club appeared to have insisted on not releasing the vessel until receiving the full value of the damaged cargo in cash. As a result the vessels were kept idle at Alexandria between 22nd August 2003 and 10th October 2003 (SIRIUS) and 26th August 2003 to 1st October 2003 (ALENA) with cargo on board which made sailing impossible without the Respondents' release. SIRIUS was finally released from Alexandria on 11th October 2003 after cash payment from the Shipowners to the Respondents for the damaged cargo. ALENA was finally released from Alexandria and sailed on 2nd October 2003 after a certified bank cheque was issued by the Shipowners in favour of the Respondents for the damaged cargo.

1.2     Sellers denied that the delays were "*solely the result of discovery of seawater damaged cargo on board the vessels*". The receipt and release for M/V "SIRIUS" in Sellers' submission shows that M/V "SIRIUS" was allowed to depart once a cash payment had been received by Buyers of USD 150,000. It was Buyers' behaviour in insisting on the fact that the vessels should not sail until Buyers had received cash in their hands that was the reason for the delay in discharge. Buyers refused to accept P&I Club security, they refused to

accept security from cargo underwriters, they refused a reasonable offer of cash settlement from underwriters and they refused to allow Sellers to buy back the damaged cargo at the contract price unless Sellers also waived their demurrage claim against Buyers.

1.3    Sellers disputed that the vessels suffered from defects in their hatch covers which permitted the ingress of seawater. Whilst the cargo underwriters surveyors consider that there must have been small leakage between hatch covers 3 and 4 in respect of M/V "SIRIUS" their evidence is inconclusive. Owners' tests have shown that the cargo was not damaged by seawater. On M/V "ALENA", it appears to have been possible rainwater during loading, no traces of deterioration in the hatch covers were noted. In Sellers' submission neither the Owners of M/V "SIRIUS" nor the Owners of M/V "ALENA" have actually accepted that the damage to the cargo was a consequence of seawater ingress. The Owners of M/V "SIRIUS" had, based on reports showing that the chloride tests were negative, asserted that the moisture damage was not caused by ingress of seawater whereas the Caleb Brett reports say that wetness was "*probably from seawater*" but not certain. There were no reports of heavy seas during the voyage or that the vessel shipped seas. There is therefore insufficient evidence to determine whether or not the vessel was unseaworthy in that her cargo spaces, hatches and holds were unfit to receive the intended cargo. The chloride tests carried out were not conclusive and on M/V "ALENA" the surveyors consider the most likely cause to be rainwater during loading.

1:4    There is no provision in the Sale Contract which stops time from running and consequently demurrage from accruing as between Sellers and Buyers where there is a problem with a cargo on discharge. (The relevant time for assessment of the quality of the cargo is in any event as per certificates on loading.) Absent such a provision time will continue to run.

1:5    **Contract No. 496 – SIRIUS Shipment**
Sellers denied the Buyers' right to reject the cargo under Contract No 496 and

Page 8

THE GRAIN AND FEED TRADE ASSOCIATION

# Ga]ta

ARBITRATION NO. 13-282

argued that laytime and demurrage continued to run in accordance with the terms of the contract. In Sellers' submission demurrage accrued as follows:

M/V "SIRIUS" arrived at the discharge port at 16:00 on Thursday 14th August 2003 and tendered her NOR at that time. She berthed at 19:30 on 17th August 2003. Discharge commenced at 19:00 on 19th August 2003.

Contract No 496 provides that the time allowed for discharge was 1,000 metric tons daily or on the total cargo of 4,970.376 metric tons a total of 4 days 23hrs and 17min.

Laytime expired at 23:17 on Sunday 24th August 2003 and demurrage was incurred until 11th October 2003 at 17:30 when the vessel was free to sail as per the laytime calculations.

In accordance with the fixture recap of the charterparty dated 26th August 2003 and the Contract No 496 Sellers calculated demurrage at the discharge port for a total of 48days 12hrs and 38min (48.52639 days) at a rate of USD 2,200 per day amounting to USD 106,758.06.

## 126  Contract No. 498 – ALENA Shipment

Sellers contended that Buyers were not entitled to reject the cargo under Contract No 498. Laytime and demurrage continued to run in accordance with the terms of the Contract No 498 and, in the Sellers' submission, accrued as follows:

On 21st August 2003 M/V "ALENA" arrived at the discharge port and tendered her NOR at 05:00.

