377-07/MEU/LJK

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
CENTRAMET TRADING S.A.,

                                  07 CIV 6379 (RMB)

            Plaintiff,

  -against-

EGYPTIAN AMERICAN STEEL ROLLING
COMPANY,

            Defendant.
------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW
## IN FURTHER SUPPORT OF MOTION
## TO VACATE MARITIME ATTACHMENT

                                                   FREEHILL HOGAN & MAHAR, LLP
                                                   Attorneys for Defendant
                                                   Egyptian American Steel Rolling Co.
                                                   80 Pine Street
                                                   New York, NY 10005
                                                   (212) 425-1900 / (212) 425-1901 fax

<u>Of Counsel</u>
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)

NYDOCS1/290816.1

## PRELIMINARY STATEMENT

Defendant EASROC, through its attorneys Freehill Hogan & Mahar, LLP, submits this reply memorandum of law and the accompanying Kahn Affirmation in further support of its motion pursuant to Rule E(4)(f) to vacate the maritime attachment obtained by Plaintiff Centramet.

## BACKGROUND FACTS

The background facts to this matter are correctly set forth in the previously submitted Beshay, Eissa and Page Declarations. The Memorandum of Law submitted by Plaintiff Centramet appears largely in agreement, but has set forth certain matters as "facts" which are either untrue or are argument, not facts.

Centramet argues[1] that the Agreement between EASROC and non-party GST required EASROC's assent to the terms of the charter party. This is plainly not true, though, as the agreement makes clear.[2] The agreement – like many other agreements that require a cargo receiver to pay demurrage as a floating price term of the contract – simply provides, "demurrage to be as per charter party…demurrage rate to be indicated at time of vessel's nomination." Kamal Dec. Ex. 1-3. Under the agreement, EASROC was not required to agree to the charter party, and EASROC never did so. Instead, the agreement required GST to arrange for transportation of the scrap steel to Egypt, and to notify EASROC of the demurrage rate once the vessel was nominated. No maritime obligations were imposed on EASROC by such an agreement.

---

[1] Centramet Brief at 2.
[2] Throughout its brief, Centramet argues that EASROC has not disputed various matters in an effort to attempt to establish certain items as facts. These matters are all in dispute and Centramet's suggestion to the contrary is untrue.

Centramet also attempts to disseminate the import of the accusations of forgery, but the fact that GST's own agent confirms that Centramet has forged some of the documents it has proffered lends credence to EASROC's position and casts doubt on the veracity of Mr. Terebov, principal of both Centramet and GST. The argument made by Centramet and Mr. Terebov that there was an effort to strike a description of the goods from the bills of lading is not true, and is not even credible, as none of the parties would benefit from striking the description. Centramet's factual recitation contains other errors as well, which are not germane to the principal issue herein – which is that maritime subject matter jurisdiction is lacking.

## ARGUMENT

### PROPER SUBJECT MATTER JURISDICTION IS LACKING

The only basis for this Court's subject matter jurisdiction raised in the Verified Complaint is admiralty. As set forth in the moving papers to this application, however, and as further explained below, such jurisdiction is entirely absent in this matter and the Court should at least vacate the attachment, even if it chooses not to dismiss the action altogether. In this regard, it is worth observing that the first response raised by Centramet in the face of EASROC's argument that there is no maritime jurisdiction is to claim subject matter jurisdiction under the Federal Arbitration Act ("FAA").[3]

**1.    Centramet's Reliance on the FAA is Misplaced**

Centramet's reliance on the FAA, though, is misplaced. There is no reference to the Court's jurisdiction arising under this Act in the Verified Complaint, and Centramet should not be permitted to amend its pleadings to compensate for this omission, as any

---

[3] Centramet Brief at 11-12.

such amendment would be futile. There is no basis for making any claim under the FAA. At the time that Centramet filed its application and restrained EASROC's funds, it had not even demanded arbitration. Now that Centramet has demanded arbitration, EASROC's time to respond has not yet passed, so Centramet is not in a position to claim "aggrieved status" which is required under Section 4 of the FAA before making an application to compel EASROC to arbitrate.[4]

It is well-established that consideration of a petition to compel arbitration is limited to determining two issues: (i) whether a valid agreement or obligation to arbitrate exists, and (ii) whether one party to the agreement has failed, neglected or refused to arbitrate, in whole or in part. PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir. 1996). Absent a refusal by the other party to arbitrate, "arbitration cannot be compelled under Section 4 [of the Federal Arbitration Act]." Downing v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 725 F.2d 192, 195 (2d Cir. 1984). Here, the assignment by GST to Centramet conveyed with it GST's right to arbitrate against EASROC, and Centramet is not "aggrieved" because EASROC has agreed to arbitrate. "It is doubtful that a petition to compel filed before the 'adverse' party has refused arbitration would present an Article III court with a justiciable case or controversy in the first instance." PaineWebber, Inc. v. Faragalli, 61 F.3d 1063, 1067 (3d Cir. 1995).