Laytime with a total of 4days 07hrs and 15min allowed under the contract commenced at 08:00 on Saturday 23rd August 2003 and expired at 16:02 on 27th August 2003. Demurrage was incurred until 11th October 2003 at 22:00

THE GRAIN AND FEED TRADE ASSOCIATION



**ARBITRATION NO. 13-282**

and, in accordance with the fixture recap of the charterparty dated 3rd July 2003 and the Contract No 498 resulted in a total of 35days 5hrs and 58min (35.24861 days) at a rate of USD 2,300 per day amounting to USD 81,071.78.

1:7    Sellers accordingly claim USD 106,758.06 and USD 81,071.78 together with interest on all sums payable at a commercial rate compounded over such period as the Tribunal sees fit, damages in the alternative and costs.

2.    DEFENDANT BUYERS' SUBMISSIONS

2:1    Buyers defended the Sellers' claims on the grounds, firstly, that Sellers are not entitled to demurrage because the delays to the vessels in Egypt were solely the result of seawater damaged cargo on board the vessels and the Owners of both vessels should not charge demurrage for the periods in question; and, secondly, in the alternative, that Buyers have a cross-claim in respect of Sellers' breaches of the shipment terms of the contracts equivalent to any such demurrage and/or damages and interest thereon that the Tribunal may find to be due to Sellers.

2:2    Contract No. 496 - SIRIUS Shipment
With regard to the SIRIUS shipment Buyers' submitted that the vessel was unseaworthy in that her cargo spaces, hatches and holds were unfit to receive the intended cargo. The joint survey statement showed that a substantial quantity of the cargo on board the "Sirius" was damaged by the ingress of seawater through the vessel's hatch covers which were in such condition that rendered them unable to withstand the rigours of the ocean voyage to Egypt. The vessel did not encounter unusually heavy weather during passage. As a consequence, the cargo carried pursuant to contract 496 was severely damaged, stained, caked and mouldy and emitted a foul odour.

2:3    The Agricultural Authorities refused to permit the damaged cargo to be discharged. They ordered The General Company for Cells and Storing in Alexandria ("GCCS") not to discharge the damaged cargo from the vessel.

not challenge on this on new alleged claim

ARBITRATION NO. 13-282

GCCS accordingly refused to accept the damaged goods into its silos. GCCS is the only entity able to store and discharge goods of the contract type at the discharge port. That company is a government entity and is related to the Agricultural Authority. The Authorities and GCCS feared that 150,000 metric tons of sound goods in the silos would be contaminated if the damaged goods were to be stored there. The Owners of the vessel initially obtained an order before the Alexandria Primary Court requiring the damaged goods to be unloaded into the said silos. For the above reasons, GCCS brought a motion before the Court to quash that order. The Court ruled against the Owners which meant that the vessel could not sail, because the damaged cargo remained on board.

2:4   Following the refusal of the Court to permit the damaged goods to be discharged and the consequent prospect of delay, Owners entered into settlement arrangements with Buyers and Sellers and Buyers entered into an arrangement whereby the damaged goods would be re-exported on the vessels and new bills of lading issued. At no point were the vessels arrested: they remained at the port because they contained cargo that they could not discharge there due to the ultimate refusal of the Court to overrule the decision of the Agricultural Authority (and of GCCS) not to permit discharge of the damaged goods.

2:5   It is incorrect to say that Buyers detained the vessels. The vessels were delayed by the combined action of the Agricultural Authority and its related company, GCCS, which prevented the damaged cargo from being discharged from the vessels in Egypt, and by the decision of the Court. Buyers did not arrest the vessels. They were only able to leave once Owners and Sellers reached agreements with Buyers that allowed the damaged goods to be re-exported so that the impasse was broken by virtue of the fact that the vessels no longer needed to discharge the damaged cargo in Egypt.

The authorities would not allow the damaged cargo to be discharged and GCCS would not permit the storage of the goods in their facility. It was simply

THE GRAIN AND FEED TRADE ASSOCIATION

not possible for Buyers to arrange the discharge and separation of the damaged quantities from the sound quantities, because of the stance that the authorities and GCCS took towards the damaged cargo on the vessel.

The Statement of Facts at Alexandria shows that the vessel was delayed and "idle" at the anchorage due to the fact that the cargo remaining on board was damaged cargo, which the authorities would not permit Receivers to unload and not, as Sellers alleged, for want of a release on the part of Buyers.