Since there is no basis for Centramet to move to compel arbitration under the FAA, the only reason it has raised this argument is for the purpose of clawing its way back into this Court's subject matter jurisdiction. Even if this Court were to accept,

---

[4] Indeed, this Court would only have the power to compel EASROC's appearance in arbitration if the Court had personal jurisdiction over EASROC, which the parties agree is lacking.

however, that subject matter jurisdiction existed under the FAA, the Court would still need to vacate the attachment as the lack of admiralty subject matter jurisdiction is fatal to a Rule B attachment. It is to the absence of maritime jurisdiction that we now turn.

## 2. There is No Maritime Jurisdiction

In attempting to establish that this Court has maritime jurisdiction, Centramet makes two arguments: (1) that the claim for demurrage is a severable maritime claim under the "mixed contracts" doctrine, and (2) that the cases relied upon by EASROC, particularly Star Grain, are distinguishable. Both arguments fail.

### (i) *Kirby* Signaled the End of the Mixed Contracts Doctrine

In Norfolk Southern Ry. Co. v. James N. Kirby Pty Ltd., 543 U.S. 14 (2004), the Supreme Court held that where a primary objective of the parties' contract is to accomplish the transportation of goods by sea, even where there are non-maritime components to the contract (in Kirby, the contract also included transportation over land by rail), "under a conceptual rather than spatial approach, this fact does not alter the essentially maritime nature of the contracts." Id. at 24; *see generally* Folksamerica Reinsurance Co. v. Clean Water of New York, Inc., 2005 A.M.C. 1747 (2d Cir. June 30, 2005), explaining Kirby.

In implementing this conceptual approach to contracts involving both maritime and non-maritime aspects, the Supreme Court confirmed that the jurisdictional inquiry should be focused "upon whether the nature of the transaction was maritime". Id. In Kirby, the contract at issue involved the shipment of machinery from Sydney, Australia to Huntsville, Alabama. The machinery was damaged during the inland portion of the shipment when a train carrying the cargo derailed. The Kirby Court ultimately concluded

that whether a contract is subject to maritime jurisdiction depends on "whether it has reference to maritime service or maritime transactions." Id. at 24, *quoting* North Pacific S.S. Co. v. Hall Bros. Marine Ry. & Shipbuilding Co., 249 U.S. 119, 125 (1919), *citing* Insurance Co. v. Dunham, 78 U.S. 1 (1871).

Prior to the Kirby decision, the general rule of admiralty jurisdiction over contracts that involve both maritime and non-maritime elements was explained in Flota Maritime Browning de Cuba v. Snoble, 363 F.2d 733, 735 (4th Cir. 1966), *citing inter alia* Compagnie Francaise de Navigation a Vapeur v. Bonnasse, 19 F.2d 777, 779 (2d Cir. 1927):

> While the principle is one of general validity when the non-maritime elements of the contract are substantial and inseparable from the maritime elements, it has long been recognized that where the maritime elements of a contract are susceptible to separate adjudication admiralty jurisdiction may be exercised to that extent.

In the immediate aftermath of Kirby, scholarly debate questioned the continuing vitality of this "mixed contracts" doctrine, generally concluding that the doctrine's brief life had ended by the Kirby decision's "conceptual rather than spatial" approach, which either extends admiralty jurisdiction to the entire contract, or does not.[5] The Second Circuit agreed. In Folksamerica, the court reviewed its "threshold inquiry" test for maritime jurisdiction and questioned the validity of the mixed contracts doctrine post-Kirby. The

---

[5] *See, e.g.*, Marva Jo Wyatt, "COGSA Comes Ashore…And More: The Supreme Court Makes Inroads Promoting Uniformity and Maritime Commerce in Norfolk Southern Railway v. Kirby", 30 Tul.Mar.L.J. 101 (Winter/Summer 2006); David W. Robertson and Michael F. Sturley, "Recent Developments in Admiralty and Maritime Law at the National Level and in the Fifth and Eleventh Circuits", 30 Tul.Mar.L.J. 195 (Winter/Summer 2006); Attilio M. Costabel, "Himalaya Strain? – A Forensic Examination of Norfolk Southern Railway Co. v. James N. Kirby, Pty Ltd. and Doe v. Celebrity Cruises, Inc.", 29 Tul.Mar.L.J. 217 (Summer 2005).