2:6 **Contract No. 498 ALENA Shipment**

Buyers pointed out that there is a great deal of similarity between the claims asserted under contract 496 and under 498 and their submissions regarding the former contract should be read, where appropriate, as applying to the latter. Buyers also joined issue with Sellers' submissions made in support of the claim under Contract 498 and deny that any sums are due to Sellers under that Contract.

3. **FINDINGS**

The contracts were on CIFFO terms and incorporated GAFTA Form No. 48. It is well known in the trade and needs no expanding that under the CIF clause the seller's responsibility for the goods ends when he delivers them at the port of shipment on board ship into the carriers custody. It was not suggested by the Buyers that the goods when loaded were unfit for the voyage. The risk thus passed to Buyers on shipment and the goods travelled at their risk.

Sellers, therefore, can only be liable for the damage and the consequential delay allegedly brought about by the Egyptian authorities' refusal to allow discharge if the damage was caused by a breach committed by them.

The burden to show such breach squarely rests on Buyers who made that allegation. Buyers had suggested that Sellers shipped the goods on vessels that were anything but first class and contended that both vessels suffered

from defects in their hatch covers, which permitted the ingress of seawater into the cargo spaces. These defects were the cause of the damage to the cargo on all the available evidence.

Expressly with regard to the SIRIUS shipment Buyers' submitted that the vessel was unseaworthy in that her cargo spaces, hatches and holds were unfit to receive the intended cargo. According to Buyers the joint survey statement showed that a substantial quantity of the cargo on board the "Sirius" was damaged by the ingress of seawater through the vessel's hatch covers which were in such condition that rendered them unable to withstand the rigours of the ocean voyage to Egypt where she did not encounter unusually heavy weather during the passage.

The evidence in respect of both vessels, however, does not bear out the Buyers' contention. Neither the Joint Survey Statements nor the Reports of Analysis contain any observation as to the possible cause of the ingress of seawater. The condition of the vessels or the state of the hatch covers is not mentioned anywhere in the documentation before us, at all. It follows that Buyers failed to discharge the onus of proof and we are, thus, unable to establish any breach on the Sellers' part. It, furthermore, follows **AND WE ACCORDINGLY FIND** that Buyers in principle are responsible to Sellers for the waiting time in Alexandria under the terms of the Shipment Conditions. Since we were unable to establish any breach on the Sellers' part which could have intervened with the passing of the risk the eventual proximate cause of the excessive waiting time is irrelevant because any accident to the goods was the Buyers' risk.

E.   **ISSUE No. 2**

Are Sellers entitled to demurrage even if they are not liable themselves for demurrage under the relevant charterparties?

THE GRAIN AND FEED TRADE ASSOCIATION



ARBITRATION NO. 13-282

CLAIMANT SELLERS' SUBMISSIONS

1.      Here it was the Sellers' case that demurrage is due from Buyers under the terms of the Sale Contract itself which gives a rate for discharge and includes provisions for time counting, an LOI and demurrage. It is only the Charterparty rate for demurrage which is included in the Sale Contract. The Sale Contract does not import the terms and conditions from the Charterparty nor does it provide for payment by Buyers of Owners' invoice. As a matter of law the payment of demurrage between Sellers and Buyers is governed by the terms of the sale contract. It is not dependent upon whether or not charterers have paid any demurrage to owners of the vessel. In any event, owners did not waive the right to claim demurrage from charterers and are pursuing their claims.

1.1     Sellers further submitted that owners' agreement before the vessel sailed that they "*should not charge demurrage for the periods in question*" and the receipt and release does not operate to release Sellers from any liability for demurrage to owners of M/V "SIRIUS" (and indeed owners are claiming demurrage in LMAA arbitration), nor does it release Buyers from the liability to pay demurrage to Sellers. The undertaking from the master of M/V "SIRIUS" is given without any consideration and therefore cannot be enforced, and relates only to claims from owners, disponent owners and charterers for demurrage. Owners had no authority to give this message on behalf of charterers. There is no waiver by Sellers of the right to claim for demurrage against Buyers and no such release would have been forthcoming hence the failure of the negotiations whereby Sellers agreed to buy back the cargo on board M/V "SIRIUS" and M/V "ALENA". As to M/V "ALENA", the agreement cannot be binding upon the Sellers of the cargo. Furthermore, even if these receipts and releases were genuine, they would be binding because they were obtained by duress as the Buyers were refusing to allow either vessel to sail without a release in respect of demurrage.