threshold inquiry test requires that courts look at "whether an issue related to maritime interests has been raised." Folksamerica, 2005 A.M.C. at 1751, *quoting* Atlantic Mutual Ins. Co. v. Balfour MacLaine Int'l Ltd., 968 F.2d 196, 199 (2d Cir. 1992).[6]

It is important here not to confuse Centramet's duty to pay demurrage to the vessel owner pursuant to its own charter party contract (which is undoubtedly maritime in nature), with EASROC's duty to pay demurrage to GST, which is merely a floating price term in a sale and purchase contract for the scrap steel, which is not maritime in nature. The demurrage payment was to compensate GST for demurrage it might owe to vessel owning interests due to delays in discharge operations. Centramet has no direct claim of its own in indemnity or otherwise against EASROC for demurrage, and instead, Centramet's claim against EASROC stems from the assignment of GST's claim. GST's claim against EASROC – to the extent it has one, which is denied – is not maritime.

A contract for the sale of a commodity (here, scrap steel) is not a maritime contract, even if it requires delivery by sea. To hold otherwise would impermissibly extend the admiralty jurisdiction of the district courts to every sales contract that included an ocean transport component.[7] The reading of Kirby urged by Centramet is illogical and improper and disregards the context in which Kirby was decided. Kirby was a case in

---

[6] Inasmuch as Centramet argues that Flota, as a mixed contract doctrine case, overruled French Republic v. Fahey, 278 F. 947 (D.MD. 11922), and insofar as the mixed contract doctrine has now been nullified by the Supreme Court in Kirby, French Republic is good law once again.

[7] Under Centramet's theory, any sales contract where the seller is responsible to ship the goods to the buyer would necessarily invoke maritime jurisdiction (*i.e.*, CIF terms would be maritime because they involve the payment of "freight"; FOB terms would be maritime because they necessarily involve placement of cargo "on board"; and door to door terms would be maritime if part of the transportation is by sea). Under Centramet's theory, it would seem that only in a FAS ("free along side") sales contract would there be no maritime component since the buyer would be responsible for the ocean transportation.

which the manufacturer of a piece of machinery contracted with a shipping line to transport the machine, which had been purchased under a separate sales contract with a non-party buyer. Here, the underlying contract is for the sale and purchase of a commodity, which is not a maritime contract. This case is on all fours with Aston Agro-Industrial AG v. Star Grain Ltd., 2006 U.S. Dist. LEXIS 91636 (S.D.N.Y. Dec. 20, 2006), which held that where the requirement to pay demurrage is merely a price term in a contract for the sale and purchase of a commodity, a claim for the payment of demurrage does not invoke the maritime jurisdiction of the Court. Based on strikingly similar facts, this Court should find Star Grain persuasive and should vacate the attachment.

### (i)   *Star Grain* is Not Distinguishable

If anything, Star Grain presented a better case than the instant one for extending maritime jurisdiction to a claim for unpaid demurrage under a sale and purchase contract. Centramet attempts to distinguish Star Grain based on what Centramet argues are different facts, but makes such argument without any reference to the actual facts in Star Grain and instead makes a number of incorrect assumptions. In Star Grain, the defendant agreed to purchase a quantity of wheat,[8] and the contracts at issue plainly required Star Grain to pay demurrage to the plaintiff. The contracts contained a substantial number of other maritime terms which imposed various maritime obligations on Aston Agro-Industrial, as set forth more specifically in the accompanying Kahn Affirmation.

In all, approximately half of the contracts' terms and verbiage concerned matters that dealt exclusively with maritime transportation, which would have seemed to impute

---

[8] Copies of the two contracts at issue in Star Grain are attached as Ex. ___ to the accompanying Kahn Affirmation.

that transportation was a primary focus of the contracts. Nonetheless, in Star Grain, the Court held that these contracts were nothing more than for the sale and purchase of a commodity and that the claim for demurrage did not invoke the Court's maritime subject matter jurisdiction.