THE GRAIN AND FEED TRADE ASSOCIATION

1:2    As to the NOR given by the master of the ALENA Sellers submitted that there is no provision in the sale contract which provides that the NOR can only be given in berth. Buyers have attempted to incorrectly construe the sale contract as if it were a berth charterparty. Laytime therefore commences at 0800hrs on Saturday 23rd August 2003.

2.    DEFENDANT BUYERS' SUBMISSIONS

2:1    Buyers submitted that, in circumstances where the Charterparties did not afford Owners the right to claim demurrage from Sellers, because any delay to the vessels was the result of breaches of the charterparties by the Owners, and where Sellers have paid no demurrage to Owners, they are not entitled to recover such demurrage from Buyers. Sellers suffered no damage as a result of the delays to the vessels in Egypt. Sellers have supplied no evidence of any demurrage having been debited to them or having been paid to the Owners of either vessel.

2:2    **Contract No. 496 – SIRIUS Shipment**
In Buyers' contention the delays the vessels in Egypt experienced were solely the result of the discovery of seawater damaged cargo on board the vessels, Buyers agreed with the Owners that they should not charge demurrage before the vessel sailed. Buyers relied in this respect on the receipt and release in respect of the "Sirius" and a letter signed on behalf of the Owners of the "Sirius" by the Master of that vessel dated 30th September 2003 and addressed to Star Grain and to whom it may concern stating on behalf of Owners, disponent Owners and Charterers that there would be no claim for demurrage for the period from 19th August 2003 until the time of sailing of the "Sirius" from Alexandria. Buyers sent the settlement documents with Owners to Sellers, to assure Sellers that Owners would not be seeking demurrage under the charterparty between Owners and Sellers.

2:3    Buyers' case was that pursuant to the terms of the final receipt and release and waiver of demurrage referred to above Owners were not entitled to claim demurrage from Sellers under the terms of the relevant charterparty for the



periods in question and that Owners accordingly did not claim any demurrage from Sellers under the terms of that charterparty for that period, which covers the period for which Sellers have claimed demurrage in respect of the "Sirius".

2:4 **Contract No. 498 ALENA Shipment**

With regard to the ALENA shipment Buyers produced the Conciliation, Final Release and Assignment Agreement entered into between Buyers and the Owners of the "Alena", together with a certified translation. Article 8 provides that no demurrage is to be claimed after 26th August 2003. Once more, Buyers sent the settlement with Owners to Sellers, to assure Sellers that Owners would not be seeking demurrage under the charterparty between Owners and Sellers. Buyers submitted that Owners pursuant to the terms of the Conciliation, Final Release and Assignment Agreement, were not entitled to claim demurrage from Sellers under the terms of the relevant charterparty for the periods in question and that Owners accordingly did not claim any demurrage from Sellers under the terms of that charterparty. This covers the period for which Sellers claim demurrage.

2:5 **Attempted Contract Amendments**

Buyers and Sellers attempted to resolve the impasse that had arisen in Egypt as a result of the damage to the cargo and they eventually concluded that the damaged cargo would be re-exported and would leave Egypt under new bills of lading so that the vessels would no longer be detained by reason of their having on board cargo that was to be discharged in Egypt but that could not be discharged there. Addenda to the Contracts were discussed and on 11th September 2003, Sellers sent a draft addendum covering both contracts to Buyers for agreement. As this made no reference to the fact that the Owners of both vessels were not entitled to demurrage under the relevant charterparties, Buyers did not agree Sellers' addendum but instead sent a further draft addendum to the Contracts to Sellers on 13th September 2003. This provided that Sellers were to confirm that no demurrage was due under the Contracts. Sellers refused so to confirm and in a fax from Rayfield Mills dated 16th September 2003, Sellers set out their position which in Buyers' view

THE GRAIN AND FEED TRADE ASSOCIATION

was wrong.

2:6    Regarding computation of laytime in respect of the ALENA  Buyers submitted that the vessel did not berth until 09.20 hours on 21st August 2003, whereas NOR was tendered at 05.00 hours on that day.