Centramet also argues that "[s]etting the instant matter and the Star Grain decision even further apart is the key distinction that the buyer's liability for demurrage in Star Grain could be determined without reference to the charter party."[9] This argument is entirely false. Demurrage in Star Grain was not determinable without reference to the charter party: the contracts in Star Grain both provided, "the charter party rate for demurrage and dispatch shall be declared upon official vessel nomination...." For all practical purposes, the Star Grain contracts and the GST-EASROC contract are the same in this regard.[10]

Centramet also attempts to distinguish Star Grain by stating that the nature of the attachment was different, claiming that in Star Grain the plaintiff was seeking to attach funds pursuant to an arbitration award that awarded the plaintiff damages based on the purchase price, while the instant matter concerns only a claim for demurrage. Centramet again is completely incorrect. Just as is the case here, in Star Grain, the plaintiff sought to attach in favor of a claim solely for unpaid demurrage. Kahn Affidavit ¶14. The only difference in this regard between the two cases was that in Star Grain, an arbitration

---

[9] Centramet Brief at 18.

[10] Centramet also attempts to distinguish Star Grain by arguing that in Star Grain, the demurrage had not been paid. This, however, is not true. In Star Grain, the underlying arbitral award (which had already been rendered against Star Grain) simply did not state one way or another whether the demurrage had or had not been paid. This factual question, however, has little bearing on the Star Grain Court's ultimate determination that it lacked maritime subject matter jurisdiction.

award granting Aston Agro-Industrial its claimed demurrage had already been awarded, while here the arbitration has only just commenced. This is a distinction without a difference.

In sum, facing a case like Star Grain which is in all important respects identical to the situation before the Court in the instant matter, Centramet attempts to set up distinctions that are entirely fictitious. This Court should find that the facts in Star Grain are in all material aspects the same and should accordingly be guided by Star Grain and should vacate the attachment. Such a ruling would be entirely consistent with the Supreme Court's decision in Kirby given that decision's finding that the presence or absence of maritime jurisdiction is to be based on a conceptual, rather than a spatial, approach. Here, the only contract to which EASROC is a party is not maritime in concept or scope – it is merely a contract for the sale and purchase of a commodity which contained a delivery term and required EASROC to pay an additional amount (demurrage) if the discharge took longer than anticipated.

### CENTRAMET'S ARGUMENT "ONCE ON DEMURRAGE ALWAYS ON DEMURRAGE" IS ENTIRELY MISLEADING

Centramet uses the expression, "once on demurrage, always on demurrage" to argue that virtually all the time the vessel was in Egypt should count as demurrage. Centramet's argument, however, is extremely misleading because it conflates the two contracts at issue here, treating them as one.

Centramet entered into a charter party contract with the vessel's owner. The charter party required Centramet to pay demurrage both at the load port and at the discharge port subject to certain free time. In this relationship, the expression, "once on demurrage, always on demurrage," governs.

NYDOCS1/290816.1                                    9

EASROC, on the other hand, was liable for demurrage to GST, if any, only pursuant to the sale and purchase agreement, and – clearly from the contract – only for demurrage at the discharge port. EASROC's demurrage debt, if any, is therefore calculated on a different basis. Once the vessel arrived at Egypt, it discharged for only a few hours before the master improperly (given the L/C) halted the operation, and a dispute arose regarding the quality of the cargo. This dispute lasted through much of August, and GST, through Mr. Terebov, agreed that all time lost was for GST's account (*i.e.*, as between EASROC and GST, demurrage had not yet commenced even though the vessel had been at port for about a month).

As discharge was about to re-commence, GST's agent questioned whether EASROC should have a further 9 days of freetime to discharge the cargo, and Mr. Terebov again responded that all time lost was for GST's account. This exchange makes it clear that all time lost – both before and after discharge commenced again – was for GST's account based on the settlement agreement reached between EASROC and GST.

Even if this position is not accepted, though, EASROC should have had at least 9 days to discharge the vessel once discharge operations re-commenced, since it was prevented from using its permitted free time when the master refused to permit further discharge in early August, and, insofar as the relationship between EASROC and GST is concerned, the vessel was not yet "on demurrage" at that time. Centramet's argument to the contrary is misleading and incorrect and should be disregarded.

## **CONCLUSION**

For all the foregoing reasons, the attachment should be vacated and this Court should grant defendant EASROC such other, further and different relief, including but

not limited to dismissal of the action and/or attorneys fees and costs as this Court may deem just and proper in the premises.

Dated: New York, New York
September 25, 2007

Respectfully submitted,

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Defendant
Egyptian American Steel Rolling Company

By: _____
Michael E. Unger (MU 0045)
Lawrence J. Kahn (LK 5215)
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 fax