The terms of the recap provided that NOR was to be tendered from the berth, unless the berth was occupied or congested. Sellers have produced no evidence of any occupation or congestion of the berth. Therefore, the NOR was not valid when tendered. Time did not start to run until discharging commenced at 12.25 hours on 25th August 2003. Bearing in mind the fact that laytime did not commence to run until discharge began, laytime would not have expired until 19.40 hours on 29th August 2003.

3.    **FINDINGS**

3:1    As we have found above the Sellers were not responsible for the condition of the goods at discharge. The risk had effectively passed to Buyers and they were obliged to pay demurrage in accordance with the Shipment Conditions if the cargo was not discharged at the rate agreed. Whether Sellers can only claim demurrage if they are liable for demurrage themselves clearly is a matter of construction and the Tribunal has to establish the intention of the parties when they concluded the contract. The question is whether the Shipment Conditions where intended as an indemnity on which the Sellers could only rely if they themselves were held liable by the shipowners or whether it was in the Parties' contemplation to set up a self-contained time counting and liquidated damages regime which would apply on its own disregarding whether the Sellers are liable under the charterparty.

3:2    It is generally accepted in the trade that parties to a sale for shipment in the sale terms may deviate from the terms of the underlying charterparty. In the Tribunal's experience the sale discharge provisions usually are independent of the charterparty. This practice is also acknowledged by the courts. Lord Justice Staughton with respect to a discharge clause in a CIF sale obiter dicta

THE GRAIN AND FEED TRADE ASSOCIATION



**ARBITRATION NO. 13-282**

remarked (Ets. Soules et, Cie –v- Intertradex S.A. (1991) Lloyd's Law Reports 379 (385)):

Alternatively the seller, although not themselves charterers, might have contracted to buy the goods from others who were charterers, on terms similar to those in the contract notes. A further possibility, of course, is that the sellers were not liable to anybody for demurrage, and merely wished to make an adventitious profit from their contract with the buyers; Equally they might make a loss, through having to pay despatch money.

3:3   The distinction normally would depend on how much of the original charterparties laytime provisions were imported into the sale contract. If laytime can properly be calculated without reference to the charterparty laytime provisions the sale terms must take precedence. If, however, a proper laytime calculation cannot be made without referring to the charterparty this would be a strong indication that an indemnity was intended.

The relevant clauses read as follows:

"SHIPMENT CONDITIONS

| | |
|---|---|
| DISCHARGE | AT A UNIFORM RATE OF 1,000 MT/WWD OF 24 WORKING HOURS THUPM FHEX EIU. |
| TIME COUNT | NOR SHALL BE TENDERED AND ACCEPTED DURING OFFICIAL WORKING HOURS WIPON WIBON; WICCON; WIFPON. LAYTIME TO COUNT AT 08:00H NEXT WORKING DAY AFTER SERVING VALID NOR. TIME SHALL NOT COUNT ON THURSDAY AND DAYS BEFORE HOLIDAYS AFTER 12:00 H UNTIL SATURDAY OR THE FIRST WORKING DAY AFTER THE HOLIDAY AT 08:00H. |
| DEMURRAGE | THE CHARTER PARTY RATE FOR DEMURRAGE AND DISPATCH. SHALL BE DECLARED UPON OFFICIAL VESSEL NOMINATION WITH FRACTIONS CALCULATED IN PROPORTION. POSSIBLE CLAIMS SHALL BE SETTLED WITHIN 14 DAYS FROM RECEIPT OF A CLAIM SUBSTANTIATED BY SOF AND CLAIMANT'S INVOICE." |

THE GRAIN AND FEED TRADE ASSOCIATION



It is evident that in the present case all ingredients for a complete laytime calculation are contained in the sale terms. The Discharge and Time Count Clause very precisely regulate the necessary details like the times and places of the giving of the NOR, the discharge rate and the days and times to count. The laytime provisions of the underlying charterparties are not required for assessing the time allowed and actually used. The Buyers' liability for demurrage as liquidated damages can be established without reference to the charterparty terms. It follows that the contracts on their true construction intended to award the Sellers demurrage on the basis of the sale terms independent of any demurrage payable under the charterparty. The charterparty rates are only imported to express the demurrage liability established under the sale terms in monetary sums. For the same reason the Buyers cannot rely on the terms of the ALENA recap for the commencement of laytime because the sale clearly provides for the NOR to be given WIBON. WE; accordingly, **FIND THAT** Buyers are liable for the demurrage as claimed.

**F.    ISSUE No. 3**

Are Sellers in breach of their duty under the GAFTA No. 48 Clause 8 SHIPMENT AND CLASSIFICATION to ship the goods in a first class vessel which would not only deny them the right to demurrage but would also give rise to counterclaims by the Buyers equivalent to the claims for demurrage?

**1.    DEFENDANT BUYERS' SUBMISSIONS**

Buyers submitted further and in the alternative that Sellers under both contracts are in breach of GAFTA 48. Clause 8 of GAFTA 48 which denies them the right to claim demurrage or damages.

1:1    In Buyers' view the clause reading, inter alia :

*"SHIPMENT AND CLASSIFICATION- Shipment from ... ... ... ... ... ... ... ... ... by first class mechanically self-propelled vessel(s) classed in accordance with the Institute Classification Clause of the International Underwriting Association in force at the time of shipment, . . . "*

imposes on the seller an obligation to ship the goods in a first class vessel.

THE GRAIN AND FEED TRADE ASSOCIATION

Ga]ta

The obligations to ensure (i) that the vessel is first class and that (ii) she is classed in accordance with the relevant Institute Classification Clause of the International Underwriting Association are separate and distinct obligations. It is Buyers' case that Sellers shipped the goods on vessels that were anything but first class. Both vessels suffered from defects in their hatch covers, which permitted the ingress of seawater into the cargo spaces. These defects were the cause of the damage to the cargo on all the available evidence. Sellers thus breached the requirements of Clause 8 of GAFTA 48 in both contracts and their breaches were the cause of the damage to the cargo on both vessels. Sellers, therefore, cannot recover demurrage or damages from Buyers where the alleged delay to the vessels was the result of the fact that the cargo was damaged by reason of breaches by Sellers of the Shipment terms of the contracts.

1:2     **Counterclaim**

Buyers' further and alternative submission was that they have a cross-claim against Sellers in respect of their breaches of the shipment terms of the Contracts. As a result of those breaches, Buyers will suffer loss and damage if the Tribunal awards Sellers any sum in respect of demurrage or damages for the alleged delay to the vessels. That loss and damage is equivalent to any such demurrage and/or damages and interest thereon that the Tribunal may find to be due to Sellers. Buyers counterclaim in respect of the said loss and damage. Therefore, Sellers' claim for demurrage, damages and interest must fail for circuity of action.

1:3     Buyers counterclaim damages for breach of contract, in a sum equivalent to any demurrage and/or damages and interest thereon that the Tribunal should find to be due to Sellers. Buyers claim compound interest on their counterclaim at such rates and over such period as the Tribunal shall think just, including post-award interest. Sellers' claim for interest therefore additionally fails for circuity of action under this head. Buyers request the Tribunal to award them legal costs and the fees and expenses of the arbitration.

Page 20

THE GRAIN AND FEED TRADE ASSOCIATION



ARBITRATION NO. 13-282

2. <u>CLAIMANT SELLERS' SUBMISSIONS</u>

2.1   Sellers denied any breach of the SHIPMENT AND CLASSIFICATION
CLAUSE. The vessels were fully classed and were entered with a reputable
P&I Club, West of England P&I. Had the vessels had a history of cargo
damage, then they would not have been chartered by Sellers. In actual fact,
there is no real evidence to show that the vessels were not first class. Sellers
further submitted that even if they were in breach of clause 8 of GAFTA 48,
the loss of time was caused not by this breach but by the outrageous and
irresponsible actions of the Buyers in refusing to allow the vessels to sail until
they had cash in their hands and a purported waiver of demurrage. Buyers'
counterclaim must therefore fail.

3. <u>FINDINGS</u>

Buyers have the burden to produce evidence which demonstrates Sellers'
breach of Clause 8 of GAFTA 48. As mentioned above (viz. B 3) no such
evidence was forthcoming. We have not been directed to any documentation
or other proof establishing the vessels' condition or class at the relevant time.
WE, therefore, FIND THAT Buyers cannot rely on the vessels' allegedly
defective state or class as defence or basis of a counterclaim.

G.   <u>REFERENCE TO THE COMPLETE PLEADINGS AND EVIDENCE</u>

The above narrative of the submissions summarises the Parties' arguments
relevant to the arbitration. For the further details the Tribunal refers to the
complete submissions, evidence, extracts and quotations from judgements
and textbooks and other documentation the Parties placed before the Tribunal
to support their respective contentions. The Tribunal duly read and carefully
considered the pleadings, the evidence and the accompanying material in their
entirety.

THE GRAIN AND FEED TRADE ASSOCIATION

**Gafta**

ARBITRATION NO. 13-282

## AWARD

**AND WE AWARD AND ADJUDGE** that Buyers shall forthwith pay to the Sellers the sums of US$ 106,758.06 (One hundred and six thousand, seven hundred and fifty eight United States Dollars and six cents) and US$ 81,071.78 (Eighty one thousand and seventy one United States Dollars seventy eight cents) together with interest at the rate of 5% (five percent) compounded at quarterly rests from 6th November 2003 to the date of payment. Buyers shall pay the fees and expenses of this arbitration as per the attached statement.

This was a normal trade arbitration involving customary issues of international business trade arbitrators could resolve without the intervention of lawyers and we make no award as to legal costs with each party bearing their own legal costs if incurred.

ARBITRATORS:-

H K Hintermann          M Sage          R Karstaedt (Chairman)

1 2 APR 2005

Page 22

THE GRAIN AND FEED TRADE ASSOCIATION

**Ga|ta**

ARBITRATION NO. 13-282

### ARBITRATION FEES AND EXPENSES

The Fees and Expenses of this Arbitration are as under:-

|  | £ |
|---|---|
| Association's Fees | 2289.00 |
| Discount for Members | 787.50 |
| Arbitrators' Fees | 6450.00 |
| VAT | 1391.51 |
| £ | 9343.01 |

are to be paid by Buyers.

*In the event of an Appeal being lodged against this Award, Appeal fee for Members and Non-Members shall be: £6,000.00*

GAFTA's VAT Identification No: GB 243 8967 24

Sellers' VAT Identification No: Not applicable

Buyers' VAT Identification No: Not Known

APPELLATE AWARD



**London**

APPEAL AWARD NO. 4074

AWARD OF ARBITRATION NO. 13-282

STAR GRAIN LTD,

Larnaca, Cyprus.

(BUYERS)

(APPELLANTS)

=V=

ASTON AGRO-INDUSTRIAL AG

Zug, Switzerland.

(SELLERS)

(RESPONDENTS)

Dated:



1 5 NOV 2005

## The Grain and Feed Trade Association

GAFTA
Room 1714 Tower 1
Henderson Centre
No. 18 Jian Guo Men Nei Da Jie
Beijing 100005
PR China
Telephone: +86 10 6518 2273
Facsimile: +86 10 6518 2274
E-mail: gafta@263.net

**GAFTA House,**
**6 Chapel Place**
**Rivington Street,**
**London EC2A 3SH**
**United Kingdom**
**Telephone: +44 20 7814 9666**
**Facsimile: +44 20 7814 8383**
**E-mail: post@gafta.com**
**Website: www.gafta.com**

GAFTA
8, Saperno - Slobodskaya Street
Office # 1
Kiev 03026
Ukraine
Telephone +380 44 524 0329
Facsimile +380 44 524 0231
E-mail: golodova@gaftakyiv.com

Registered in England with liability limited by guarantee under number 1006456

2

**Gafta**

**APPEAL AWARD NO: 4074**

We, the Board of Appeal, comprising R.A.Barber (Chairman), J.Boerjan, G.Clark S.J.Hoekstra, and G.M.Perry, elected to hear the Appeal presented by Star Grain Ltd against the Award of Arbitration No. 13-282 of Mr R. Karstaedt (Chairman), Mr H. K. Hintermann, and Mr M. Sage. DO **HEREBY FIND AND AWARD** as follows:

At the Hearing, held on 9 August 2005, Appellant/Buyers were represented by Mr P. M. Brown and Respondent/Sellers by Mr A. G. Scott.

1. The contracts make reference to GAFTA contract no.48 and GAFTA Arbitration Rules 125 and that under the GAFTA Arbitration Rules no.125 the juridical seat of this arbitration, as defined in the Arbitration Act 1996, is England. The arbitration is subject to English procedural law and under the terms of GAFTA contract 48. The substantive law governing the contracts is English Law.

2. The dispute concerns demurrage on two contracts for Russian Wheat. The first, no.496 dated 4 August 2003, was for 5,000 mts CIF free out 1 safe berth Dakheila, Egypt. The goods were shipped on MV 'SIRIUS', which arrived at Alexandria roads and tendered NOR on 14 August 2003.

3. The second, no.498 dated 14 August 2003, was for 4,500 mts CIF free out 1 safe berth Dakheila, Egypt. The goods were shipped on MV 'ALENA', which arrived at Alexandria roads and tendered NOR on 21 August 2003.

4. When the cargoes arrived in Egypt Buyers found that a portion of the goods in both vessels was water damaged and they refused to

3

**Gafta**

## APPEAL AWARD NO: 4074

discharge the cargoes or to release the ships until they had received full payment for the damaged cargo. Buyers would not accept indemnities from the P & I Club, shipping or insurance companies.

5.   The ships tendered NOR on the 14 and 21 August 2003 respectively and were held with cargo on board until being released on 1 and 11 October 2003 respectively. As a result demurrage accrued, which Buyers refused to pay and a dispute arose.

6.   The First Tier Tribunal found in favour of Sellers and awarded that Buyers should pay the sums in demurrage of US$106,758.06 and US$81,071.78 together with compound interest thereon at 5%.

7.   At the Appeal Hearing both parties served their first tier submissions in their entirety and did not introduce new evidence or arguments which materially affected their submissions at first tier.

8.   Buyers applied for the First Tier Award to be overturned and reversed. They claimed costs at this Appeal and at First Tier, interest, Representative's costs and legal fees incurred at this Appeal and at First Tier.

9.   Sellers applied for the First Tier Award to be upheld in its entirety and claimed costs, interest, Representative's costs and legal fees incurred at this Appeal and at First Tier.

10.  The Board of Appeal after considering all the statements and all submissions made together with the supporting documents, drawing particular attention to paragraph G of the First Tier Award, come to the

IS-R-18   18:28   FROM-THE GRAIN   SED TRADE ASSOCIATION   T44-805 P0948 P-112

4

**Gafta**

**APPEAL AWARD NO: 4074**

conclusion that the Board agreed not only with the decision on the substantive issue of the First Tier Tribunal but also with their reasons and there is nothing in the First Tier Award with which we disagree.

11.   The Board therefore upholds the decisions in the First Tier Award no. 13-282 and, in the interests of saving time and cost, attaches the Award as an annexure to this Award and it shall form part thereof.

12.   **WE FIND THAT** the substantive issue in Award 13-282 is **UPHELD.**

13.   **WE FIND AND HOLD THAT** Seller's claim for demurrage in the sums of US$106,758.06 (contract 496 MV 'SIRIUS') and US$81,071.78 (contract 498 MV 'ALENA') succeeds in full.

**WE THEREFORE AWARD:**

A.   That Buyers shall forthwith pay to Sellers the sums of US$106,758.06 and US$81,071.78 making a total of US$187,829.84 (one hundred & eighty-seven thousand, eight hundred and twenty-nine United States Dollars and eighty-four cents).

B.   That Buyers shall pay to Sellers interest on the sum of US$187,829.84 (one hundred & eighty-seven thousand, eight hundred and twenty-nine United States Dollars and eighty-four cents) at the rate of 4% (four percent) compounded at quarterly rests from 6th November 2003 to the date of payment.

C.   That Buyers shall pay the fees and expenses of this arbitration as per the attached schedule, and the fees and expenses of the First Tier

5



## APPEAL AWARD NO: 4074

Arbitration.

D.   That Buyers shall pay Seller's legal costs including those incurred at First Tier, if not agreed, to be assessed by the Board of Appeal.

E.   That Buyers shall pay the costs of Seller's Representative at this Appeal.

6

# APPEAL AWARD NO: 4074

And the Fees and Expenses of this Appeal as under:-

|  | £ |
|---|---|
| Association Fees | 2252.10 |
| Board of Appeal's Fees | 3358.50 |
| VAT | 981.86 |
| | £6592.46 |

are to be paid by Buyers

CHAIRMAN OF THE BOARD

GAFTA's VAT Identification No: GB 243 8967 24

Sellers' VAT Identification No:  Not Applicable

Buyers' VAT Identification No:  Not Known



## BOARD:-

R A Barber (Chairman)

S J Hoekstra

G M Perry

J Boerjan

G Clark